UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| OLIVER UDEMBA ) | **05 - 11161 RGS** |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| v. ) | RECEIPT # CA742 |
| ) | AMOUNT $ 250.00 |
| CUMBERLAND FARMS, INC. ) | SUMMONS ISSUED 2 |
| AND EMILE C. TAYEH ) | LOCAL RULE 4.1 |
| Defendant. ) | WAIVER FORM |
| ) | MCF ISSUED |
| | BY DPTY. CLK. D.P. |
| | DATE 6/6/05 |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

MAGISTRATE JUDGE JS

### Introduction

Plaintiff Oliver Udemba hereinafter ("Mr. Udemba") files this civil action for money damages against his employer Defendant Cumberland Farms, Inc., and (hereinafter "CFI") and supervisor,Emile C. Tayeh ("Mr. Tayeh") alleging claims of unlawful discrimination on the basis of Mr. Udemba's race (black) in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C.§ 2000e-2 and the Massachusetts anti-discrimination statute, M.G.L. c. 151B, § 4(1).

### Jurisdiction

1. Jurisdiction of this action arises under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-2, et seq.

### Venue

2. Venue is proper in this court as this is the judicial district in which the defendant does business and in which the relevant events occurred.

## Parties

3.      Plaintiff Oliver Udemba (hereinafter "Mr. Udemba") is an individual residing in Framingham, Middlesex County, Massachusetts.

4.      Defendant Cumberland Farms Inc. (hereinafter "CFI") is a corporation duly organized pursuant to the laws of the state of Delaware with a principal place of business at 777 Dedham Street Canton, MA.

5.      Emile C. Tayeh who resides at 65 Bryant Street Plymouth County West Bridgewater, MA is employed as Chief of Environmental Affairs and Vice President of Construction at Cumberland Farms, Inc.

## Factual Allegations

6.      On or about May 20, 1991, CFI hired Mr. Udemba, who is black and from Nigeria, to work as a Project Manager in its newly-created Environmental Affairs Department.

7.      At the time of hiring, although designated by CFI as a Project Manager, Mr. Udemba actually performed the duties of an environmental engineer which included providing expertise to CFI in the identification and clean-up of hazardous waste sites in six New England states as well as guiding CFI in its compliance with environmental regulatory obligations.

8.      At the time of his hiring, Mr. Udemba had a Bachelor of Science degree in Petroleum Engineering from the University of Kansas and other advanced certificates in environmental and water resources management as well as ten years of post-qualification experience.

9.      Citing financial difficulties at the time of Mr. Udemba's hiring in 1991, CFI

2

offered Mr. Udemba a starting salary of $23,000 per annum - a salary substantially below that of an environmental engineer with Mr. Udemba's experience and educational background.

10.    During Mr. Udemba's interview and in recognition of the low salary offered, Emile Tayeh ("Mr. Tayeh"), the head of the newly created Environmental Affairs Department, and Ms. Colleen Cessarini ("Ms. Cessarini"), the Human Resources Manager, assured Mr. Udemba there would be many opportunities for advancement given that the Environmental Affairs Department was a new department.

11.    Shortly, after Mr. Udemba began working at CFI, he was also assigned to work on projects located at dealerships and independent franchises of Gulf Oil Company ("Gulf"), a separate corporation but wholly owned subsidiary of CFI. During his interview, Mr. Udemba was not apprised that he would be performing work for Gulf in addition to CFI.

12.    Because of Mr. Udemba's experience and educational background, he was and continues to be assigned the most difficult tasks, especially those requiring technical skill and acumen in the field of environmental engineering.

13.    Since his employment in 1991 to the present date, Mr. Udemba has made significant contributions to CFI and has consistently received performance evaluations rating his work as "good" "outstanding" or "superior."

14.    In December 1993, Mr. Tayeh was promoted to Vice President of the Environmental Affairs Department for CFI.

15.    Upon his appointment as Vice President of Environment Affairs, Mr. Tayeh promoted Andrew Beland ("Mr. Beland"), who is white, to the position of supervising

3

Project Manager of the Environmental Affairs Department.  Mr. Beland was another engineer who had been transferred into the Environmental Affairs Department.

16.    Mr. Beland supervised and completed performance evaluations  of Mr. Udemba and as well as others within the Environmental Affairs Department.

17.    In May 1993, Mr. Udemba received an unexpected pay raise which increased his salary to $25,000 per annum. Mr. Tayeh took credit for the increase  and further stated how difficult it had been to obtain the raise for him.

18.    Mr. Udemba was advised that he received the pay raise because he was promoted to a senior position.  No formal announcement was made to reflect Mr. Udemba's promotion.

19.    On or about October 2003, Mr. Udemba discovered that representations linking his pay raise to a promotion were false and that the raise was actually due to a general wage increase implemented by Human Resources.

20.    More specifically, on October 1, 2003, Mr. Udemba discovered a document dated October 1, 1992 drafted by the Vice President of Human Resources, Foster Macrides ("Mr. Macrides"), addressed to "All Department Heads" announcing "…the lifting of the wage freeze, a general wage increase and more."

21.    Mr. Udemba was not provided with a copy of this letter in October 1992 as it was addressed to "heads of departments."

22.    Thus, in October 2003, Mr. Udemba  discovered that he did not receive a promotion to the position of Senior Project Manager in 1993.    Rather, he had merely received the wage increase as had every other CFI employee resulting from the  lifting of the wage freeze.

4

23.    In December 1994, the supervising Senior Project Manager, Mr. Beland, left his position.    Mr. Udemba approached Mr. Tayeh about the possibility of filling in Mr. Beland's position.    Mr. Tayeh immediately dismissed Mr. Udemba as a candidate for the position and told him that, "the construction and other departments of the company would not accept you."    Mr. Tayeh made these comments because Mr. Udemba is a black African and the construction department and other departments at the time were predominantly white.

24.    In response to Mr. Udemba stated, " If President Bill Clinton felt that way about Colin Powell, he could not have become the Chairman of the Joint Chief of Staff."  Mr. Tayeh did not refute Mr. Udemba's analogy.

25.    As he had been denied a promotion on the basis of his race, Mr. Udemba went to Ms. Cessarini in human resources and reiterated Mr. Tayeh's comments as well as the Powell analogy.  During his conversation with Ms. Cessarini, Mr. Udemba made it clear that he believed the statements were motivated by discriminatory animus.

26.    Ms. Cessarini immediately arranged a meeting between Mr. Udemba and Mr. Tayeh.  Mr. Udemba reiterated Mr. Tayeh's racially charged comments.  Mr. Tayeh in turn apologized and further stated that he had not made a final decision on filling the position.

27.    In 1995, Mr. Tayeh hired Loraine Higgins ("Ms. Higgins") as an office supervisor and placed her in the office vacated by  Mr. Beland.  As time progressed, Ms. Higgins began issuing directives to Mr. Udemba, and even completed a performance evaluation of Mr. Udemba and signed the evaluation as the "supervisor" of Mr. Udemba.

28.     Mr. Udemba was particularly aggrieved at the fact that Ms. Higgins' role of completing a written evaluation given that she had no educational background or prior experience in environmental affairs to adequately supervise Mr. Udemba's work activities.

29.     Further discriminatory animus was demonstrated against Mr. Udemba with respect to other white individuals who were trained by Mr. Udemba and then promoted to supervisory positions over Mr. Udemba.

30.     For example, Mr. Udemba trained Kevin McCabe ("Mr. McCabe"), who joined CFI's Environmental Affairs Department in 1994, having just left university. Unlike Mr. Udemba, Mr. McCabe did not have an engineering degree, nor did he have an engineering background.

31.     Notwithstanding his lack of engineering experience, Mr. McCabe became Mr. Udemba's superior issuing directives and earning a higher rate of compensation even though he performed less than 10% of the duties performed by Mr. Udemba.

32.     On August 26, 1997, upon successfully passing a written examination Mr. Udemba became a Licensed Site Professional (LSP), which is an environmental scientist or engineer experienced in the clean up of oil and hazardous contamination.

33.     An LSP is required to have a degree in engineering, geology, hydrogeology or related science and greater than 8 years experience in investigation and remediation of contamination of soil and ground water.

34.     An LSP's duties include directing professional staff; final review of project documents; expert testimony; evaluation and approval of new technological innovations;

6

certification of Department of Environmental Protection (DEP) documents; and rendering professional opinions.

35.    Since obtaining his license as an LSP, Mr. Udemba has provided all in-house LSP services for CFI in addition to performing his duties as a Project Manager because he is the only LSP at CFI. As in-house LSP, Mr. Udemba provides 24-hour on-call coverage and supervises the work of other LSP's working as consultants for CFI and Gulf. Also, as in-house LSP, Mr. Udemba supervises the work of professionals, engineers, geologists, biologists, ecologists, environmental scientists, industrial hygienists, chemists, etc., that work on hundreds of projects managed by Mr. Udemba.

36.    Mr. Udemba's services as an LSP are invaluable. In fact, in recognition of the need for LSPs at CFI, Mr. Tayeh has unsuccessfully took the LSP examination on two separate occasions to obtain his LSP license.

37.    When Mr. McCabe left CFI in 1997, Mr. Udemba expected that he would be promoted to supervising project manager of the environmental affairs department. Such expectations, however, were to no avail.    Rather, than accord Mr. Udemba any promotion, Mr. Tayeh has promoted individuals to the same position as Udemba who have significantly less qualifications.

38.    In 1999, Richard Longton ("Mr. Longton"), Vice President of the Construction Department retired. At that time and presently, Mr. Udemba was the most qualified and experienced employee who performed the most complex tasks in the Environmental Department and certainly the only LSP. Mr. Udemba was deeply disappointed to learn that Mr. Tayeh was promoted to the position of Vice President of Construction and Vice

President of Environmental Affairs rather than appoint Mr. Udemba as head of Environmental Affairs.

39.    Mr. Udemba's workload increased, but he did not receive a promotion even to a supervisory position as senior Project Manager of the Environmental Department.

40.    In 2000, Angela Pimental, with only a high school diploma, joined CFI's Environmental Affairs Department as an assistant to Mr. Udemba.    By 2003, she was promoted to the same position as Mr. Udemba and now exercises more supervisory responsibility than Mr. Udemba.

41.    Furthermore, upon the merger of the construction and environmental departments Ms. Higgins exercised more supervisory control over the Environmental Department issuing directives to Mr. Udemba.

42.    In 2002, Ms. Higgins resigned and rather than appoint Mr. Udemba, Mr. Tayeh assigned Muriel Tyler ("Ms. Tyler"), an Office Manager and former secretary to Mr. Longton, to supervise over the environmental affairs department.

43.    Ms. Tyler immediately began to rudely order Mr. Udemba  around.  She further advised Mr. Udemba that he was a Project Engineer just like everyone else and that no one had advised her that he was a Senior Project Manager.  When Mr. Udemba related these events to Mr. Tayeh, he stated, "If you do not like the way you are treated you should quit."  A statement evidencing his approval of Ms. Tyler's exercise of authority over Mr. Udemba.

44.    In September 2003, CFI announced that Mr. Tayeh was promoted to the position Vice President of Construction and Chief of Environmental Affairs.

8

45.     On October 7, 2003, CFI prepared a flow chart describing the organizational structure of the Construction and Environmental Affairs Department.

46.     Within the Construction and Environmental Affairs Department there are four (4) divisions: the Environmental Engineers, Office Manager, Director of Construction, and the Project Manager of the UST (Underground Storage Tanks).

47.     According to the organizational chart, Peter Lehtola is designated as the Director of Construction, who supervises a construction supervisor and several project managers.

48.     The organization chart indicates that Richie Fizoli is designated as Project Manager of the Underground Storage Tank division.  Mr. Fizoli supervises a spill coordinator and two UST coordinators.

49.     Muriel Tyler is denoted in the organizational chart as the Office Manager with supervisory authority over several administrative clerks, which include the construction coordinator, an expense coordinator, and three AP coordinators.

50.     Importantly, the organizational chart indicates a vacancy in the position of the Environmental Engineer in the environmental affairs division.

51.     Mr. Udemba and Angela Pimental are denoted on the flow chart as Senior Project Engineers within the Environmental Affairs Department below the Environmental Engineer position. Significantly, Mr. Udemba and Ms. Pimental share the same title even though Ms. Pimental's credentials pale in comparison to those of Mr. Udemba. Furthermore, Ms. Pimental enjoyed a rather rapid series of promotion to attain the position of Senior Project Engineer.

52.    The organizational chart created in October 2003 shows discriminatory animus on the part of Mr. Tayeh given that he elected to leave the supervisory Environmental Engineer position vacant rather than promote Mr. Udemba.

53.    Mr. Udemba is the only employee at CFI qualified to fill the position designated on the flow chart as an "Environmental Engineer." In fact, on business cards issued by CFI between the years of 1991 – 1993, Mr. Udemba is identified as an "Environmental Engineer" for CFI and Gulf.

54.    Furthermore, as the only LSP at CFI, Mr. Udemba retains legal responsibility for technical oversight of environmental issues arising at CFI.

55.    Thus, Mr. Udemba's designation in the organizational chart as a "Senior Project Engineer" is a demotion from the position of "Environmental Engineer" that Mr. Udemba held between 1991-1993.

56.    Notwithstanding Mr. Udemba's status as an LSP and his seniority, other junior and less qualified employees to date continue to exercise supervisory capacity over Mr. Udemba, who performs functions of an environmental engineer requiring a technical expertise.

57.    Mr. Tayeh's failure to promote Mr. Udemba to the Environmental Engineer position in October 2003 demonstrates discriminatory animus given that when Mr. Tayeh was solely responsible for the Environmental Affairs Department he promoted individuals such as Andrew Beland and Kevin McCabe to assist him with the operation of the environmental affairs department.

58.    To assist him with the performance of his job, Mr. Udemba has requested the use of a company car, a cellular phone and internet access at home. Mr. Udemba requested

10

the car because his job requires him to visit numerous sites throughout Massachusetts and Connecticut.  Mr. Tayeh refused to provide Mr. Udemba with a car, a cellular phone and internet access at home.

59.    Importantly, Mr. Tayeh permitted Andrew Beland to use a company car when he occupied the position supervising Project Manager.    Mr. Udemba's current position requires substantially more travel than Mr. Beland, and therefore use of a company car and cellular phone is appropriate.

60.    On numerous occasions, Mr. Udemba approached Mr. Tayeh about CFI's discriminatory practices and its failure to adequately compensate him for his services as an LSP.

61.    In response to Mr. Udemba's inquiries, sometime in November 2003, Mr. Tayeh suggested that he would contact human resources to conduct market survey to assess whether Mr. Udemba's rate of compensation  was commensurate with someone of his skill set.  Mr. Tayeh failed to request the human resources department to complete a market salary analysis for Mr. Udemba.

62.    In November 2003, Mr. Tayeh suggested that he would request a substantial bonus of $10,000 - $15,000 to recognize Mr. Udemba's accomplishments.  When Mr. Udemba, however, followed up Mr. Tayeh's offer of a bonus, Mr. Tayeh repeatedly told Mr. Udemba that he was looking into the matter.

63.    Mr. Tayeh also suggested that Mr. Udemba consider taking a position as an LSP consultant to CFI which would allow Mr. Udemba to make substantially more than his present salary Mr. Tayeh told Udemba that LSP consultants earn as much as $275,000 per year.  When Mr. Udemba requested a contract, Mr. Tayeh refused.  Mr. Udemba was

confounded by Mr. Tayeh's refusal to offer him an LSP consulting contract given that many LSP consultants, who are white, have contracts with CFI.

64.    Throughout his tenure at CFI, Mr. Udemba has been continuously subjected to disparate treatment in the terms and conditions of his employment from that of his white counterparts.

65.    Mr. Udemba has been repeatedly denied promotions or passed over for promotions despite his outstanding credentials and the fact that as an LSP he is ultimately responsible under Massachusetts law for the technical aspects of environmental remediation efforts at CFI.

66.    Mr. Tayeh's discriminatory animus has reached a point to where has left a position vacant rather than accord Mr. Udemba the promotion and the respect that he has earned after providing almost 14 years of service to CFI.

67.    Notwithstanding Mr. Udemba's credentials, Mr. Tayeh has seen fit to expeditiously promote white individuals to supervisory positions with substantially less credentials that Mr. Udemba.

68.    Mr. Tayeh has failed to recognize Mr. Udemba's value as an LSP and has substantially underpaid Mr. Udemba.

69.    Mr. Tayeh has refused to offer Mr. Udemba a contract to work as an LSP consultant.

70.    Mr. Tayeh has even refused to provide Mr. Udemba with the appropriate tools, which include a company car and cell phone to perform his job. Yet, Mr.Tayeh gladly provided a car and cell phone to white individuals who had less responsibility than Mr. Udemba.

71.    The actions of defendants were intentional, malicious and/or done with reckless indifference to Mr. Udemba's rights.

72.    Mr. Udemba has been injured and has suffered financial as well as severe emotional injury as a result of the discriminatory acts of the Defendants.

73.    Mr. Udemba has complied with all statutory requirements and conditions precedent necessary to maintain this action by filing a timely charge on December 16, 2003 with the MCAD and the EEOC.

74.    On January 25, 2005 the EEOC found probable cause to believe that Mr. Udemba had, in fact, suffered discrimination on the basis of race

## COUNT I- DISCRIMINATION BASED ON RACE
### (Violation of 42 U.S.C., § 2000e-2)

75.    Mr. Udemba repeats the allegations contained in paragraph 1 through 74 as if fully set forth herein.

76.    Mr. Udemba is a member of a protected group in that he black.

77.    The conduct of Defendants represents, inter alia, intentional violations of 42 U.S.C.§ 2000e-2.

## COUNT II- DISCRIMINATION BASED ON RACE
### (Violation of M.G.L. C. 151B, § 4(1))

78.    Mr. Udemba repeats the allegations contained in paragraph 1 through 77 as if fully set forth herein.

79.    Mr. Udemba is a member of a protected group in that he black.

80.    The conduct of Defendants represents, inter alia, intentional violations of M.G.L. c. 151B, § 4(1)).

13

## RELIEF SOUGHT

WHEREFORE, Mr. Udemba prays that this Honorable Court:

1. Enter judgment against Defendants on Count I for compensatory damages, punitive damages, reasonable attorney's fees, interest and costs.

2. Enter judgment against Defendants on Count II for compensatory damages, punitive damages, reasonable attorney's fees, interest and costs and

3. Enter such other and further relief as the Honorable Court may deem just and necessary.

**THE PLAINTIFF OLIVER UDEMBA REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Oliver Udemba
Plaintiff
By His Attorney

Aderonke O. Lipede
BBO # 567431
105 Union Wharf
Boston, MA 02109
(617) 742-9424

Date: June 3, 2005

14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) Oliver Udemba v Cumberland
   FARMS, Inc

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   ___ I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   X II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121
      740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

   ___ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
      315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
      380, 385, 450, 891.

   ___ IV. 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
      690, 810, 861-865, 870, 871, 875, 900.

   ___ V. 150, 152, 153.

   **05 - 11161 RGS**

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   None

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☒    NO ☐

   A. If yes, in which division do all of the non-governmental parties reside?

      Eastern Division ☒    Central Division ☐    Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

      Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ADERONKE  LIPEDE
ADDRESS 105 Union Wharf  Boston, MA 02109
TELEPHONE NO. (617) 742 - 9424

(CategoryForm.wpd -5/2/05)

◥JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Oliver Udemba

## DEFENDANTS
Cumberland Farms, Inc.
Emile C. Tayeh

**(b)** County of Residence of First Listed Plaintiff   Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Norfolk
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Aderonke L. Ipede
195 Union Wharf
Boston, MA 02109   (617) 742-9424

Attorneys (If Known)

# 05 1161 RGS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C § 2000 e-2

Brief description of cause:
Employment discrimination on the basis of race

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE

DOCKET NUMBER

DATE
June 3, 2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE