UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                    )
                                 )
                Plaintiff,       )
        v.                       )        CIVIL ACTION NO:  05CV 11161 RGS
                                 )
CUMBERLAND FARMS, INC.           )
AND EMILE C. TAYEH,              )
                                 )
                Defendant.       )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM

Pursuant to Fed.R.Civ.P. 56 and LR 7.1 and 56.1, Defendants Cumberland Farms, Inc.

("the Company" or "CFI") and Emile Tayeh ("Tayeh") move for summary judgment dismissing

the complaint, on the grounds that there are no genuine issues of material fact and they are

entitled to judgment as a matter of law.

### PRELIMINARY STATEMENT

In this lawsuit, Plaintiff Oliver Udemba ("Udemba") asserts that his employer and his

supervisor violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII")

and the Massachusetts Fair Employment Practices Act, MGL c.151B, § 4 (Chapter 151B), by

discriminating against him on the basis of race over a period of fifteen years.  The Company

served interrogatories and requests for production of documents on Udemba,[1] and took his

deposition.  Udemba has served no written discovery and taken no depositions in this case, and

the deadline for completion of non-expert discovery was May 28, 2006.

---

[1] Udemba failed to serve responses to the Company's requests for production of documents until after the Company moved for and was granted an order compelling discovery, and he did not serve answers to the Company's interrogatories until after the Company filed a second motion to compel discovery.

1

## UNDISPUTED FACTS

Pursuant to Fed.R.Civ.P. 56 and LR 56.1, Defendants have submitted a statement of material facts as to which there is no genuine dispute ("DSMF"), supported by references to the transcript of Udemba's deposition, the pleadings, exhibits and affidavits.  A description of the parties and of Udemba's claims is set forth below.  Additional undisputed facts are referred to in the course of the Argument, as they become relevant to the analysis of Udemba's claims.

### A.    Defendant Cumberland Farms, Inc.

The Company is a Delaware corporation with its principal office and place of business at 777 Dedham St., Canton, MA ("Canton office" or "Canton").  DSMF, ¶ 1.  For over 30 years, the Company has operated convenience stores in many of the New England and mid-Atlantic states and Florida.  *Id.,* ¶ 2.

### B.    Defendant Emile Tayeh.

Tayeh has worked for the Company since December 17, 1990, and he has had overall responsibility for the Company's compliance with federal and state environmental laws in the states where the Company operates since the time he was hired.  *Id.,* ¶ 6.  Tayeh was made Vice President ("VP") of Environmental Affairs on December 12, 1993.  *Id.,* ¶ 31.  He is Lebanese by birth.  *Id.,* ¶ 7.

### C.    Plaintiff Oliver Udemba.

Udemba, who is black and from Nigeria, was hired by Tayeh as a Project Manager in the Company's Environmental Affairs Department on May 20, 1991, and he has worked for the Company continuously since then.  *Id.,* ¶¶ 13, 14.

**D.     The Company's Environmental Work.**

The Company sells gasoline and/or diesel fuel (collectively, "gas") at retail to the general public, through its own stores, and also sells gas at wholesale to dealers who resell it at retail to the general public. *Id.,* ¶ 3. The gas sold at the Company's stores is kept in underground storage tanks at those locations. It is delivered to the stores by means of tanker trucks, many of which are owned and operated by the Company. The tankers are loaded with gas at storage terminals which (until December 30, 1993) were operated by the Company as part of its Gulf Oil division. *Id.,* ¶ 4.

The storage, handling and transportation of gasoline and other petroleum products are subject to regulation by state and federal environmental agencies under applicable state, local and federal environmental laws and regulations. *Id.,* ¶ 5. Since the time Tayeh was hired, the Company has relied upon outside contractors who specialize in environmental work ("consultants") to investigate and assess its environmental compliance and remediation needs at the various sites which it owns, controls and/or operates, and to design and implement solutions for environmental compliance and remediation at those sites. *Id.,* ¶ 8. The Company relies upon its own employees to oversee the work of these consultants. *Id.*

**E.     Andrew Beland.**

Andrew Beland ("Beland") was hired in 1989 to work in the Company's Gulf Oil Division, where he was responsible for overseeing compliance with federal and state environmental laws in the operation of the Company's petroleum storage terminals. DSMF, ¶ 10. He retained this responsibility in March of 1991 when he was brought into the newly formed Environmental Affairs Department. *Id.,* ¶¶ 11, 12. On December 13, 1992, Beland was promoted to Project Management Supervisor. In that position, Beland had supervision over

Udemba and from three to five other employees in the Environmental Affairs Department. *Id.,* ¶ 23. On December 30, 1993, the Company transferred certain assets, including its petroleum storage terminals, to a newly formed limited partnership, named "Gulf LP." *Id.,* ¶ 33. Beland quit the Company on December 1, 1994, and went to work for Gulf LP. *Id.*, ¶ 35.

### F.    Udemba's Charge Of Discrimination.

Udemba filed a charge of discrimination against the Defendants with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD") On December 16, 2003. *Id.*, ¶ 74.

### G.    Udemba's Claims

In his Complaint, Udemba alleges:

- That his promotion to senior project manager in 1993 was a sham (Complaint, ¶¶ 17-22;

- That he was denied promotion to a supervisory position in the Environmental Affairs Department that was vacated by Andrew Beland in 1994, because of his race (Complaint, ¶¶ 23-26);

- That white co-workers in the Environmental Affairs Department whom he trained were promoted to supervisory positions over him (Complaint, ¶¶ 29-31);

- That a white co-worker in the Environmental Affairs Department with less responsibilities was more highly compensated than he was, and that the Company failed to adequately compensate him, because of his race (Complaint, ¶¶ 31-36, 54, 60, 63, 65, 68, 69);

- That he was denied a Company car, cell phone and internet access because of his race (Complaint, ¶¶ 58, 59 and 70); and

- That he was subjected to demeaning behavior at work (Complaint, ¶¶ 27 and 43).

## SUMMARY OF ARGUMENT

1.      There is no direct evidence that the Company discriminated against Udemba because of his race, and the circumstantial evidence that Udemba relies upon amounts to nothing

more than speculation. Accordingly, Udemba has failed to make out a *prima facie* case of unlawful discrimination under either Title VII or Chapter 151B.  Moreover, the Company has articulated lawful reasons for each of the actions Udemba complains of, and there is no evidence that the reasons advanced by the Company are a pretext for discrimination.

2.     Title VII does not impose liability upon an individual supervisor.  Although a supervisor may be liable for "aiding and abetting" unlawful discrimination under Chapter 151B, there is no evidence that Tayeh "had the requisite intent to discriminate" against Udemba, because of his race.  Accordingly, Udemba's claims against Tayeh must be dismissed.

3.     Udemba has failed to identify a specific act of discrimination that occurred within 300 days before he filed a charge of discrimination against the Defendants with the EEOC and MCAD.  Accordingly, all of his claims of unlawful discrimination are time-barred, under both Title VII and Chapter 151B.

### ARGUMENT

## I.     APPLICABLE LEGAL STANDARDS.

### A.     Standard For Summary Judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Once the moving party avers the absence of genuine issues of material fact, the party opposing the motion "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  Summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation.  *Ingram v. Brink's, Inc.* 414 F.3d 222 (1st Cir. 2005); *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.

1990); *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1ˢᵗ Cir.1991) ("[n]ot every discrepancy in

the proof is enough to forestall a properly supported motion for summary judgment;  the

disagreement must relate to some genuine issue of material fact").  Summary judgment, when

appropriate, may be entered even where the outcome depends upon motive and intent, as in the

employment discrimination context. *Id.*; *Quinones v. Houser Buick,* 436 F.3d 284, 289 (1ˢᵗ Cir.

2006).

### B.      Standard Generally Applicable To Discrimination Claims Under Title VII and MGL c.151B.

In *Quinones*, the First Circuit explained that employment discrimination cases alleging

disparate treatment ordinarily proceed under the three-step, burden-shifting framework outlined

in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), *Texas Dep't of Community Affairs*

*v. Burdine,* 450 U.S. 248 (1981), *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993), and

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000):

> First, the plaintiff must make out a prima facie case of discrimination.  The
> burden then shifts to the defendant to present a legitimate, non-discriminatory
> reason, sufficient to raise a genuine issue of material fact as to whether it
> discriminated against the employee, for the employment decision.  Finally, the
> burden is placed on the plaintiff to demonstrate that the non-discriminatory
> reason is mere pretext and that the real reason was discrimination.  *McDonnell*
> *Douglas,* 411 U.S. at 802, 93 S.Ct. 1817;  *see also St. Mary's Honor Ctr.,* 509
> U.S. at 510-11, 515-16, 113 S.Ct. 2742.

436 F.3d at 289.  The Court observed that this analysis applies generally to claims under both

Title VII and its Massachusetts analogue, MGL c.151B.  *Id.,* at n.1 (citing *Fite v. Digital Equip.*

*Corp.,* 232 F.3d 3, 7 (1ˢᵗ Cir.2000)).

Where the plaintiff alleges that he was denied a promotion because of unlawful

discrimination, the elements of his *prima facie* case are:

> that the plaintiff (i) is a member of a protected class who (ii) was qualified for an
> open position for which she applied, but (iii) was rejected (iv) in favor of

someone possessing similar qualifications. *Gu v. Boston Police Dep't,* 312 F.3d
6, 11 (1st Cir. 2002).

*Rathbun v. Autozone, Inc.,* 361 F.3d 62, 71 (1st Cir. 2004).

Assuming that a plaintiff has established a *prima facie* case of discrimination, and that

the employer has articulated lawful reasons for its actions, in order to defeat a motion for

summary judgment the plaintiff must produce evidence which demonstrates the existence of a

genuine issue of fact with respect to two points:  whether the employer's articulated reason for its

adverse action was a pretext and whether the real reason was unlawful discrimination.  He must

produce evidence to permit a reasonable jury to conclude both that he was subjected to disparate

treatment and that the difference in treatment was because of his race.  *Quinones,* 436 F.3d at

289-290.

     **C.**      **Applicable Statutes of Limitation.**

Both Title VII and Chapter 151B require that a charge of discrimination be filed within

300 days of the unlawful discrimination.  42 U.S.C. § 2000e-5(e)(1); G.L. c.151B, § 5.[2]  Under

both statutes, each discrete act of discrimination (e.g., termination or denial of promotion to a

particular job) is subject to this limitation period - and the fact that one discrete act falls within

the limitations period does not make the charge timely with respect to other discrete acts of

discrimination that fall outside the period.  *National R.R. Passenger Corp. v. Morgan,* 536 U.S.

101, 111-112 (2002); *Ocean Spray Cranberries v. Mass. Comm'n Against Discrimination,* 441

Mass. 632, 641, 808 N.E. 2d 257, 265-266 (Mass. 2004).

---

[2] In 2002, the Massachusetts Legislature amended c.151B to extend the limitations period from six months to 300
days.  St.2002, c. 223, § 1.

A claim of unlawful "hostile environment" harassment under Title VII *may* be based on conduct outside the limitations period, provided that such conduct is part of a pattern which includes at least one incident falling within the limitations period:

> In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*National R.R. Passenger Corp. v. Morgan,* 536 U.S. at 118.

Similarly, under Chapter 151B, conduct outside the limitations period may be actionable as part of a "continuing violation," if the plaintiff can prove (1) at least one discriminatory act within the limitations period, (2) that the discriminatory act which occurred within that period has a substantial relationship to the discriminatory acts outside that period, and (3) earlier violations outside the limitations period did not trigger the plaintiff's awareness of and duty to assert his rights, i.e., that plaintiff could not have formed a reasonable belief at the time the employment actions occurred that they were discriminatory. *Ocean Spray Cranberries,* 441 Mass. at 643, 808 N.E. 2d at 266-7.

## II.    UDEMBA'S CLAIM THAT HIS 1993 PROMOTION WAS A "SHAM" IS ENTIRELY WITHOUT EVIDENTIARY SUPPORT.

Udemba's first claim of discrimination is that the promotion he received in 1993 was nothing but a sham.  The Complaint alleges that:

> 17.    In May 1993, Mr. Udemba received an unexpected pay raise which increased his salary to $25,000 per annum.  Mr. Tayeh took credit for the increase and further stated how difficult it had been to obtain the raise for him.

> 18.    Mr. Udemba was advised that he received the pay raise because he was promoted to a senior position.  No formal announcement was made to reflect Mr. Udemba's promotion.

> 19.    On or about October 2003, Mr. Udemba discovered that representations linking his pay raise to a promotion were false and that the raise was actually due to a general wage increase implemented by Human Resources.

20.     More specifically, on October 1, 2003, Mr. Udemba discovered a document dated October 1, 1992 drafted by the Vice President of Human Resources, Foster Macrides ("Mr. Macrides"), addressed to "All Department Heads" announcing "... the lifting of the wage freeze, a general wage increase and more."

…

22.     Thus, in October 2003, Mr. Udemba discovered that he did not receive a promotion to the position of Senior Project Manager in 1993.   Rather, he had merely received the wage increase as had every other CFI employee resulting from the lifting of the wage freeze.

Complaint, ¶¶17-22.

The memo referred to in Paragraph 20 of the Complaint was identified at Udemba's deposition as the document bearing Bates stamp number 017 in Exhibit 4.[3]  It is a memo to department heads from Foster Macrides, Vice President of Human Resources, dated October 1, 1992, which announced the lifting of the wage freeze which had been imposed when the Company filed for bankruptcy, and an across-the-board wage increase of 3%.  DSMF, ¶¶ 19-21.

At his deposition Udemba was unable to explain how Macrides' October 1, *1992* memo had anything to do with the wage increase he received eight months later in May of *1993*.[4]

Q.  Is there anything in this document, Exhibit 4, Bates stamped No. 17, that refers to the increase that you received in May of 1993?

A.  Specifically, no.

Q.  How do you know that this memo dated October 1st, 1992 has anything to do with the increase you received in May of 1993?

A.  Because they happened at the same time that this, that this memo was implemented.

Q.  Mr. Udemba, I don't understand.  This document dated October 1st, 1992 is eight months before the wage increase you referred to in Paragraph 17 of your complaint.  What's the connection between this memo of October 1st, 1992 and the pay increase that you say you received in May of 1993?

A.  Actually, that it happened, this wage, this announcement, already the pay increase followed this announcement.  That's my connection.

---

[3] References to the exhibits identified at Udemba's deposition will be abbreviated as "Dep.Ex." followed by the exhibit number and the Bates stamp number, where applicable.  The word "Exhibit" appearing without the words "Udemba Deposition" preceding it should be ignored:  these separate "exhibit" designations were affixed when the documents were submitted to the EEOC during its investigation of Udemba's charge.

[4] In point of fact, Udemba's salary was increased on April, 1993, not in May of 1993.  DSMF ¶ 26.  The pay increase tied to his promotion to Senior Project Manager came on August 30, 1993.  DSMF, ¶ 29.

Q. By eight months?

A. Okay. Yes.

Q. Did anybody ever say to you this memo of October 1st, 1992 has some connection to the pay increase you received in May of 1993?

A. No.

Q. Do you have any other basis for assuming that this memo of October 1st, 1992 is somehow connected to the pay increase you received in May of 1993?

A. No.

Udemba deposition, May 7, 2006, Tr. 131-133.[5]

In fact, Udemba received five (5) salary increases between October 1, 1992 and October 1, 1993. DSMF, ¶¶ 22, 25, 26, 29 and 30. The raise Udemba received in August 1993 reflected both a merit increase and his promotion to senior project manager. DSMF, ¶¶ 27, 29. This information is set forth in a computer "profile" which is the second document Udemba relies upon to support his claim that his promotion to senior project manager was a sham. This profile identifies Udemba's job code as "621 engineer." Dep.Ex. 5, Bates #071. On August 21, 2003, Udemba sent Tayeh an e-mail which asked why this profile identified his job as "engineer." Dep.Ex. 4, Bates # 002. On August 29, 2003, Tayeh replied in an e-mail to Udemba (*Id.,* Bates # 004), to which Tayeh attached an e-mail he had received from Tracy Watts in the Company's Human Resources Department (*Id.,* Bates # 003). In her e-mail to Tayeh, Watts explained that the Company assigned every employee a job code, that it did not have a different job code for every job title, and that other senior project managers in the Environmental Affairs Department were assigned the same job code as Udemba ("621 engineer"). Watts also stated, "it is recognized that Oliver [Udemba] is a senior project manager and this is reflected within the

---

[5] Because no other depositions were taken, references to Udemba's deposition will be abbreviated to "Tr." followed by the volume number in boldface and the transcript page. Thus, the preceding reference would appear as "Tr. **2**:131-133."

company's organizational charts." *Id.*[6]  Udemba admits that he has no reason to believe that any of the statements Watts made in her e-mail to Tayeh were untrue.  Tr. **2**:140-142.  Watts' explanation is corroborated by the computer profiles of the other two senior project managers to whom Udemba compares himself, Kevin McCabe and Angela Pimental, which also display the job code "621 Engineer."  Dep.Ex. 5, Bates # 074 and 076.

Thus, there is not and never was even a scintilla of evidence to support Udemba's allegation that his promotion to senior project manager in 1993 was a sham.

## III.  UDEMBA WAS NOT DENIED A PROMOTION TO "SUPERVISING PROJECT MANAGER" BECAUSE OF HIS RACE.

Udemba's second claim in this case is that when Andrew Beland left the Company in 1994, he should have been promoted to the position of "supervising project manager" vacated by Beland.  Complaint, ¶¶ 23-26.  Udemba is *not* claiming that he should have been promoted to this position *instead* of Beland, in the first place.  DSMF, ¶ 24.

Udemba has no evidence that anyone else was promoted to the position of "supervising project manager" after Beland left.  Tr. **2:**56.  He claims that the Company deliberately left the position vacant, rather than award it to him, because of his race.  Tr. **2:**192-193.  The only "evidence" which Udemba offers in support of this claim is an organizational chart dated October 7, 2003, which displays a box bearing the heading "Environmental Engineers."  Dep.Ex. 5, Bates # 077.  Udemba contends that this box proves that there was a vacancy in a position which would have had supervisory authority over the project managers in the Environmental Affairs Department.  Tr. **2:**189-190.

---

[6] At various times, the project managers in the Environmental Affairs Department have been referred to internally as "engineers."  The use of "engineer" instead of "manager" did not reflect any change in job responsibilities or status within the Company.  DSMF, ¶ 17.

On the chart in question, the box displaying the heading "Environmental Engineers" appears at the head of a column which includes five other boxes, each of which also displays the word "engineer." Udemba and Pimental are each listed as "Sr. Proj. Engineer;"[7] Donna Polleys is listed as "Proj.Engineer/Reimbursements;" Jason Ruebeck is listed as "Proj.Engineer" and one box shows an open position of "Proj. Engineer." Thus, the heading "Environmental Engineers" is merely a label that describes the category of employees listed beneath it, and Udemba's contention that this chart shows a vacancy in a position with supervisory authority over the other project managers is nothing more than speculation on his part - the type of "rank speculation" that is insufficient to defeat a motion for summary judgment. *Ingram v. Brink's,* and other decisions cited above in I.A., *supra.* Although such speculation does not deserve or require refutation, it is refuted by the affidavit of Debra Damon, who created the chart. Damon explains that the only reason the chart displays a box with the heading "Environmental Engineers" is that she did not have space to display Udemba and the four other project engineer positions horizontally. DSMF, ¶ 40.

In fact, Tayeh and his boss, Harry Brenner, decided not to replace Beland because (1) Beland had been responsible for environmental oversight of the petroleum storage terminals, and the transfer of those assets to Gulf LP a year earlier meant that the Company was no longer doing that work, (2) the decline in the number of stores which sold gas (from 734 to 631) and the settlement of environmental litigation had further reduced the workload of the Environmental Affairs Department, and (3) the Company had emerged from bankruptcy just one year before, and Brenner (the Company's Chief Operating Officer) was determined to keep down the Company's operating costs. The benefits of eliminating Beland's position were so obvious that

---

[7] See fn. 6, above.

Tayeh and Brenner never even discussed promoting one of the other project managers to replace

Beland.  DSMF, ¶¶ 32, 36, 37-39.

Udemba also relies upon a conversation which he claims he had with Tayeh in December

1994, in which he asked to be promoted to the position vacated by Beland.  According to

Udemba, Tayeh

> 23.    … immediately dismissed Mr. Udemba as a candidate for the position and
> told him that, "the construction and other departments of the company would not
> accept you."  Mr. Tayeh made these comments because Mr. Udemba is a black
> African and the construction department and other departments at the time were
> predominantly white.
>
> 24.    In response to [sic] Mr. Udemba stated, "If President Bill Clinton felt that
> way about Colin Powell, he could not have become the Chairman of the Joint Chief
> of Staff."  Mr. Tayeh did not refute Mr. Udemba's analogy,

Complaint, ¶¶ 23 and 24.[8]

The Defendants dispute Udemba's version of this conversation.  Tayeh Aff., ¶ 17.

However, even if Udemba's version is accepted as true, the Defendants submit that they are

entitled to summary judgment, for the reasons which follow.

**A.    Udemba's Claim That The Remark, "They Would Not Accept You,"
Was A Reference To His Race Is Mere Speculation.**

Udemba claims that Tayeh made the statement "they would not accept you" because he is

a black African and the construction and other departments of the Company are predominantly

white.  Complaint, ¶ 23.  However, he admits that Tayeh made no reference at all to his race, or

to anyone else's race, in this conversation:

> Q.  He didn't say anything about you being a black African, did he?
> MS. LIPEDE:  Objection.
> A.  No.
> Q.  He didn't say anything about the construction and other departments being

---

[8] At his deposition, Udemba testified that he never made any notes of this conversation with Tayeh, and that the portions of Paragraphs 23 and 24 that are bracketed by quotation marks are the only portions of this conversation that he claims to remember "word for word."  Tr. **2:**24.

predominantly white, did he?

A.  No.

Q.  He didn't make any reference to race, white or black, in that conversation, did he?

A.  No.

Tr. **2**:57 (DSMF, ¶ 77).

Udemba concedes that he has never heard Tayeh - or anyone else at Cumberland Farms - use a racial epithet, or any other term of disparagement, to refer to people who are African or African-American.  DSMF, ¶ 75.  Udemba has never a seen a Company document that characterizes a person's race as a factor in their compensation, promotion or any other aspect of their employment, and he does not know if such a document has ever existed. DSMF, ¶ 76.

In short, Udemba's claim that Tayeh's statement "they would not accept you" was a reference to race - once again - is nothing more than speculation on his part.[9]

### B.    Udemba's Analogy Of Himself To Colin Powell Is Not Evidence Of Discrimination.

In *Weston-Smith v. Cooley Dickinson Hospital*, 153 F.Supp. 2d 62 (D.Mass. 2001), the plaintiff recited to her former supervisor a statement allegedly made by the woman who replaced the plaintiff, which purported to quote the supervisor as saying that the plaintiff had been laid off because she took maternity leave.  The plaintiff argued that the supervisor's silence in the face of this accusation was tantamount to an admission that it was true.  This Court held that the supervisor's silence was of "doubtful admissibility" but even if admissible it was too ambiguous to be considered direct evidence of discrimination, and the First Circuit affirmed.  *Weston-Smith v. Cooley Dickinson Hospital*, 282 F.3d at 60, 67(1st Cir. 2002):

> The district court correctly concluded that in context there might have been a great many reasons why Bowles was silent on the point and changed the subject,

---

[9] Udemba's speculation that Tayeh was referring to race when he made that statement is further undermined by the fact that it was Tayeh who hired Udemba, Tayeh who promoted Udemba to senior project manager, and Tayeh whom Udemba turned to for a personal reference when he applied for his LSP license.  DSMF, ¶¶ 16, 28, 47 and 87.

and those other reasons made it far from unnatural for Bowles to handle the matter as she did.  *Weston-Smith,* 153 F.Supp.2d at 69.

In the case at bar, even if Udemba's version of his conversation with Tayeh is accepted as true, Udemba does not claim that Tayeh *agreed* with his analogy to Colin Powell:  he cannot recall if Tayeh said anything at all in response to that remark.  DSMF, ¶ 78.  Thus, Tayeh could have voiced disagreement, or remained silent, or changed the subject.  He was under no obligation to refute (or even to respond to) Udemba's statement about Colin Powell, and he may have had many reasons for declining to engage Udemba on that topic.  Accordingly, Udemba's testimony about this conversation is (like the conversation in *Weston-Smith*) "of doubtful admissibility," and even if admissible, it is too ambiguous to constitute evidence of racial animus on Tayeh's part.

### C.    Udemba's Claim That He Was Wrongly Denied A Promotion In 1994 Is Time-Barred.

Udemba was required to file a charge against the Defendants with the EEOC and the MCAD within 300 days of each discrete act of discrimination alleged in his Complaint.  His charge was filed with the EEOC and the MCAD no earlier than December 16, 2003. DSMF, ¶ 74.  Accordingly, any discrete acts of discrimination occurring prior to February 20, 2003, are time-barred.  *National R.R. Passenger Corp. v. Morgan,* 536 U.S. at 111-112; *Ocean Spray Cranberries v. Mass. Comm'n Against Discrimination,* 441 Mass. at 641, 808 N.E. 2d at 265-266.

In his Complaint, Udemba alleges that when Tayeh failed to promote him to Beland's position in 1994, he complained about this to Colleen Cesarini in the Company's Human Resources Department, and that "During his conversation with Ms. Cessarini, Mr. Udemba made it clear that he believed the statements [quoted in ¶¶ 23 and 24 of the Complaint] were motivated

by discriminatory animus." Complaint, ¶ 25.  Udemba knew that Cesarini reported to Foster

Macrides, the head of the Human Resources Department, and he knew that if he was unsatisfied

with Cesarini's handling of his complaint, he could have spoken directly to Macrides about it -

but he never did:

> Q.  Did you have any reason to think that Foster Macrides would refuse to meet
>      with you?
> A.  No.
> Q.  Did you have any reason to think that Ms. Cessarini was biased against
>      Africans or African Americans?
> A.  No.
> Q.  Or that Foster Macrides was biased against Africans or African Americans?
> A.  I have no reason to believe so.
> Q.  At any time?
> A.  No.
> Q.  Did you understand that if you were unhappy with Ms. Cessarini's handling
>      of your concern, that you could have gone to Foster Macrides since he was
>      her superior?
> A.  Yes.
> Q.  But you didn't do that?
> A.  No.
> Q.  So when you did not hear back from Ms. Cessarini and you were not satisfied
>      with the outcome of that, you were convinced at that time that you did not get
>      the position because of your race?
> A.  Yes.
> Q.  And did you file a complaint with the Massachusetts Commission Against
>      Discrimination or with the Equal Employment Opportunity Commission in
>      1994 or 1995?
> A.  No.
> Q.  Why not?
> A.  Because I thought the matter was still ongoing.  The matter was still open.  I
>      haven't received any instruction from human resources to do anything
>      otherwise.
> Q.  So you didn't hear anything from human resources at Cumberland Farms and
>      you were not satisfied with the outcome and you thought that you had been
>      denied a promotion to Andy Beland's position because of your race?
> A.  Yes.
> Q.  But you did not file a complaint with the Massachusetts Commission Against
>      Discrimination or the EEOC --
> A.  Yes.
> Q.  -- in 1994?
> A.  Yes.
> Q.  And 1995?

A.  Yes.
Q.  Or in 1996?
A.  Yes.
Q.  Or in 1997?
A.  Yes.
Q.  Or in 1998?
A.  Yes.
Q.  Or in 1999?  During that entire period of time, did you remain convinced that you had been denied the promotion to Andy Beland's position because of your race?
A.  Yes.
Q.  And during that entire period of time, you were unsatisfied with the outcome from your conversation with Colleen Cessarini?
A.  Yes.

Tr. **2:**68-72; DSMF ¶¶ 69-73.

Based on Udemba's own testimony, there is no excuse for his 10-year delay in filing a charge of discrimination over the (alleged) failure to promote him in 1994.

## IV.    UDEMBA WAS NOT DENIED A PROMOTION TO THE POSITION OF "CHIEF OF THE ENVIRONMENTAL AFFAIRS DEPARTMENT" BECAUSE OF HIS RACE.

Next, Udemba claims that when Dick Longton retired in 1999, the Company should have given him the position of "head" of Environmental Affairs.  Complaint, ¶ 38.  This is another discrete act of (alleged) discrimination which is barred by Udemba's failure to file a charge of discrimination until December of 2003.  Even if this claim were not time-barred, it is utterly without foundation.

Udemba admitted at his deposition that he does not know who made the decision to allow Tayeh to continue as head of Environmental Affairs, after Longton retired.  Tr. **2:**89-90.  Consequently, he has no idea what the basis for that person's decision was, and his contention that race was a factor in that decision, once again, rests on nothing more than his own speculation.  In fact, Brenner (Tayeh's boss) consolidated the positions held by Tayeh and Longton as a cost-cutting move.  DSMF, ¶¶ 34, 42.  As Brenner states in his affidavit:  "I did that

17

to save the Company money, and the idea of making Tayeh the Vice President of Construction and promoting someone else to be Vice President of Environmental Affairs, never even occurred to me." Brenner Aff., ¶ 12. Brenner did exactly the same thing for exactly the same reason in two other cases. DSMF, ¶¶ 41. Udemba has no evidence to show or even to suggest that Brenner's explanation is untrue, or that it is a pretext for unlawful discrimination.

## V.    THERE WERE NO CAUCASIAN EMPLOYEES TRAINED BY UDEMBA WHO WERE PROMOTED TO POSITIONS WITH SUPERVISORY AUTHORITY OVER HIM.

In his Complaint, Udemba asserts that:

29.    Further discriminatory animus was demonstrated against Mr. Udemba with respect to other white individuals who were trained by Mr. Udemba and then promoted to supervisory positions over Mr. Udemba.

30.    For example, Mr. Udemba trained Kevin McCabe ("Mr. McCabe"), who joined CFI's Environmental Affairs Department in 1994, having just left university. Unlike Mr. Udemba, Mr. McCabe did not have an engineering degree, nor did he have an engineering background.

31.    Notwithstanding his lack of engineering experience, Mr. McCabe became Mr. Udemba's superior issuing directives and earning a higher rate of compensation even though he performed less than 10% of the duties performed by Mr. Udemba.

At his deposition, Udemba testified that Pimental and McCabe are the only "white individuals" referred to in Paragraph 29 of his Complaint. Tr. **2:** 217, 221.

Udemba has no evidence that either McCabe or Pimental ever were given supervisory authority over him. Instead, he testified that they "acted" as if they had such authority, and he bases this contention on two incidents. In the first of these, McCabe dropped a report in Udemba's "in basket" and told him to read it and "get back to him [McCabe] about it." Tr.

18

**2:**153-154.  In the second example, Pimental "instructed" Udemba to sit down and talk to a

newly hired employee, Jason Ruebeck:

> A.  … one time Angela brought that [sic] to my office and instructed me to sit
>       down with Jason and talk with Jason.
> Q.  What exactly did she say on that occasion?
> A.  What I just said now is a paraphrase of what she said.
> Q.  Can you remember exactly what she said?
> A.  I cannot.
> Q.  You said she instructed you.  What words did she use?
> A.  I'm just paraphrase [sic] what she said.  She came into my office and
>       instructed me to sit down and talk with Jason.
> Q.  Did she order you to sit down and work with Jason?
> A.  She instructed me, was the word that I used.
> Q.  Did she say "I'm your boss"?
> A.  No.
> Q.  Did she ever say "I'm your boss"?
> A.  No.
> Q.  Did she ever say "I've been promoted over you"?
> A.  No.
> Q.  Did anybody ever say to you that Angela has been promoted over you?
> A.  No.
> Q.  Did anybody ever say to you that Angela is your boss?
> A.  No.
> Q.  Is there anything else that you're relying on for your claim in this case that
>       Angela Pimental was promoted to a supervisory position over you other than
>       that one incident that you just described?
> A.  This is the only one I can recall at this point.

Tr. **2:**220-221.[10]

Even if Udemba's version of these incidents is accurate, they do not prove that either of

his co-workers was given supervisory authority over him, and in fact, Tayeh never gave either

McCabe or Pimental authority over Udemba.  DSMF, ¶ 88.  In the end, this allegation shows

merely that Udemba has a tendency to overreact to imagined slights from co-workers.  *Oncale v.*

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)(Title VII does not establish a "general

---

[10] Similarly, no one ever told Udemba that McCabe was his boss.  Tr. **2:**151-152.

civility code" for the American workplace; isolated incidents of offensive conduct will not support a claim of discriminatory harassment).

## VI.    UDEMBA'S CLAIM OF DISCRIMINATION IN COMPENSATION IS WITHOUT MERIT.

### A.    Comparison of Udemba to McCabe.

In ¶ 31 of his Complaint (quoted above), Udemba claims that McCabe (who is white) earned "a higher rate of compensation even though he performed less than 10% of the duties performed by Mr. Udemba."  However, Udemba testified at his deposition that he is *not* claiming that McCabe (or Pimental) earned more money than he did.  DSMF, ¶¶ 44, 49.  Instead, he is claiming (a) that McCabe's starting salary was higher than the salary Udemba was hired at, and (b) that one or more of the salary increases McCabe received was greater in percentage terms, than one or more of the increases that Udemba received.  Tr. **3:**28-30.  Neither fact is evidence of discrimination.

Udemba was hired on May 20, 1991 at a salary of $23,000.  DSMF, ¶ 14.  McCabe was hired almost three years later, on January 20, 1994, at a salary of $27,500.  DSMF, ¶ 43.  By the time McCabe was hired, Udemba's salary had increased to $32,500.  DSMF, ¶ 45.  Three months later, on April 1, 1994, Udemba's salary was increased to $34,125.  *Id.*  On August 30, 1994, Udemba's salary was increased again, to $35,660.  At that time, McCabe's salary was *still* only $27,000.  *Id.*

Starting salaries are not static, and it is specious for Udemba to claim that McCabe was treated more favorably than he was simply because McCabe's starting salary in 1994 was higher than Udemba's starting salary in 1991.  The same goes for Udemba's second contention - that one or more of the salary increases McCabe received was greater in percentage terms, than one

or more of the increases that Udemba received.  Udemba and McCabe received different

increases at different times, based upon different performance:

Percentage Salary Increase

| | McCabe | Udemba |
|---|---|---|
| 1992 | | 8.7% |
| 1993 | | 30.2% |
| 1994 | | 9.6% |
| 1/20/95 | 28% | |
| 8/30/95 | | 5% |
| 1/20/96 | 15.5 | |
| 8/30/96 | | 5% |
| 1/9/97 | | 12% |
| 1/20/97 | 5.5 | |
| 8/30/97 | | 10.1% |
| 1/20/98 | 10.2 | |
| 8/30/98 | | 4% |

DSMF, ¶ 46.

In short, there were years in which McCabe received a higher percentage increase in his

salary, and years in which Udemba received a higher percentage increase in *his* salary.  No

inference of unlawful discrimination can be drawn from any of this.[11]

B.    **Comparison of Udemba to Pimental.**

At his deposition, Udemba also claimed that the Company's rapid promotion of Pimental

supports his claim of discrimination based on race, because she has only a high school education.

In support of this contention, Udemba testified as follows:

A.    It is obvious.  Because -- because if -- if you were to reverse the role, I come
into Cumberland Farms with a high school education, and then a white
person with an engineering degree have spent, with that level of experience,
and is an LSP, has attained the highest level of -- the highest level of
professional status, if I was -- if I was a black person with a high school
education with this white person, I don't see how I -- I don't see how all of a
sudden within a few years or within a year I would attain the same status as

---

[11] As for Udemba's claim in ¶ 31 of the Complaint that McCabe "performed less than 10% of the duties performed
by Mr. Udemba," his deposition testimony shows that Udemba has no basis for claiming to know what McCabe did
or how much time he spent doing it.  Tr. **3:**33-41.

> that person.  It just -- it just -- it is just common sense.  It just -- it just -- it
> just wouldn't happen.

Tr. **3:**53.

There is no need to refute Udemba's reasoning, because it rests upon a false premise, *viz,* that Pimental was rapidly promoted to the same position as Udemba even though she possessed only a high school education.  In fact (a) Pimental had a Bachelor of Science degree in Environmental Geography when the Company hired her, and (b) she was not promoted to senior project manager until 30 months after she was hired, whereas Udemba was promoted to senior project manager 28 months after he was hired.  DSMF, ¶ 48, 50.

### C.    Udemba's Alleged Services To The Company As An LSP.

Udemba also claims that the Company has failed to adequately compensate him for his "invaluable" services as a Licensed Site Professional ("LSP").[12]  Complaint, ¶¶ 32-36, 54, 60, 63, 65, 68, 69.  However, Udemba has never rendered *any* services to the Company as an LSP.  DSMF, ¶¶ 86, 89.  Udemba admits that the Company has relied upon outside consultants who employ their own LSP's, ever since the law requiring use of LSP's was enacted, and that Massachusetts law does not require the Company to *directly* employ its own LSP.  DSMF, ¶ 82, 83.  He admits that all reports filed with the Massachusetts Department of Environmental Protection in the Company's behalf that required the seal of an LSP were filed by the LSP's who are employed by the consultants.  DSMF, ¶ 84.  He admits that *he* has never filed a report

---

[12] In Massachusetts, a private individual may be licensed as a "hazardous waste site cleanup professional" (also known as a "licensed site professional"), defined as

> an individual who, by reason of appropriate education, training, and experience, is qualified, as attested by being licensed by the board, to render waste site cleanup activity opinions that can be relied on as sufficient to protect public health, safety, welfare, and the environment.

MGL c.21A, § 19.  Licenses are issued by the Board of Registration of Hazardous Waste Site Cleanup Professionals.  MGL. c.21A, § 19A.  Udemba obtained his LSP license in 1997.  DSMF, ¶ 81.

imprinted with his own seal as an LSP in behalf of the Company, because he has never been the "LSP of record" on any of the Company's sites.  DSMF, ¶ 85.

Even if there were a genuine dispute on this issue (whether or not Udemba ever rendered services as an LSP to the Company), it is not a fact that is *material* to this case, because Udemba cannot show that the Company treated other, similarly situated employees more favorably, in matters of compensation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. at 259 ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")  Udemba cannot identify any other employee (white, black, Asian, Hispanic, etc.) whom the Company *did* compensate for services as an LSP.

> Q. No, no.  Anybody -- any other employee.  I'm not talking about outside consultants.  Was there another employee like you?
> A. We don't have any other employee LSP in Cumberland Farms.  I am the only in-house LSP.

Tr. **3:**99-100.

Absent a similarly situated employee of another race to compare himself to, Udemba's claim that he was "underpaid" is nothing more than a garden-variety workplace grievance by a disgruntled employee.  See *Keyes v. Secretary of Navy*, 853 F.2d 1016, 1027 (1st Cir.1988) ("Plaintiff, who had the ultimate burden of proving the claim, did not offer a scintilla of evidence which tended to show that her color or her sex -- as opposed, say, to some informal preferment of veterans or garden-variety cronyism -- was a factor in the decisionmaking process.").

Finally, Udemba contends that the Company discriminated against him by refusing to employ him as an outside consultant, i.e., as an independent contractor instead of as an employee.  Tr. **3:**92-93.  Udemba claims that the refusal to give him a contract as a consultant constitutes discrimination because "other white LSPs engaged by the company are given contracts." Tr. **3:**99.  However, the LSP's whom Udemba refers to were never directly

employed by the Company.  Tr. **3:**100.  Tayeh has never promised to give any other employee of

the Company a contract to perform work for the Company as an outside contractor or consultant.

DSMF, ¶ 90.

Udemba is, of course, free to quit his job with the Company and compete against the

other firms who seek contracts to perform environmental services for the Company.  However,

he cannot claim that the Company's refusal to *guarantee* him such a contract while he is still an

employee constitutes discrimination based on race.

**VII.    UDEMBA WAS NOT DENIED A COMPANY CAR, CELLPHONE OR
         INTERNET ACCESS BECAUSE OF HIS RACE.**

**A.    Company Car.**

Udemba claims that he was promised a company car by Tayeh in 1992.  Tr. **2:**163.

Tayeh disputes this (Tayeh Aff., ¶ 22), but assuming for purposes of this Motion that Udemba is

correct, failure to fulfill that promise does not constitute race discrimination.

The Company's policy since 1987 has been to furnish cars only to its Vice Presidents and

to other employees who can document a minimum of 15,000 business miles per year (or

otherwise justify their need for a car to the satisfaction of the Company's COO).  DSMF, ¶ 51.

No one in the Environmental Affairs Department has ever been furnished with a company car,

except for Tayeh and Beland.  DSMF, ¶ 54.  Tayeh did not receive a company car until he rose to

the rank of Vice President, in 1993, and Beland needed a car because he regularly visited the

petroleum storage terminals that he was responsible for, in Massachusetts, New York, Ohio,

Pennsylvania, Maine, Connecticut and New Jersey (DSMF ¶¶ 52, 53).  When those terminals

were transferred to Gulf LP in December of 1993, Beland was forced to relinquish his Company

car.  *Id.*  The Company's records show that Udemba never sought reimbursement for more than

2897 miles per year, for business-related travel, and Udemba kept no mileage records of his own. DSMF, ¶ 55, 56.

Moreover, Udemba's claim that the refusal to give him a company car was based on his race is time-barred.   He testified at his deposition that he believed *in 1994* that Tayeh's failure to deliver on his promise of a Company car was due to his (Udemba's) race (Tr. **2:**166-167), but he did not file a charge of discrimination until ten years later.[13]

### B.    Cell Phone.

In Paragraph 58 of the Complaint, Udemba alleges that the Company failed to furnish him with a cellular phone.  When asked at his deposition if he claimed this was because of his race, he answered. "Not necessarily …" Tr. **3:**81.

> Q.  Are you claiming that other people were given cell phones and you weren't?
> A.  I'm saying --
> Q.  Yes or no, Mr. Udemba.
> A.  I don't know.  I don't know what other people were given.

Tr. **3:**82.

Tayeh, a Vice President, is the only person in the Environmental Affairs Department who has ever been furnished with a cell phone for his exclusive use.  DSMF, ¶ 57.

### C.    Internet Access.

Udemba claims that the Company failed to provide him with access to the Internet at work.  Complaint, ¶ 58.  At his deposition, he testified that he was only furnished Internet access after he commenced this suit, and he claimed that Tayeh (his boss) and Higgins (the office manager of the Environmental Affairs Dept.) had Internet access at work, before he did.  Tr.

---

[13] Udemba never complained about his lack of a Company car to the Human Resources Department.  Tr. **2:**167-169. In fact, his complaint to Cesarini in 1994 was the *only* time Udemba ever spoke to anyone in Human Resources about anything connected to his employment with the Company.  DSMF, ¶¶ 69, 72.

**3:**82-83.  In fact, Higgins was never furnished Internet access, when she worked for the

Company, and she left the Company in 2002.  DSMF, ¶ 58.

In short, there is no evidence that the Company treated Udemba less favorably than other

*similarly situated* employees (i.e., project managers), when it came to a Company car, cell phone

and Internet access.

## VIII.  UDEMBA WAS NOT SUBJECTED TO HARASSMENT BECAUSE OF HIS RACE.

This Court recently articulated the standard for judging a claim of hostile environment

harassment based on race (and sex), in *Douglas v. J.C. Penney Company, Inc.,* 2006 U.S. Dist.

LEXIS 15078 (D.Mass. March 30, 2006):

> To establish a claim for a hostile work environment, Plaintiff must show (1) that
> he is a member of a protected class; (2) that he was subjected to unwelcome
> harassment; (3) that the harassment was based upon race or sex; (4) that the
> harassment was sufficiently severe or pervasive so as to alter the conditions of his
> employment and create an abusive work environment; (5) that objectionable
> conduct was both objectively and subjectively offensive, such that a reasonable
> person would find it hostile or abusive and the victim in fact did perceive it to be
> so; and (6) that some basis for employer liability has been established.  O'Rourke
> v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).
>
> To determine whether an environment is hostile or abusive, a court must
> look at the totality of the circumstances.  These "may include the frequency of the
> discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably interferes
> with an employee's work performance."  Harris, 510 U.S. at 23.  As the First
> Circuit has noted, "[t]he thrust of this inquiry is to distinguish between the
> ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual
> harassment."  Noviello, 398 F.3d at 92.

*Douglas,* Slip Copy, pp. 51-52.

Udemba claims that he was subjected to demeaning behavior at work (Complaint, ¶¶ 27

and 43), but the evidence he offers to support this claim is insufficient as a matter of law to prove

a claim of hostile environment based on race.  First, Udemba relies upon his 1995 performance

evaluation, which initially was signed by Higgins, the office manager.  DSMF, ¶ 59.  The

evaluation form has a space reserved for the employee's comments and in that space Udemba

wrote:

> I report to the vice president, Emile Tayeh.  It is a major discrepancy to indicate
> Lorraine Higgins, office supervisor, as my supervisor.

DSMF, ¶ 60.  This was the only comment Udemba wrote on the evaluation, and he does not

remember if he said anything to Tayeh about the evaluation, in addition to this written comment.

DSMF, ¶ 61.  When Tayeh received Udemba's comment, he whited out Higgins' name and

substituted his signature for hers.  DSMF, ¶ 62.  In fact, it was Tayeh, and not Higgins, who rated

Udemba in each category of the evaluation.  Tayeh had asked Higgins to type up the evaluation

and sign his name to it, but she apparently misunderstood him and signed her own name.  DSMF,

¶ 63.[14]

Although the incident involving his 1995 evaluation is asserted as an act of

discrimination in the Complaint, ¶¶ 27 and 28, at his deposition Udemba testified that he does

not know what the significance of it is:

> Q.  Now, is it your testimony, Mr. Udemba, that because Lorraine Higgins' name
> appears in the space for supervisor on Bates stamp 39, that this was an act of
> racial discrimination?
> A.  I don't know what it is.  No, it's not my testimony.
> Q.  I'm sorry?
> A.  It's not my testimony.
> Q.  It's not.  So you're not claiming that this was an act of racial discrimination?
> A.  No.  I don't know what it is.
> Q.  Are you contending that this is evidence of racial discrimination against you?
> A.  I don't know.
> Q.  You don't know?
> A.  No.

Tr. **2:**183.

---

[14] The evaluation is dated September 8, 1995, and as of that date Higgins had only been working for Tayeh for three
and a half weeks.  DSMF, ¶¶ 58, 59.

Next, Udemba points to the fact that the Company directory in 1995 listed him as a mere project manager, when it should have listed him as a *senior* project manager.  However, Tayeh corrected this typographical error as soon as Udemba called it to his attention.  DSMF, ¶ 64.

In Paragraph 27 of the Complaint, Udemba alleges that Higgins (the office manager) issued directives to him.  However, Udemba is unable to identify any such directives, and he is unable to say whether Higgins' actions in issuing him directives is evidence of race discrimination (DSMF, ¶ 65, 66):

> Q.  So the fact that she issued directives to you is not evidence of racial discrimination?
> A.  I don't know.
> Q.  Well, are you saying it is or are you saying it's not?
> A.  I'm saying I don't know.

Tr. **2:**216.

Udemba also claims that Higgins' successor as office manager, Muriel Tyler (DSMF, ¶ 67), once treated him in a demeaning way:

> A.  Well, what prompted this is Muriel Tyler demeaned me at the meeting and said to me in front of other staff that nobody told her that I'm anything other than -- that I'm not -- nobody told her that I'm the senior project manager.  She said, "you're just like everybody else.  Nobody told me you're a project manager."

Tr. **2:**139.

And, Udemba claims that on two occasions, Tyler "rudely ordered [him] around." However, he is unable to say whether she acted that way because of his race (DSMF, ¶ 68):

> Q.  So you have identified two incidents in which you said that Muriel Tyler rudely ordered you around.  Was there a third incident?
> A.  There might have been, but these are the ones that I recall right now.
> Q.  You can't remember any other occasion that she rudely ordered you around?
> A.  I don't recall any right now, any other.
> Q.  Is it your contention that on each of these two occasions that you have described that Muriel acted that way because you're black?

A.  I don't know why she acted that way.

Tr. **3:**67-68.

To sum up, (1) Udemba has no evidence that any of these incidents were based on his race, and (2) this handful of incidents occurring over the fifteen years of Udemba's employment falls far short of "harassment" which was "sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment." *Douglas v. J.C. Penney, supra*; *Burns v. State Police Ass'n*, 230 F.3d 8 (1st Cir.2000) (affirming summary judgment dismissing claim under 42 U.S.C. § 1985 because of absence of any evidence of race-based animus).

Finally, none of the events which Udemba cites as "harassment" took place after February 20, 2003, the date that is 300 days prior to the date he filed his charge with the EEOC and the MCAD.  Thus, this claim also is time-barred.

## IX.    UDEMBA'S CLAIMS AGAINST TAYEH MUST BE DISMISSED.

As set forth above, there is no evidence that Udemba ever was subjected to discrimination on account of his race, during his employment with the Company.  Moreover, even if Udemba could prove that the Company unlawfully discriminated against him, his claims against Tayeh under Title VII must be dismissed.

> "every circuit court that has interpreted Title VII's definition of 'employer' and the majority of District Courts in the First Circuit ⋯ have concluded that Congress did not intend to impose individual liability upon agents of an employer." *Edsall v. Assumption College,* 367 F.Supp.2d 72, 77 (D.Mass.2005), *quoting Healy v. Henderson,* 275 F.Supp.2d 40, 44-45 (D.Mass.2003).

*Anthony v. Busby,* Slip Copy, 2005 WL 3440644 (D.Mass. 2005).

While Chapter 151B permits individual liability for those who aid and abet an employer's discriminatory conduct, the burden is on the plaintiff to show that the individual supervisor

named as a co-defendant "had the requisite intent to discriminate." *Anthony v. Busby,* 2005 WL 3440644, *2, quoting *Beaupre v. Cliff Smith & Assoc.,* 50 Mass.App.Ct. 480, 494 n. 23, 738 N.E.2d 753 (2000).  There is no evidence that Tayeh ever harbored an intent to discriminate against Udemba because of his race.  Thus, Udemba's claims against Tayeh under Chapter 151B also must be dismissed.

## CONCLUSION

Based upon the foregoing arguments and citations, and the deposition, the pleadings, the exhibits and affidavits on file or submitted with this Motion, the Defendants submit that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law dismissing the Complaint.

DATED at Portland, Maine this 30th day of May, 2006.

CUMBERLAND FARMS, INC. and
EMILE C. TAYEH

By their attorneys,

MOON, MOSS & SHAPIRO, P.A.
Ten Free Street
P. O. Box 7250
Portland, ME  04112-7250
(207) 775-6001


*/s/ Philip J. Moss*
Philip J. Moss  BBO# 358020

## CERTIFICATE OF SERVICE

I, Philip J. Moss, attorney for Cumberland Farms, Inc. and Emile Tayeh, hereby certify that a paper copy of the Application of Defendants' Motion for Summary Judgment with Incorporated Memorandum, electronically filed with the Clerk of Court using the ECF system, will be sent this date by first-class U.S. mail, postage prepaid to the following:

Aderonke O. Lipede, Esq.
434 Massachusetts Avenue, Suite 401
Boston, MA 02118
(BBO # 567431)

Dated:  May 30, 2006

/s/ Philip J. Moss
Philip J. Moss, Esq., BBO# 358020
MOON, MOSS & SHAPIRO, P.A.
Ten Free Street
P. O. Box 7250
Portland, ME  04112-7250
Tel:  (207) 775-6001
Fax:  (207) 775-6407
pmoss@moonmoss.com