UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                    )
                                 )
              Plaintiff,          )
     v.                          )          CIVIL ACTION NO:  05CV 11161 RGS
                                 )
CUMBERLAND FARMS, INC.           )
AND EMILE C. TAYEH,              )
                                 )
              Defendant.         )

**DEFENDANTS' STATEMENT OF
MATERIAL FACTS IN SUPPORT OF THEIR
MOTION  FOR SUMMARY JUDGMENT**

Pursuant to Fed.R.Civ.P. 56 and LR 56.1, Defendants Cumberland Farms, Inc. ("the

Company" or "CFI") and Emile Tayeh ("Tayeh") submit this statement of material facts as to

which there is no genuine dispute.

1.     The Company is a Delaware corporation with its principal office and place of business at

       777 Dedham Street, Canton, MA ("Canton office" or "Canton").  Affidavit of Harry

       Brenner, ¶ 3.

2.     For over 30 years, the Company has operated convenience stores and gas stations

       (collectively "stores") in many of the New England and mid-Atlantic states and Florida.

       *Id.,* ¶ 4.

3.     The Company sells gasoline and/or diesel fuel (collectively, "gas") at retail to the general

       public, through its own stores, and also sells gas at wholesale to dealers who resell it at

       retail to the general public.  Affidavit of Emile Tayeh, ¶ 3.

4.     The gas sold at the Company's stores is kept in underground storage tanks at those

       locations.  It is delivered to the stores by means of tanker trucks, many of which are owned

and operated by the Company.  The tankers are loaded with gas at storage terminals which (until December 30, 1993) were operated by the Company as part of its Gulf Oil division.  *Id.*

5.   The storage, handling and transportation of gasoline and other petroleum products are subject to regulation by state and federal environmental agencies under applicable state, local and federal environmental laws and regulations.  *Id.*, ¶ 4.

6.   Tayeh is an individual who has worked for the Company since December 17, 1990.  Since the time he was hired, Tayeh has had overall responsibility for the Company's compliance with federal and state environmental laws in the states where the Company operates.  *Id.*, ¶¶ 2, 5.

7.   Tayeh is Lebanese by birth and he became a naturalized citizen of the United States in 1990.

8.   From the time Tayeh was hired, the Company has relied upon outside contractors who specialize in environmental work ("consultants") to investigate and assess its environmental compliance and remediation needs at the various sites which it owns, controls and/or operates, and to design and implement solutions for environmental compliance and remediation at those sites.  The Company has relied upon its own employees to oversee the work of these consultants.  *Id.*, ¶ 6; Udemba deposition, Vol. 1, Tr. 189-190, 199-200, 202-203; Vol. 2, Tr. 207-208 (hereinafter "Tr." followed by the volume number in **boldface**, followed by the page reference, e.g., "Tr. **1:**189-190").

9.   Tayeh's first position with the Company was Construction and Environmental Engineer and in that position he reported directly to Dick Longton, Vice President ("VP") of Construction.  *Id.*, ¶ 7.

10. Andrew Beland ("Beland") is an individual who came to work for the Company on October 2, 1989. He was hired to work in the Company's Gulf Oil Division, where he was made responsible for overseeing compliance with federal and state environmental laws, in the operation of the Company's petroleum storage terminals. *Id.,* ¶ 8; Affidavit of Patricia Firing, ¶ 3.

11. On March 2, 1991, Beland was transferred to the Construction Department, where he continued to be responsible for overseeing compliance with federal and state environmental laws, in the operation of the Company's petroleum storage terminals. Tayeh Aff., ¶ 9; Firing Aff., ¶ 3.

12. On March 16, 1991, the Company formed the Environmental Affairs Department as an administrative subdivision of its Construction Department. Tayeh was promoted to Manager of Environmental Affairs, and continued to report to Longton. Beland was assigned to the Environmental Affairs Department and reported to Tayeh. Tayeh Aff., ¶ 10.

13. Plaintiff Oliver Udemba ("Udemba") is black and from Nigeria. Complaint and Answer, ¶ 6.

14. On May 20, 1991, Udemba was hired as a Project Manager in the Environmental Affairs Department, at a salary of $23,000 per year. In that position he reported directly to Tayeh. Udemba has worked continuously for the Company since May 20, 1991. Firing Aff., ¶ 5; Tayeh Aff., ¶11.

15. Colleen Cesarini ("Cesarini") is an individual who worked in the Company's Human Resources Department from 1986 to December 29, 2000. Affidavit of Foster Macrides, ¶ 5; Firing Aff., ¶ 4.

16.  Udemba was interviewed and hired by Tayeh and Cesarini.  Tr. **2:**95; Tayeh Aff., ¶ 11.

17.  At various times, the project managers in the Environmental Affairs Department have been referred to internally as "engineers."  The use of the term "engineer" instead of "manager" did not reflect any change in job responsibilities or status within the Company.  Firing Aff., ¶ 6.

18.  On October 1, 1992, Tayeh was promoted to Director of Environmental Affairs and in that position he reported directly to Harry Brenner, who at that time was the Senior VP of Retail Operations.  Tayeh Aff., ¶ 12.

19.  Foster Macrides is an individual who has been the Company's VP of Human Resources since 1986.  Macrides Aff., ¶ 2; Tr. **2:**67-68.

20.  On May 1, 1992, the Company filed for reorganization under Chapter 11 of the federal Bankruptcy Code.  When the Company filed for bankruptcy, all wages and salaries of the Company's employees were "frozen."  Macrides Aff., ¶ 3.

21.  In a memo to the Company's department heads dated October 1, 1992, Macrides announced the lifting of the wage "freeze" and an across-the-board increase in wages and salaries of 3% for all employees of the Company.  Macrides Aff., ¶ 4; Tr. **2:**131; Udemba Deposition Exhibit 4, Bates  # 017.[1]

22.  Udemba's salary was increased on October 1, 1992, from $23,000 to $23,689.64.  Firing Aff., ¶ 7.

23.  On December 13, 1992, Beland was promoted to Project Management Supervisor.  In that position, Beland had supervision over Udemba and from three to five other employees in the Environmental Affairs Department, including (at various times):  Derrick Golden,

---

[1] References to the exhibits identified at Udemba's deposition will be abbreviated as "Dep.Ex." followed by the exhibit number and the Bates stamp number, where applicable.

David Brochu and Kevin McCabe, Mark Finnegan, Michele Paul and Joseph Friesen.
Beland continued to be responsible for overseeing compliance with federal and state
environmental laws, in the operation of the Company's petroleum storage terminals.
Tayeh Aff., ¶ 13.

24. Udemba is not claiming that he should have been promoted to Project Management
    Supervisor instead of Beland.  Tr. **2:**121.

25. On December 13, 1992, Udemba's salary was increased to $25,000.  Firing Aff., ¶ 8.

26. On April 17, 1993, Udemba's salary was increased to $27,500.  *Id.,* ¶ 9.

27. Udemba was promoted to senior project manager on August 30, 1993.  *Id.,* ¶ 10; Tayeh
    Aff., ¶ 11.

28. It was Tayeh who initiated and approved Udemba's promotion to senior project manager.
    Tayeh Aff., ¶ 11.

29. Udemba's salary was increased on August 30, 1993 to $30,813.12, in part because of his
    promotion to senior project manager and in part to reflect a merit increase.  Firing Aff., ¶
    11.

30. Udemba's salary was increased on October 1, 1993 to $32,500.  *Id.,* ¶ 12.

31. On December 12, 1993, Tayeh was promoted to VP of Environmental Affairs, and in that
    position he continued to report directly to Brenner, who at that time was the Executive VP
    and Chief Operating Officer ("COO") of the Company.  Tayeh Aff.,
    ¶ 14.

32. On December 30, 1993, the Company emerged from bankruptcy.  Brenner Aff., ¶ 8.

33.  On December 30, 1993, the Company transferred certain assets, including its petroleum storage terminals, to a newly formed limited partnership, named "Gulf LP."  Brenner Aff., ¶ 8.

34.  Since he became COO of the Company in May of 1993, Brenner has cut costs by eliminating and/or consolidating a number of management positions.  Brenner Aff., ¶ 9.

35.  Beland quit the Company on December 1, 1994, and went to work for Gulf LP.  Tayeh Aff., ¶ 16.

36.  The Company sold a number of stores while it was in bankruptcy and in the year following its emergence from bankruptcy.  Tayeh Aff., ¶ 16; Brenner Aff., ¶ 10.  Between September of 1991 and December 1, 1994, the number of stores which sold gas at retail to the public declined from 734 to 631.  *Id.*.

37.  In the year after the Company emerged from bankruptcy, the Company settled some major environmental litigation.  Tayeh Aff., ¶ 16; Brenner Aff, ¶ 10.

38.  When Beland left the Company, Brenner and Tayeh decided to eliminate the supervisory position formerly held by Beland, because (1) Beland had been responsible for environmental oversight of the petroleum storage terminals, and the sale of those assets to Gulf LP a year earlier meant that the Company was no longer doing that work, (2) the decline in the number of stores which sold gas and the settlement of environmental litigation further reduced the workload of the Environmental Affairs Department, and (3) the Company had emerged from bankruptcy just one year before, and Brenner was determined to keep down the Company's operating costs.  Tayeh Aff., ¶ 16; Brenner Aff., ¶ 10.

39. The benefits of eliminating Beland's position were so obvious that Tayeh and Brenner never even discussed promoting one of the other project managers to replace Beland. Tayeh Aff., ¶ 16; Brenner Aff., ¶ 10.

40. Dep.Ex. 5, Bates # 077, displays an organizational chart dated October 2003. This chart was created by Debra Damon. The only reason there is a box labeled "Environmental Engineers" on this chart, is that Damon did not have sufficient space to display the names of Udemba and the other engineers horizontally, on the same level as Tyler, Lehtola and Etzold. Damon did not intend anything on the chart to signify that there was an open supervisory position between Tayeh and the project engineers. Affidavit of Debra Damon, ¶ 4.

41. When Darry Stuart, VP of Distribution, resigned from the Company in 1998, Brenner did not promote anyone to Vice President in his place. Instead, Brenner consolidated Stuart's position with another position held by Robert Handforth, VP of Manufacturing and Distribution. When Handforth was laid off in 1999, Brenner assumed some of his responsibilities and assigned the remainder to George P. Haseotes, VP of the Wholesale Petroleum Division. Brenner Aff., ¶ 11.

42. When Longton, the VP of Construction, retired on February 1, 1999, Brenner did not promote anyone to Vice President in his place. Instead, Brenner assumed some of Longton's responsibilities and assigned the remainder to Don Holt, Chief Financial Officer. On April 3, 2000, Brenner consolidated the positions of VP of Construction and VP of Environmental Affairs, and assigned Tayeh the duties of both positions. *Id.,* ¶ 12.

43.  Kevin McCabe ("McCabe") is an individual who was hired to work as a project manager in the Environmental Affairs Department on January 20, 1994 at a salary of $27,500.  Firing Aff., ¶ 13.

44.  Udemba is not claiming that McCabe was ever paid more than he was.  Tr. **3:**28-29.

45.  At the time McCabe was hired, Udemba's salary was $32,500.  On April 1, 1994, Udemba's salary was increased to $34,125.  On August 30, 1994, Udemba's salary was increased to $35,660.  At that time, McCabe's salary was still $27,000.  Firing Aff., ¶ 14.

46.  McCabe and Udemba received salary increases in the following percentages:

<u>Percentage Salary Increase</u>

|  | <u>McCabe</u> | <u>Udemba</u> |
|---|---|---|
| 1992 |  | 8.7% |
| 1993 |  | 30.2% |
| 1994 |  | 9.6% |
| 1/20/95 | 28% |  |
| 8/30/95 |  | 5% |
| 1/20/96 | 15.5 |  |
| 8/30/96 |  | 5% |
| 1/9/97 |  | 12% |
| 1/20/97 | 5.5 |  |
| 8/30/97 |  | 10.1% |
| 1/20/98 | 10.2 |  |
| 8/30/98 |  | 4% |

Firing Aff., ¶ 15.

47.  All of Udemba's salary increases were authorized and approved by Tayeh.  Tayeh Aff., ¶ 11.

48.  Angela Pimental ("Pimental") is an individual who was hired by the Company on September 25, 2000.  At the time she was hired, Pimental had a Bachelor of Science degree in Environmental Geography.  *Id.,* ¶ 21; Affidavit of Angela Pimental, ¶¶ 2, 3.

49. Udemba is not claiming that Pimental was ever paid more than he was.  Tr. **3:**50.

50. Pimental was promoted to senior project manager 32 months after she was hired; Udemba was promoted to senior project manager 27 months after he was hired.  Tayeh Aff., ¶ 21.

51. Since 1987, the Company's practice has been to furnish a "Company car" to employees in the position of Vice President or above, and to employees whose job duties required them to travel more than 15,000 miles per year.  Firing Aff., ¶ 16; Tr. **2:**161; Dep.Ex.4, Bates # 012.

52. Tayeh was furnished with a Company car when he was made VP of Environmental Affairs in 1993.  Tayeh Aff., ¶ 22.

53. Beland was furnished with a Company car because his job duties required him to regularly visit the petroleum storage terminals that he was responsible for, in Massachusetts, New York, Ohio, Pennsylvania, Maine, Connecticut and New Jersey.  After the petroleum storage terminals were sold to Gulf LP on December 30, 1993, Beland was required to relinquish his Company car on April 4, 1994.  Tayeh Aff., ¶ 22.

54. Other than Beland and Tayeh, no employee in the Environmental Affairs Department has ever been furnished with a Company car.  Tayeh Aff., ¶ 22; Tr. **2:**164-165.

55. The Company's records show that Udemba never sought reimbursement for more than 2897 miles per year, for business-related travel.  Firing Aff., ¶ 17.

56. Udemba has no records of his own to prove that he ever met the 15,000 mile per year threshold required for a Company car, and does not recall how many miles he may have driven on Company business that he did not seek reimbursement for.  Tr. **1:**143; **3:**84.

57. Other than Tayeh, no one in the Environmental Affairs Department has ever been furnished with a cell phone for their exclusive use.  Tayeh Aff., ¶ 23; Tr. **3:**82.

58.  Lorraine Higgins ("Higgins") is an individual who was employed by the Company as Office Supervisor in the Environmental Affairs Department from August 14, 1995 until March 18, 2002.  The Company did not furnish Higgins with access to the Internet at work, at any time during her employment.  Firing Aff., ¶ 18.

59.  Udemba's performance evaluation, dated September 8, 1995, was initially signed by Higgins.  Tr. **2:**177; Dep.Ex. 5, Bates # 39-41.

60.  Udemba's 1995 evaluation has a space reserved for the employee's comments and in that space Udemba wrote:

I report to the vice president, Emile Tayeh.  It is a major discrepancy to indicate Lorraine Higgins, office supervisor, as my supervisor.

Tr. **2:**178; Dep.Ex. 5, Bates # 41.

61.  This was the only comment Udemba wrote on the evaluation, and he does not remember if he said anything to Tayeh about the evaluation, in addition to this written comment.  Tr. **2:**178-179.

62.  When Tayeh received Udemba's comment, he whited out Higgins' name and substituted his signature for hers.  Tr. **2:**179; Dep.Ex. 5, Bates # 42-45.

63.  It was Tayeh, and not Higgins, who rated Udemba in each category of the evaluation. Tayeh had asked Higgins to type up the evaluation from his handwritten notes.  Tayeh did not authorize Higgins to sign the evaluation as Udemba's "supervisor."  Tayeh Aff., ¶ 24.

64.  In 1995, Udemba brought to Tayeh's attention the fact that the Company directory listed him as "project manager," when it should have listed him as "senior project manager." Tayeh corrected this typographical error as soon as Udemba called it to his attention. Tayeh Aff., ¶ 25; Dep.Ex. 4, Bates # 005 and 006; Tr. **2:**145-148.

65.  Udemba cannot identify any "directives" that Higgins issued to him.  Tr. **2**:214-215.

66.  Udemba does not know if Higgins issued directives to him because of his race.  Tr. **2:**216.

67.  Muriel Tyler ("Tyler") is an individual who succeeded Higgins as Office Supervisor.

Firing Aff., ¶ 19.

68.  Udemba does not know if Tyler's treatment of him was due to his race.  Tr. **3:**67-68

69.  On one occasion, between 1994 and 1996, Udemba spoke to Cesarini about his

employment with the Company.  Tr. **2:**65-68.

70.  At the time he spoke to Cesarini, Udemba was aware that she reported to Macrides, the

head of the Human Resources Department, and he understood that he could have spoken to

Macrides if he was not satisfied with Cesarini's handling of his concerns.  Tr. **2:**67-70.

71.  Udemba has no reason to believe that either Cesarini or Macrides was biased against

Africans or African-Americans.  Tr. **2:**70.

72.  Udemba never attempted to speak with Cesarini on any other occasion, and never spoke

with Macrides or with anyone else in the Human Resources Department, to complain about

discrimination or any other aspect of his employment with the Company.  Macrides Aff., ¶

5; Tr. **2:**68.

73.  The only reason that Udemba made no attempt to speak with Cesarini again, or to speak

with Macrides or anyone else in the Human Resources Department, was that he was busy

with work.  Tr. **2:**69.

74.  Udemba did not file a charge of discrimination with the Equal Employment Opportunity

Commission and the Massachusetts Commission Against Discrimination until on or after

December 16, 2003.  Dep.Ex. 7, Bates # 125, 127, 138.

75.  Udemba has never heard Tayeh, or anyone else at Cumberland Farms, use a racial epithet, or any term of disparagement to refer to people who are African or African-American.  Tr. **2:**63-64.

76.  Udemba has never a seen a Company document that characterizes a person's race as a factor in their compensation, promotion or any other aspect of their employment, and he does not know if such a document has ever existed. Tr. **2:**59-61.

77.  Udemba claims that in or about December of 1994, in a conversation with Tayeh, Tayeh said to him, "the construction and other departments of the company would not accept you."  Complaint, ¶ 23.  Tayeh did not make any reference to anyone's race, in that conversation.  Tr. **2:**56-58.

78.  Udemba claims that in this same conversation, he said to Tayeh, "If President Bill Clinton felt that way about Colin Powell, he could not have become the Chairman of the Joint Chief [sic] of Staff."  Complaint, ¶ 24.  Udemba cannot recall if Tayeh said anything in response to this statement.  Tr. **2:**54-55.

79.  [intentionally omitted]

80.  [intentionally omitted]

81.  Udemba obtained his LSP license in 1997.  Tr. **1:**179.

82.  Massachusetts law does not require the Company to directly employ its own LSP.  Tr. **1:**260-263.

83.  Ever since Massachusetts has required the use of LSP's, the consultants used by the Company have employed their own LSP's.  Tr. **1:** 260-261; Tayeh Aff., ¶ 26.

84. All reports filed with the Massachusetts Department of Environmental Protection in the Company's behalf that required the seal of an LSP were filed by the LSP's who are employed by the consultants.  Tr. **1:**261-262.

85. Udemba has never filed a report imprinted with his own seal as an LSP in behalf of the Company, and he has never been the "LSP of record" on any of the Company's sites.  Tr. **1:**275.

86. Udemba did not need to be licensed as an LSP, in order to oversee the work performed by the LSP's employed by the consultants.  Tayeh Aff., ¶ 26; Tr. **3:**109-111.

87. Udemba asked Tayeh to furnish him with a personal reference to support his application for his LSP license in 1993, and Tayeh did furnish him with such a reference.  Tayeh Aff., ¶ 11.

88. Tayeh never gave Pimental or McCabe supervisory authority over Udemba.  Tayeh Aff., ¶¶ 20, 21.

89. Udemba has never rendered any services to the Company as an LSP. Tayeh Aff., ¶ 26.

90. Tayeh has never promised to give any current employee of the Company a contract to perform work for the Company as an outside contractor or consultant. Tayeh Aff., ¶ 27.

DATED at Portland, Maine this 30th day of May, 2006.

CUMBERLAND FARMS, INC. and
EMILE C. TAYEH,

By their attorneys,

MOON, MOSS & SHAPIRO, P.A.
Ten Free Street, P. O. Box 7250
Portland, ME  04112-7250
(207) 775-6001

*/s/ Philip J. Moss*
Philip J. Moss BBO# 358020

## CERTIFICATE OF SERVICE

I, Philip J. Moss, attorney for Cumberland Farms, Inc. and Emile Tayeh, hereby certify that a paper copy of Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment, electronically filed with the Clerk of Court using the ECF system, will be sent this date by first-class U.S. mail, postage prepaid to the following:

Aderonke O. Lipede, Esq.
434 Massachusetts Avenue, Suite 401
Boston, MA 02118
(BBO # 567431)

Dated:  May 30, 2006

/s/ Philip J. Moss
Philip J. Moss, Esq., BBO# 358020
MOON, MOSS & SHAPIRO, P.A.
Ten Free Street
P. O. Box 7250
Portland, ME  04112-7250
Tel:  (207) 775-6001
Fax:  (207) 775-6407
pmoss@moonmoss.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                          )
                                        )
                  Plaintiff,            )
     v.                                 )     CIVIL ACTION NO: 05CV 11161 RGS
                                        )
CUMBERLAND FARMS, INC.                  )
AND EMILE C. TAYEH,                     )
                                        )
                  Defendant.            )

### AFFIDAVIT OF HARRY BRENNER IN SUPPORT OF
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Harry Brenner, being duly sworn, does aver as follows:

1. I reside at 105 Morse Avenue, Attleboro, MA. 02703.

2. I have been employed by the Defendant Cumberland Farms, Inc. ("the
   Company") since 1981. Since August 18, 2003, I have been the President and
   Chief Operating Officer of the Company.

3. The Company is a Delaware corporation with its principal office and place of
   business at 777 Dedham St., Canton, MA ("Canton office" or "Canton").

4. For over 30 years, the Company has operated convenience stores and gas stations
   (collectively "stores") in many of the New England and mid-Atlantic states and
   Florida.

5. I was promoted to Senior Vice President of Retail Operations in 1990. On
   October 1, 1992, I promoted Emile Tayeh to Director of Environmental Affairs
   and in that position he reported directly to me.

6. In March of 1993 I was promoted to Executive Vice President and in May of
   1993 I was promoted to Chief Operating Officer ("COO") of the Company.

1

7. On December 12, 1993, I promoted Emile Tayeh to Vice President of Environmental Affairs, and in that position he continued to report directly to me.

8. On December 30, 1993, the Company emerged from bankruptcy. Also on that date, the Company transferred certain assets, including its petroleum storage terminals, to a newly formed limited partnership, named "Gulf LP." Although the Company owned 2/3 of Gulf LP it was only a limited partner and as such it was no longer directly involved in or responsible for the management of those terminals.

9. Since I became COO of the Company, I have cut costs by eliminating and/or consolidating a number of management positions.

10. In December of 1994, Andrew Beland quit the Company and went to work for Gulf LP. After talking to Emile Tayeh, I decided that it was not necessary to replace Beland, for several reasons. First, Beland had been responsible for environmental oversight of the petroleum storage terminals, and the transfer of those assets to Gulf LP a year earlier meant that we were no longer doing that work. Secondly, the Company had sold a number of stores during the bankruptcy and in the year following its emergence from bankruptcy. The number of stores which sold gas had declined from 734 in September of 1991 to 631 by the time Beland left. Also, in the past year the Company had settled some major environmental litigation. These factors meant a further reduction in the work of the Environmental Affairs Department. After the Company emerged from bankruptcy I was determined to keep down the Company's operating costs. The benefits of eliminating Beland's position were obvious to me and I said as much

to Emile. He and I never even discussed promoting one of the other project managers to replace Beland.

11. When Darry Stuart, Vice President of Distribution, resigned from the Company in 1998, I did not promote anyone to Vice President in his place. Instead, I consolidated Stuart's position with another position held by Robert Handforth, Vice President of Manufacturing and Distribution. When Handforth was laid off in 1999, I assumed some of his responsibilities and assigned the remainder to George P. Haseotes, Vice President of the Wholesale Petroleum Division. In this way, I eliminated the positions of two (2) Vice Presidents at a substantial savings to the Company.

12. When Dick Longton, the Vice President of Construction, retired on February 1, 1999, I did not promote anyone to Vice President in his place. Instead, I assumed some of Longton's responsibilities and assigned the remainder to Don Holt, Chief Financial Officer. On April 3, 2000, I consolidated the position of Vice President of Construction with the position held by Emile Tayeh, Vice President of Environmental Affairs, and assigned Emile the duties of both positions. In this way, I eliminated the position of another Vice President. I did that to save the Company money, and the idea of making Emile the Vice President of Construction and promoting someone else to be Vice President of Environmental Affairs, never even occurred to me.

13. The foregoing facts are based upon my personal knowledge and are true and accurate to the best of my knowledge and recollection.

14. The foregoing facts are based upon my personal knowledge and are true and

accurate to the best of my knowledge and recollection.

_Harry Brenner_

HARRY BRENNER

Subscribed and sworn to before me this 4 day of May, 2006.

Notary Public

My commission expires: 10/8/2010

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                        )
                                     )
                    Plaintiff,        )
       v.                            )        CIVIL ACTION NO: 05CV 11161 RGS
                                     )
CUMBERLAND FARMS, INC.               )
AND EMILE C. TAYEH,                  )
                                     )
                    Defendant.        )

### AFFIDAVIT OF EMILE TAYEH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant Emile Tayeh, being duly sworn, does aver as follows:

1. I reside at 65 Bryant St., West Bridgewater, MA 02379.

2. I am Lebanese by birth. I became a naturalized citizen of the United States in 1990. I have been employed by the Defendant Cumberland Farms, Inc. ("the Company") since December 17, 1990.

3. During the time that I have worked for the Company, it has sold gasoline and/or diesel fuel (collectively, "gas") at retail to the general public, through its own stores and gas stations (collectively, "stores"). The Company also sells gas at wholesale to dealers who resell it at retail to the general public. The gas is delivered to the stores and dealers by means of tanker trucks, many of which are owned and operated by the Company. The tankers are loaded with gas at storage terminals which (until December 30, 1993) were owned and operated by the Company as part of its Gulf Oil division.

4. The storage, handling and transportation of gasoline and other petroleum products are subject to regulation by state and federal environmental agencies under applicable state, local and federal environmental laws and regulations.

5. Since the time I was hired, I have had overall responsibility for the Company's compliance with federal, state and local environmental laws in the states where the Company operates.

6. During the entire time that I have worked for the Company, it has relied upon outside contractors who specialize in environmental work ("consultants") to investigate and assess its environmental compliance and remediation needs at the various sites which it owns, controls and/or operates, and to design and implement solutions for environmental compliance and remediation at those sites. The Company has used its own employees to oversee the work of these consultants.

7. My first position with the Company was Construction and Environmental Engineer and in that position I reported directly to Dick Longton, Vice President ("VP") of Construction.

8. When I was hired, Andrew Beland was working in the Company's Gulf Oil Division, where his responsibilities included overseeing compliance with federal, state and local environmental laws, in the operation of the Company's petroleum storage terminals.

9. On March 2, 1991, Andrew Beland transferred into the Construction Department, where he continued to be responsible for overseeing compliance with federal and state environmental laws, in the operation of the Company's petroleum storage terminals.

10. On March 16, 1991, the Company formed the Environmental Affairs Department as an administrative subdivision of its Construction Department. I was promoted

to Manager of Environmental Affairs, and continued to report to Longton. Beland was assigned to the Environmental Affairs Department and reported to me.

11. Oliver Udemba has worked continuously for the Company in its Environmental Affairs Department since May 20, 1991. Along with Colleen Cesarini, I interviewed and hired Oliver. His first position was Project Manager and in that position he reported directly to me. I have authorized and approved all of Oliver's salary increases, since the time he was hired, and I initiated and approved his promotion to Senior Project Manager in August of 1993. In 1993, at Oliver's request, I furnished him with a personal reference in support of his application for an LSP license.

12. On October 1, 1992, I was promoted to Director of Environmental Affairs and in that position I reported directly to Harry Brenner, who at that time was the Senior VP of Retail Operations.

13. On December 13, 1992, I promoted Beland to Project Management Supervisor. In that position, Beland had supervision over Oliver Udemba and three to five other employees in the Environmental Affairs Department, including (at various times), Derrick Golden, David Brochu, Kevin McCabe, Mark Finnegan, Michele Paul and Joseph Friesen, all of whom are Caucasian. Beland continued to be responsible for overseeing compliance with federal, state and local environmental laws, in the operation of the Company's petroleum storage terminals.

14. On December 12, 1993, I was promoted to Vice President of Environmental Affairs, and in that position I continued to report directly to Harry Brenner, who

at that time was the Executive VP and Chief Operating Officer ("COO") of the Company.

15. On December 30, 1993, the Company transferred certain assets, including its petroleum storage terminals, to a newly formed limited partnership, named "Gulf LP." From and after that date, the Company was no longer directly involved in or responsible for the management of those terminals.

16. On December 1, 1994, Andy Beland quit the Company and went to work for Gulf LP. When I told Harry Brenner that Andy was leaving, we discussed whether it was necessary to replace him. The terminals which Andy had been responsible for had been sold to Gulf LP the year before. During the bankruptcy proceeding, the Company had sold all of the stores it had been operating on the Pennsylvania turnpike. In the year since it had emerged from bankruptcy, the Company had sold all of its stores in upstate New York and had settled some major environmental litigation. After reviewing these factors, Harry said that he didn't see the need to replace Andy and I agreed. We did not discuss promoting any of the other project managers to replace Andy.

17. I have read the Complaint in this case, and in Paragraphs 23 and 24 of the Complaint, Oliver Udemba describes a conversation that he claims he had with me in December of 1994, about his desire to fill the position vacated by Andy Beland. Oliver did speak to me about that, before I spoke with Harry Brenner about it. I told Oliver that no decision had been made on replacing Andy, which was true at the time that he and I first spoke about it. After I spoke with Harry, I told Oliver that we were not going to replace Andy. Oliver did not mention race,

or racial discrimination, in these conversations, and neither did I. I did not tell

Oliver, "the construction and other departments of the company would not accept

you," and Oliver did not say to me, "If President Bill Clinton felt that way about

Colin Powell, he could not have become the Chairman of the Joint Chief [sic] of

Staff."

18. Shortly after I told Oliver that we were not going to fill Andy Beland's position,

Colleen Cesarini told me that Oliver had come to see her about it. Colleen

arranged for the two of us to meet with Oliver to explain again why no one was

going to be promoted to replace Andy. Oliver did not say anything about race, or

racial discrimination, or Colin Powell in that meeting.

19. On April 3, 2000, Harry Brenner consolidated my position as Vice President of

Environmental Affairs with the position formerly held by Dick Longton, Vice

President of Construction, and assigned me the duties of both positions.

20. Kevin McCabe worked in the Environmental Affairs Department from 1994 to

1998. When he left, Kevin held the same position that Oliver Udemba held,

Senior Project Manager. I never gave Kevin any authority to supervise Oliver

Udemba, or to give him orders or instructions.

21. In September of 2000, I hired Angela Pimental. At the time she was hired,

Angela had a Bachelor of Science degree in Environmental Geography. On

March 26, 2003, thirty months after she was hired, Angela received a promotion

to Senior Project Manager. Oliver Udemba was promoted to Senior Project

Manager 27 months after he was hired. I never gave Angela any authority to

supervise Oliver, or to give him orders or instructions.

22. I never promised Oliver Udemba a Company car. Andy Beland and I are the only
employees in the Environmental Affairs Department who ever were furnished
with a Company car. I was not furnished with a Company car until I became a
Vice President, in December of 1993. Andy Beland had a Company car when he
joined the Environmental Affairs Department in 1991. Andy needed a car
because he regularly visited the petroleum storage terminals that he was
responsible for, in Massachusetts, New York, Ohio, Pennsylvania, Maine,
Connecticut and New Jersey. When those terminals were sold in December of
1993, Andy's business travel fell off, and he was required to relinquish his
Company car on April 4, 1994.

23. I am the only employee in the Environmental Affairs Department who has ever
been furnished with a cell phone for his exclusive use.

24. Lorraine Higgins ("Higgins") is an individual who was employed by the
Company as Office Supervisor in the Environmental Affairs Department from
August 14, 1995 until March 18, 2002. I asked Lorraine to type up Oliver
Udemba's 1995 performance evaluation, from my handwritten notes. It was I, and
not Lorraine, who determined the scores and other contents of that evaluation. I
did not direct Lorraine to type my name in the space reserved for "supervisor" or
to sign the evaluation. I assumed that she would type my name into that space,
and when Oliver brought to my attention the fact that she had typed in her own
name I instructed her to correct that. I also did not authorize Lorraine to sign the
evaluation, and I changed that, too. I don't know why Lorraine put her own name
on the evaluation, and I can only assume that she misunderstood what I wanted

her to do. The evaluation is dated September 8, 1995, and as of that date Lorraine had only been working for me for three and a half weeks.

25. In 1995, Oliver Udemba brought to my attention the fact that the Company directory listed him as "project manager," when it should have listed him as "senior project manager." I corrected this typographical error as soon as Oliver called it to my attention.

26. The Company has never directly employed anyone as a Licensed Site Professional ("LSP"). The Company has always relied upon its outside consultants to provide LSP services, as necessary. When Oliver Udemba obtained his LSP license, I congratulated him on that achievement, but told him that the Company did not need him to perform any services as an LSP, and he never has rendered any services to the Company as an LSP. Oliver did not need to be licensed as an LSP, in order to oversee the work performed by the LSP's employed by our outside consultants.

27. I have never promised to give any current employee of the Company a contract to perform work for the Company as an outside contractor or consultant

28. The foregoing facts are based upon my personal knowledge and are true and accurate to the best of my knowledge and recollection.

_____
EMILE TAYEH

Subscribed and sworn to before me this 8th day of May, 2006.

_____
Notary Public
My commission expires: 3/15 3013





7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                          )
                                        )
                    Plaintiff,          )
        v.                              )        CIVIL ACTION NO: 05CV 11161 RGS
                                        )
CUMBERLAND FARMS, INC.                  )
AND EMILE C. TAYEH,                     )
                                        )
                    Defendant.          )

## AFFIDAVIT OF PATRICIA A. FIRING
## IN SUPPORT OF DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT

Patricia A. Firing, being duly sworn, does aver as follows:

1. I reside at 30 Prudence Crandall Lane, No. Easton, MA. 02356.

2. I am employed by the Defendant Cumberland Farms, Inc. ("the Company") as
   Director of Human Resources. In this position, I have authorized access to the
   personnel and payroll records of current and former employees of the Company.

3. Andrew Beland ("Beland") came to work for the Company on October 2, 1989.
   He was hired to work in the Company's Gulf Oil Division. On March 2, 1991,
   Beland was transferred to the Construction Department.

4. Colleen Cesarini ("Cesarini") was employed as a Manager in the Company's
   Human Resources Department from 1986 to December 29, 2000.

5. On May 20, 1991, Udemba was hired as a Project Manager in the Environmental
   Affairs Department, at a salary of $23,000 per year.

6. At various time, the project managers in the Environmental Affairs
   Department have been referred to internally as "engineers." The

1

use of the term "engineer" instead of "manager" did not reflect any change in job responsibilities or status within the Company.

7.  Udemba's salary was increased on October 1, 1992, from $23,000 to $23,689.64.

8.  On December 13, 1992, Udemba's salary was increased to $25,000.

9.  On April 17, 1993, Udemba's salary was increased to $27,500.

10. Udemba was promoted to senior project manager on August 30, 1993.

11. Udemba's salary was increased on August 30, 1993 to $30,813.12, in part because of his promotion to senior project manager and in part to reflect a merit increase.

12. Udemba's salary was increased on October 1, 1993 to $32,500.

13. Kevin McCabe ("McCabe") is an individual who was hired to work as a project manager in the Environmental Affairs Department on January 20, 1994 at a salary of $27,500.

14. At the time McCabe was hired, Udemba's salary was $32,500. On April 1, 1994, Udemba's salary was increased to $34,125. On August 30, 1994, Udemba's salary was increased to $35,660. At that time, McCabe's salary was still $27,000.

15. McCabe and Udemba received salary increases in the following percentages:

Percentage Salary Increase

|          | McCabe | Udemba |
|----------|--------|--------|
| 1992     |        | 8.7%   |
| 1993     |        | 30.2%  |
| 1994     |        | 9.6%   |
| 1/20/95  | 28%    |        |
| 8/30/95  |        | 5%     |
|          |        |        |
| 1/20/96  | 15.5   |        |
| 8/30/96  |        | 5%     |
| 1/9/97   |        | 12%    |
| 1/20/97  | 5.5    |        |

| 8/30/97 | | 10.1% |
| 1/20/98 | 10.2 | |
| 8/30/98 | | 4% |

16. Since 1987, the Company's practice has been to furnish a "Company car" to employees in the position of Vice President or above, and to employees whose job duties required them to travel more than 15,000 miles per year.

17. The Company's records show that Udemba never sought reimbursement for more than 2897 miles per year, for business-related travel.

18. Lorraine Higgins ("Higgins") was employed by the Company as Office Supervisor in the Environmental Affairs Department from August 14, 1995 until March 18, 2002. The Company did not furnish Higgins with access to the Internet at work, at any time during her employment.

19. Muriel Tyler ("Tyler") succeeded Higgins as Office Supervisor.

20. The foregoing facts are based upon my personal knowledge and are true and accurate to the best of my knowledge and recollection.

_____

PATRICIA A. FIRING

Subscribed and sworn to before me this 5 day of May, 2006.

_____

Notary Public

My commission expires: 10/8/2010

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                    )
                                 )
               Plaintiff,        )
                                 )
     v.                          )          CIVIL ACTION NO:  05CV 11161 RGS
                                 )
CUMBERLAND FARMS, INC.           )
AND EMILE C. TAYEH,              )
                                 )
               Defendant.        )

**AFFIDAVIT OF FOSTER MACRIDES
IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Foster Macrides, being duly sworn, does aver as follows:

1. I reside at 226 Aldrich Avenue, Warwick, RI 02889.

2. I am employed by the Defendant Cumberland Farms, Inc. ("the Company") as

   Vice President of Human Resources, a position I have held since 1986.

3. On May 1, 1992, the Company filed for reorganization under Chapter 11 of the

   federal Bankruptcy Code. When the Company filed for bankruptcy, all wages and

   salaries of the Company's employees were "frozen."

4. In a memo to the Company's department heads dated October 1, 1992, I

   announced the lifting of the wage "freeze" and an across-the-board increase in

   wages and salaries of 3% for all employees of the Company.  A true copy of that

   memo was marked at Udemba's Deposition as Exhibit 4, Bates # 017, and is

   attached to this Affidavit. Effective October 1, 1992, Oliver Udemba's salary was

   increased by 3%, from $23,000 to $23,689.64.  He received an entirely separate

1

salary increase at the time of his promotion to Senior Project Manager, on August 30, 1993.

5. Oliver Udemba never asked to speak with me about his job, or any aspect of his job. He never communicated to me that he believed he was subjected to discrimination on account of his race. Colleen Cesarini worked for me in the Human Resources Department, from 1986 to December 29, 2000. Oliver never communicated to me that he was unsatisfied with Colleen's handling of anything. After Colleen left the Company, Oliver did not make a claim or report of discrimination on account of race to anyone else in the Human Resources Department.

6. The foregoing facts are based upon my personal knowledge and are true and accurate to the best of my knowledge and recollection.

FOSTER MACRIDES

Subscribed and sworn to before me this 3 day of May, 2006.

Notary Public
My commission expires: 10/8/2010

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                     )
                                  )
                Plaintiff,        )
        v.                        )    CIVIL ACTION NO:  05CV 11161 RGS
                                  )
CUMBERLAND FARMS, INC.            )
AND EMILE C. TAYEH,               )
                                  )
                Defendant.        )

### AFFIDAVIT OF DEBRA DAMON
### IN SUPPORT OF DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT

Debra Damon, being duly sworn, does aver as follows:

1.  I reside at 406 North Avenue, Rockland, MA 02370.

2.  I am employed by the Defendant Cumberland Farms, Inc. ("the Company") as
    Compensation and Operations Manager in the Human Resources department.  I
    have held essentially the same position for over four years.

3.  Attached to this affidavit is a copy of a document which I have been told was
    marked as an exhibit at a deposition in this case, Dep.Ex. 5, Bates # 077.  The
    document displays an organizational chart which I developed in October of 2003.
    I created only the chart itself and do not know where the other information on this
    document originated.

4.  In creating this organizational chart, I used a software program which organizes
    the information I enter on my desktop computer.  The chart shows that there were
    eight (8) positions reporting directly to Emile Tayeh in October of 2003, in
    addition to his personal secretary:  one of these positions ("Proj Engineer") was

1

open, and the others were held by Richie Etzold, Peter Lehtola, Muriel Tyler, Oliver Udemba, Angela Pimental, Donna Polleys and Jason Ruebck. I did not have enough space to display Udemba, Pimental, Polleys, Ruebeck and the open position horizontally, on the same level as Tyler, Lehtola and Etzold, so I displayed them vertically and placed a box at the top of that column with the heading "Environmental Engineers." Doing it that way was my own idea, and my only reason for doing it this way was lack of space. Neither Emile Tayeh nor anybody else told me what information should be displayed on this chart, or how it should be displayed. I did not intend anything on this chart to signify that there was an open supervisory position between Emile Tayah and the project engineers.

5. The foregoing facts are based upon my personal knowledge and are true and accurate to the best of my knowledge and recollection.

DEBRA DAMON

Subscribed and sworn to before me this 18 day of April, 2006.

Notary Public
My commission expires: 10/8/2010

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETTS

OLIVER UDEMBA,                        )
                                     )
                    Plaintiff,        )
v.                                   )        CIVIL ACTION NO:  05CV 11161 RGS
                                     )
CUMBERLAND FARMS, INC.                )
AND EMILE C. TAYEH,                   )
                                     )
                    Defendant.        )

### AFFIDAVIT OF ANGELA PIMENTAL
### IN SUPPORT OF DEFENDANTS' MOTION
### FOR SUMMARY JUDGMENT

Angela Pimental, being duly sworn, does aver as follows:

1. I reside at 62 Elva Road, Weymouth, MA 02191.

2. I was hired by the Defendant Cumberland Farms, Inc. ("the Company") on

   September 25, 2000.

3. I graduated from Bridgewater State College in August of 2000 with a Bachelor of

   Science degree in Environmental Geography, and a GPA of 3.9

4. The foregoing facts are based upon my personal knowledge and are true and

   accurate.

ANGELA PIMENTAL

Subscribed and sworn to before me this 4 day of May, 2006.

Notary Public
My commission expires: 10/8/2010

1

UDEMBA
DEPOSITION
EXHIBIT 4
3-6-06

# RESPONSE TO REQUEST NO. 2

**Date:** 8/21/03

**To:** Emile Tayeh, VP Environmental & Construction

**From:** Oliver Udemba, Senior Project Manager

**RE:** Job Title Clarification

---

I respectfully request that you kindly clarify my job title and employment situation. As you may recall, I had the chance to know for the first time, the contents of my "Employee Profile" sheet after my 2002 annual evaluation. Please see the attached sheet that I obtained from you.

In the profile, my job title is depicted as "Engineer". In the same profile, there is also a history of transfer effective date of "05251991" to corp "061 and Store "4019".

As you know I was employed by Cumberland Farms, Inc. on May 20, 1991 as "Project Manager". I have worked here in the Canton corporate office ever since I was employed. I was "promoted" to Senior Project Manager in 1993.

I am at a loss as to the meaning of these records since they are not consistent with my duties and functions here in the corporate office.

Thank you for your anticipated kind consideration of this matter

Sincerely,

Oliver Udemba

Senior Project Manager

CC: Foster Macrides, VP Human Resources

OU/ml



Tracy Watts - Oliver Udemba

Page

**From:**  Tracy Watts
**To:**  Tayeh, Emile
**Subject:**  Oliver Udemba

Hello Emile!

A copy of Oliver's correspondence of 08/21/03 was directed to my attention. It is my understanding you were seeking information via e-mail, for discussion with Oliver.

It is recognized that Oliver is a Sr. Project Manager, and this is reflected within the Company's organizational charts. In regards to the Employee Profile record in which he is referring "job code 621/Engineer"; we assign job code to every employee. We do not have a different code for every existing job title. (Other persons with his same job title of Sr. Project Manager are also documented on the Employee Profile as Engineer)

In regards to 061/4019. This coding simply reflects the corporation and department or location where the employee is assigned. Further, the date of 05/25/91 is simply the week ending date he started working for the Company.

If you have any questions regarding the above, please let me know. I can be reached at extension 5556.

Tracy Watts
Employee Relations Supervisor

CUMBERLAND FARMS

MEMORANDUM                                    DATE: 08/29/03

TO:     OLIVER UDEMBA, SENIOR PROJECT MANAGER

FROM:   EMILE TAYEH, VP OF CONSTRUCTION/CHIEF OF
        ENVIRONMENTAL AFFAIRS

RE:     JOB TITLE CLARIFICATION

In reference to your memo of August 21, 2003, attached is
a response from our Human Resources Department clarifying
the items you highlighted on your Employee Profile regarding
job title, date of hire and transfer history.  I would also
like to state to you that you are our most Senior Project
Manager within the Department.

                          Emile C. Tayeh

mat

cc:  F. Macrides, VP HUMAN RESOURCES

ENVIRONMENTAL CONTROL

| | | |
|---|---|---|
| VICE PRESIDENT | TATEN, DELLE | 3161,3302,6324 |
| SECRETARY | ROGERS, STACEY | 3302 |
| SUPERVISOR | HIGGINS, LORRAINE | 3419 |
| SR PROJECT MANAGER | MCCABE, KEVIN | 3871 |
| PROJECT MANAGER | DOKELL, TIMOTHY | 3414 |
| PROJECT MANAGER | GOLDEN, DERRICK | 3417 |
| PROJECT MANAGER | LOVELY, WILLIAM | 3416 |
| PROJECT MANAGER | UDBHEN, OLIVER | 3415 |
| DRAFTSMAN | BERRIER, NORMAN | 3159 |
| SPILL COORDINATOR | CASSAULT, JOHN | 3412 |
| REIMBURSEMENT SPEC. | STEELE, LISA | 3420 |
| UST COORDINATOR | POLLETS, DENISA | 3122 |
| ENVIRONMENTAL | GREGORY, JANICE | 3324,3419 |
| | | 3160 |

Emile

The above is information as contained in the 1995 CFL phone directory. It is my understanding that the information received your approval before publication. Whatever the significance of it, I don't think it is very nice. I am dismayed that after 5 years in this department it would appear that my welfare is the least important.

Thank you

10/4/95

[signature]

MEMORANDUM                                              OCTOBER 4, 1995

TO:     WILLIAM SCHULTE, MANAGER, TELECOMMUNICATIONS

FROM:   EMILE C. TAYEH, PE  VP OF ENVIRONMENTAL AFFAIRS

RE:     TELEPHONE DIRECTORY

It has come to my attention that an administrative oversight
has Oliver Udemba's title incorrectly listed in the recent
issue of the Telephone Directory.

Please correct to show Mr. Udemba's title as Senior Project
Manager.

0000006

| | |
|---|---|
| From: | Edward Potkay |
| To: | Finng, Patricia |
| Date: | 3/28/04 10:30AM |
| Subject: | Company Automobiles |

Please be advised that I have been involved in the company automobile program since 1979 and became fully responsible for the program in 1987. It has been always been our policy that non-field, non-VP personnel are only eligible for a company automobile if (1). approved by the divisional VP and (2) the immediate supervisor of the individual can document and/or justify a minimum of 15,000 business miles per year. - or - the Sr. VP acquires approval from the COO of the company if the mileage criteria can not be met.

Please contact me if you should have any further questions.

Edward Potkay
Fleet Manager
Cumberland Farms, Inc.
777 Dedham St.
Canton, MA 02021
781-828-4900 ext 5206
Fax 781-821-2439

EXHIBIT  12



**CUMBERLAND FARMS, INC.**

777 DEDHAM STREET, CANTON, MASSACHUSETTS 02021-9118

PHONE: 617-828-4900    TELEX: 710-348-0130 (CUMBRARMS-CTON)

October 1, 1992

ALL DEPARTMENT HEADS:

I have attached a notice to All Employees from Lily H. Bentas, President. It will be distributed today, Thursday, October 1, 1992. The notice announces the lifting of the wage freeze, a general wage increase and more.

This memo describes the manner in which we will implement the general increase and the restoring of Performance Merit Increases. Your employees will have many questions so please review this memo carefully and be sure to seek our advice if you are in doubt about any aspect of the procedures outlined.

The general increase will be granted to all active, non-retail store/station, non-union employees. Employees compensated by rates other than hourly or salary wage will have such rates adjusted to reflect an increase of up to 3%. This increase will be implemented by the Human Resources Department. No action on the part of Supervisors will be necessary.

The procedure established to exit from the eighteen month Performance Merit Increase postponement is as follows:

Employees previously scheduled for merit increase consideration with April 1991 dates will be evaluated for merit increases effective the same date in October 1992. Likewise, previously scheduled employees from May of 1991 are re-scheduled to November 1992 and so on.

Following this next scheduled review, everyone will begin a new 12 month review cycle. The Human Resources Department will be forwarding you evaluation forms and schedules for all your employees. Please review the information and report any differences to Human Resources for correction, and then you should discuss the schedule with your employees. Retail Store and Station Managers will receive Merit Increase consideration effective January 1, 1993. New employees, those hired on October 1, 1992 or afterwards, will be reviewed on a twelve month cycle for Performance Merit Increases. They will not receive the 3% general increase.

All Plant, Bakery, Beverage, Warehouse, Maintenance and Non-union Terminal employees in job classifications previously granted step increases will begin receiving those step increases based on a continuation of timing in process prior to the freeze, that is, an employee due a step increase in April of 1991 will receive it in October of 1992, those due in May of 1991 will be received in November of 1992, etc.

Your recommendations for merit increases should follow these guidelines: 3.5%, 4.5% or 5.5% increases for performance evaluated as Good, Superior or Outstanding respectively. Overall department averages should be 4.5%. You will be measured against a 4.5% pool of dollars created from your departments current total compensation level. Remember, it will be important that your evaluations resemble a bell shaped normal distribution for you to stay within your 4.5% target.

Peter G. Macrides
Vice President Human Resources

UDEMBA
DEPOSITION
EXHIBIT 5
3-6-06 jm

# RESPONSE TO REQUEST NO. 5

Performance Appraisal
(Exempt Personnel)

Name ____ Oliver C. Udemba _____    Soc. Sec. No. ____

Position Title __ Sr. Project Engineer __ Location ____ En____

Type of Appraisal: ___ Annual ___ XX __ Promotion _____

Evaluation Period:    From : __ 8/30/94 _____    To: __ 8/ _____

Supervisor's Name _____ Lorraine Higins _____    Supervisor's Title ___ Office Supervisor

| Key Performance Factors | Performance Description | *Performance Levels | | | | |
|---|---|---|---|---|---|---|
| **Planning** - Consider ability to conceptualize, formulate ideas, analyze problems, gather facts, ascertain causes, develop, alternative solutions, and predetermine a course of action. | Oliver has a superior ability to analyze problems, gather facts and develop adequate solutions to problems. Oliver has, however, shown a lessening in foreseeing/anticipating work and following through. Oliver needs to work on his ability to delegate. | 1 | 2 | ③ | 4 | 5 |
| **Organizing** - Consider ability to plan, organize and prioritize work activities for effective accomplishment of objectives. | Oliver needs to concentrate on formalizing a plan to prioritize his workload regularly and therefore enable him to work on daily and unplanned activities efficiently. | 1 | 2 | ③ | 4 | 5 |
| **Managing/Directing** - Consider ability to influence people to accomplish desired objectives, ensuring employee (subordinate) understanding through delegation, activation, coordination and management of change. | Oliver has shown good managerial abilities. He needs to increase his motivational skills and coordination in the delegation of work. | 1 | 2 | 3 | ④ | 5 |
| **Controlling** - Consider ability to ensure progress toward object-ives, according to plan, establish reporting system, develop performance standards for employees, measure results, take corrective action, reward and discipline. | Oliver has the ability to see work through to completion in light of the goals of the specific project.  Improvement in timely follow up on pending tasks is necessary. | 1 | 2 | ③ | 4 | 5 |

*Performance Level - Refer to Rating Definitions Chart

*handwritten note:* This evaluation should not have been done by Higins!

0000039

Performance Appraisal
(Exempt Personnel)

Page 2

| Key Performance Factors | Performance Description | *Performance Levels |
|---|---|---|
| Development - Consider ability to select, train, and develop subordinates, and to maintain adequate staffing levels for effective unit performance. | N/A | |
| Communication - Consider effectiveness in communicating with associates, supervision, subordinates, and field management, and effectiveness in handling interpersonal relationships on various organization and/or job related issues. | Oliver has excellent written communications with vendors and authorities. Oliver has good verbal communication; however, there is some room for improvement. | 1  2  3  (4)  5 |
| Technical/Job Knowledge - Consider the understanding of the elements and technical requirements of the current job/position. Knowledge of the job gained through experience, general education and specialized training. | Oliver has an excellent technical and job knowledge based on his education and work experience. Oliver has worked to keep up to date on current regulations and requirements to ensure proper investigations are conducted. | 1  2  3  (4)  5 |
| Decision-Making/Judgement - Consider ability to utilize logical and sound reasoning necessary to respond to routine and unexpected problems in day-to-day operations. | Oliver has an excellent ability to utilize logical and sound reasoning to react and respond to routine and unexpected problems in a day-to-day operation. | 1  2  3  (4)  5 |
| List Additional Performance Factors | Oliver has a very good ability to analyze problems. Oliver has exhibited significant amounts of professional competence, maturity and ethical practices when managing projects overall. | 1  2  3  (4)  5 |
| | | 1  2  3  4  (5) |
| Overall Performance Level Rating | | 1  2  3  (4)  5 |

0000040

Performance Appraisal
(Exempt Personnel)

Page 3

## PERFORMANCE DEVELOPMENT PLAN

1) List and describe the employee's performance strengths (i.e. knowledge, skills, abilities, etc.).

2) List and describe the employee's performance factors needing improvement.

3) Describe the action necessary to achieve improvement in specific areas.

4) Career Development Action Recommended - Indicate action to be taken to increase the employees capabilities for future growth. Include specific education programs, new job experiences, seminars, etc.

5) Career Development Plans - List specific development plans which both the employee and supervisor have agreed will occur during the next year (or rating period).

It is important that employees are informed and their personnel records reflect the consequences for failure to correct a serious weakness. Please indicate below the probable consequences for the employee's failure to correct improvement needs.

☐ Smaller or No          ☐ No Consideration          ☐ Demotion×          ☐ Termination×
  Salary Increase           for Promotion             ×=Consult Human Resources Department

THIS PERFORMANCE APPRAISAL HAS BEEN DISCUSSED WITH ME

Employee's Signature _____ Date ___9/8/95___

Employee's Comments:

I report to the Vice President, Emile Tweh.
It is a major discrepancy to indicate Lorraine Higgins
(office supervisor) as Eng. Supervisor.

Reviewer's Signature _____ Date ___9/8/95___

Second Level Reviewer's Signature _____ Date _____

SALARY CHANGE APPROVAL FORM

| CORP | SORD | MD | EMPLOYEE NAME | EMPLOYEE TITLE | F/T | FT/PT | CURRENT ANNUAL SALARY | PROPOSED ANNUAL SALARY | SALARY CHANGE AND % | PERF• RATING | EFF DATE | % AMOUNT LAST INCREASE | DATE | % AMOUNT PREVIOUS INCREASE | DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXAMPLE: 061 | 1002 | 01 | SMITH, MARY | | FT | | $20,800.00 | $21,632.00 | 4.00% | GOOD | 01/01/93 | 3.00% | 10/01/92 | 4.00% | 07/01/93 |
| | | | Udemba, Oliver | L. Higgins | FT | | 35,659.00 | 37,441.95 | 5.00% | Superior | 8/30/95 | 4.5 | 8/30/95 | 5.0 | 2/28/94 |

NOTE: INCREASES FOR OTHER THAN NORMAL MERIT SHOULD BE NOTED IN THE PERFORMANCE RATING COLUMN.

APPROVALS:

DEPARTMENT HEAD: _____

VICE PRESIDENT: _____

HUMAN RESOURCES: _____

0000042

Performance Appraisal
(Exempt Personnel)

*(handwritten)* 8.30.94 to 8.3005

Name ____Oliver C. Udemba____     Soc. Sec. No. ___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___

Position Title __Sr. Project Engineer__  Location ____Environmental Department____

Type of Appraisal:   __Annual__   __XX__   Promotion _____   Other _____

Evaluation Period:   From : __8/30/94__                          To: __8/30/95__

Supervisor's Name ___Emile Tayeh___     Supervisor's Title  Vice President

| Key Performance Factors | Performance Description | *Performance Levels |
|---|---|---|
| **Planning** – Consider ability to conceptualize, formulate ideas, analyze problems, gather facts, ascertain causes, develop, alternative solutions, and predetermine a course of action. | Oliver has a superior ability to analyze problems, gather facts and develop adequate solutions to problems. Oliver has, however, shown a lessening in foreseeing/anticipating work and following through. Oliver needs to work on his ability to delegate. | 1  2  ③  4  5 |
| **Organizing** – Consider ability to plan, organize and prioritize work activities for effective accomplishment of objectives. | Oliver needs to concentrate on formalizing a plan to prioritize his workload regularly and therefore enable him to work on daily and unplanned activities efficiently. | 1  2  ③  4  5 |
| **Managing/Directing** – Consider ability to influence people to accomplish desired objectives; ensuring employee (subordinate) understanding through delegation, motivation, coordination and management of change. | Oliver has shown good managerial abilities. He needs to increase his motivational skills and coordination in the delegation of work. | 1  2  3  ④  5 |
| **Controlling** – Consider ability to ensure progress toward object-ives, according to plan, establish reporting system, develop performance standards for employees, measure results, take corrective action, reward and discipline. | Oliver has the ability to see work through to completion in light of the goals of the specific project. Improvement in timely followup on pending tasks is necessary. | 1  2  3  4  5 |

*Performance Level – Refer to Rating Definitions Chart

0000043

Performance Appraisal
(Exempt Personnel)

Page 2

| Key Performance Factors | Performance Description | *Performance Levels |
|---|---|---|
| **Development** – Consider ability to select, train, and develop subordinates, and to maintain adequate staffing levels for effective unit performance. | N/A | 1  2  3  4  5 |
| **Communication** – Consider effectiveness in communicating with associates, supervision, subordinates, and field management, and effectiveness in handling interpersonal relationships on various organization and/or job related issues. | Oliver has excellent written communications with vendors and authorities. Oliver has good verbal communication; however, there is some room for improvement. | 1  2  3 ④ 5 |
| **Technical/Job Knowledge** – Consider the understanding of the elements and technical requirements of the current job/position. Knowledge of the job gained through experience, general education and specialized training. | Oliver has an excellent technical and job knowledge based on his education and work experience. Oliver has worked to keep up to date on current regulations and requirements to ensure proper investigations are conducted. | 1  2  3 ④ 5 |
| **Decision-Making/Judgement** – Consider ability to utilize logical and sound reasoning necessary to respond to routine and unexpected problems in day-to-day operations. | Oliver has an excellent ability to utilize logical and sound reasoning, to react and respond to routine and unexpected problems in a day to day operation. | 1  2  3 ④ 5 |
| **List Additional Performance Factors** | Oliver has a very good ability to analyze problems. Oliver has exhibited significant amounts of professional competence, maturity and ethical practices when managing projects overall. | 1  2  3 ④ 5 |
| **Overall Performance Level Rating** | | 1  2  3 ④ 5 |

0000044

Performance Appraisal
(Exempt Personnel)

Page 3

## PERFORMANCE DEVELOPMENT PLAN

1) List and describe the employee's performance strengths (i.e. knowledge, skills, abilities, etc.).

2) List and describe the employee's performance factors needing improvement.

3) Describe the action necessary to achieve improvement in specific areas.

☐ Smaller or No
Salary Increase

☐ No Consideration
for Promotion

☐ Demotion*
*Consult Human Resources Department

☐ Termination*

It is important that employees are informed and their personnel records reflect the consequences for failure to correct a serious weakness. Please indicate below the probable consequences for the employee's failure to correct improvement needs.

4) Career Development Action Recommended – Indicate action to be taken to increase the employees capabilities for future growth. Include specific education programs, new job experiences, seminars, etc.

5) Career Development Plans – List specific development plans which both the employee and supervisor have agreed will occur during the next year (or rating period).

THIS PERFORMANCE APPRAISAL HAS BEEN DISCUSSED WITH ME

Employee's Signature _____ Date ___9/8/95___

Employee's Comments: I report to the Vice President, Emile Tavieh.
It is a major discrepancy to indicate Lorraine Higgin,
(office supervisor) as my supervisor.

Reviewer's Signature _____ Date _9/9/95_

Second Level Reviewer's Signature _____ Date _____

0000045



EXHIBIT 1

"B"

Jun-02-04   04:03pm   Exam-LEUL-QUALITY ASSURANCE OFFICE

| K. J. MCCABE | | KEVIN | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

1 FOGG RD

01-20-94   621   01-20-97   ENGINEER

04-15-70

822.62   42776.24   40.00

1.00

RANDOLPH   MA 02368

01-20-94

**SALARY, JOB AND EVALUATION HISTORY CHRONOLOGICALLY**

TRANSFER HISTORY

| Effective Date | | | | Amount of Change | | Job Code | | Job Title | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 01-20-97 | | 822.62 | 2230.28 | | 5.5 % | 621 | ENGINEER | | | |
| 01-20-96 | | 779.73 | 5441.28 | | 15.5 % | 621 | ENGINEER | | | |
| 01-20-95 | | 675.09 | | | | 621 | ENGINEER | | | |
| 01-20-94 | | | 27499.68 | | % | 621 | ENGINEER | | | |
| 01-20-94 | | 528.84 | | | | 621 | ENGINEER | | | |

012094

| | | 621 | ENGINEERS | 10 | BACHELORS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

TRANSFER TO

04   04   0000

**BENEFITS (EMPLOYER AND EMPLOYEE CONTRIBUTIONS)**

04-01-96

03-01-95

01-20-95   01-20-94

01-20-97   01-20-98

COMMENTS

PERSONNEL COPY

EXHIBIT 3

"D"

0000074

CUMBERLAND FARMS INC.

A M PIMENTAL

ANGELA    00000000

UC HICKS ROCK ROAD

07252000    621    06022003  ENGINEER

04273976    750.64    49433.28    40.00

PLYMOUTH    MA 02360    000001.00

F  09252000

| | | | | | |
|---|---|---|---|---|---|
| 2354.04 | 5.0 % | 621 | ENGINEER | | |
| 2559.44 | 5.7 % | 621 | ENGINEER | 11112000 | 061 4019 |
| 2539.92 | 6.0 % | 621 | ENGINEER | 09302000 | 061 4019 |
| 4700.28 | 12.6 % | 621 | ENGINEER | | |
| 208.00 | .5 % | 146 | PROJECT MANAGER | | |
| 40908.40 | 52.4 % | 146 | PROJECT MANAGER | | |
| | | 126 | SPILL COORDINATOR | | |

D  S  621  ENGINEERS    04  HIGH SCHOOL

04    04    0000

01    12012000

09302000    12012000    06022003    06022004

E TAYEH

PERSONNEL COPY

**EXHIBIT 4(a)**

** TOTAL PAGE.02 **

"F"

0000076



**CUMBERLAND FARMS INC**
**CONSTRUCTION/ENVIRONMENTAL**
10/07/2003

Attention: Lionel Porter
Hiroshi & Dimitry

Dec 15, 1993
Emile Tayeh was promoted Vice President of Environmental Affairs

1991 - 1993

is up for me?

Oliver O. Uzemba
*Environmental Engineer*

Cumberland Farms, Inc.
777 Dedham Street, Canton, MA 02021-9118
Tel: 617-828-4900 Ext. 03415  1-800-225-9702
Fax: 617-828-1497

EMILE TAYEH
VICE PRESIDENT CONSTRUCTION & CHIEF OF ENVIRONMENTAL AFFAIRS

LEEANN BATES
EXECUTIVE SECRETARY

RICHIE ETZOLO
PROJECT MGR/UST

CAROLE MCGEE
SR SECRETARY

MELISSA BLUDDEN
SPILL COORDINATOR

DEBORAH LEBELLO
UST COORDINATOR

JANE CARMICHAEL
UST COORDINATOR

PETER LEHTOLA
DIR CONSTRUCTION

JOHN BUGNER
CONST SUPV

N. RUTHEN
PROJECT MGR

R. THIBEOUX
PROJECT MGR

J. SCHOLES
PROJECT MGR

GAS CONSTRUCTION
MECHANICS

MURIEL TYLER
OFFICE MANAGER

SONIE JEAN
SR SECRETARY

LESLIE ALLEN
CONSTRUCTION COORD

JANE CARMICHAEL
EXPENSE COORDINATOR

CONNIE GREY
AP COORDINATOR

ZORAIDA ESTRELLA
AP COORDINATOR

MARY GIUSTI
AP COORDINATOR

ENVIRONMENTAL ENGINEERS

OLIVER UDEMBA
SR PROJ ENGINEER

ANGELA PIMENTAL
SR. PROJ ENGINEER

DONNA POLLEYS
PROJ ENGINEER/REIMBURSEMENTS

LOIS GRAHAM
REIMBURSEMENT SPECIALIST

OPEN
PROJ ENGINEER

JASON RUEBECK
PROJ ENGINEER

EXHIBIT 6

"G"

UDEMBA
DEPOSITION

EXHIBIT 7
*JMW* 3-6-06

# RESPONSE TO REQUEST NO. 11

LAW OFFICES
## HRONES AND GARRITY
LEWIS WHARF - BAY 232
BOSTON, MASSACHUSETTS 02110-3927

STEPHEN HRONES
JESSICA D. HEDGES

OF COUNSEL
DONALD HARWOOD
(ALSO MEMBER OF NEW YORK BAR)
JOSÉ LUIS SERPA

LIONEL PORTER
PARALEGAL December 16, 2003

TELEPHONE (617) 227-4019
FACSIMILE (617) 227-3908
E-MAIL hrones@masscriminallawyer.com
WEBSITE www.masscriminallawyer.com

PAUL J. GARRITY
(ALSO MEMBER OF NEW HAMPSHIRE BAR)

NEW HAMPSHIRE OFFICE:

14 LONDONDERRY ROAD
LONDONDERRY, NEW HAMPSHIRE 03053
TELEPHONE (603) 434-4106
FACSIMILE (603) 437-6714

Ann Giantonio, Supervisor
Equal Employment Opportunity Comm'n
John F Kennedy Federal Bldg, Rm 475
Government Center
Boston, MA   02203

Re:  *Oliver Udemba v. Cumberland Farms, Inc., et. al., and Emile Tayeh*, EEOC No.__

Dear Ms. Giantonio:

Enclosed please find Complaint and Notice Of Appearance in the above-referenced matter. We are amenable to mediation.

If there are questions or comments, please contact Lionel Porter, who represents the this law firm in all proceedings.

Sincerely,

Stephen Hrones

LP/ams
Enclosures
cc:  Oliver Udemba

0000125

CHARGE NUMBER

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

☒ FEPA
☐ EEOC

United States Equal Employment Opportunity Comm'n

_____ and EEOC
State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Oliver Udemba | 508/620-2963 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 76A Beaver Park Road, Framingham, MA 01702 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Cumberland Farms, Inc., et al, and | | |

| STREET ADDRESS Emile Tayeh | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 1991 | 12/2003 |

☒☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

SEE EXHIBIT "A", attached hereto.

ADRYANN M. STRAUSS
Notary Public
My Commission Expires February 11, 2005

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

Oliver Udemba

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Month, day and year) 12/16/2003

Date _____   Charging Party (Signature)

EEOC FORM 5 (Rev. 07/99)

0000127

## CERTIFICATE OF SERVICE

I, Stephen Hrones, hereby certify that on this __16th__ day of December, 2003, I have served a true and correct copy of the foregoing COMPLAINT OF OLIVER C UDEMBA, via United States First-Class Mail, postage prepaid, as follows:  MCAD, One Ashburton Place, Ste 601, Boston, MA   02108.

Stephen Hrones

0000138

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ORIGINAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OLIVER UDEMBA,

            Plaintiff

     vs.             No. 05-11161-RGS

CUMBERLAND FARMS, INC.

and EMILE C. TAYEH,

            Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME:  I

PAGES: 1-288

DEPOSITION of OLIVER UDEMBA, a witness
called on behalf of the Defendants,
pursuant to the Federal Rules of Civil
Procedure, before Judith McGovern
Williams, Certified Shorthand Reporter
No. 130993, Registered Professional
Reporter, Certified Realtime Reporter,
Certified LiveNote Reporter, and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Seyfarth,
Shaw, Two Seaport Lane, Boston,
Massachusetts  02110, on Monday, March 6,
2006, commencing at 10:20 a.m.

1   A.  I don't know if I do.  I don't remember if

2      I do.

3   Q.  Well, how many miles a year do you say

4      that you incur for these business trips

5      that you don't seek reimbursement from the

6      company for?  Is it over a thousand miles

7      a year?

8   A.  I don't have a number for you now.  I

9      don't know.

10  Q.  You have no idea if it is 5 miles or 500

11     miles?

12  A.  No.  Not right now.  I don't have -- I

13     don't have an idea.  I don't have a number

14     for you.

15  Q.  Okay.  Aside from the mileage, are there

16     any other expenses that you incur in the

17     course of your work for Cumberland Farms

18     that you do not get reimbursed for?

19  A.  Well, I mean sometimes when you go to the

20     site you, you know, grab a bite to eat.

21     Sometimes I don't -- if I don't have, you

22     know, if sometimes I lose the receipt.  If

23     I lose the receipt, you know, I --

24     sometimes I don't claim -- I don't -- I

Page 179

1          what the -- the acronym, you know, stands

2          for.

3    Q.    All right.  I stand corrected.

4                    How does one get licensed as an

5          LSP in Massachusetts?

6    A.    An LSP, it is an engineer.

7    Q.    No.  I asked you how one gets licensed.

8    A.    You go through a screening process to --

9          and then after that, you take a qualifying

10         exam.

11   Q.    Okay.  When did you get licensed as an LSP

12         in Massachusetts?

13   A.    I believe it was in 1997.

14   Q.    Okay.  And after you obtained your LSP

15         license, you performed work for the Town

16         of Pelham as an LSP; correct?

17   A.    Yes.

18   Q.    Okay.

19                    MR. MOSS:  Mark this.

20                    (One-page letter dated

21                     September 20, 2003 to Mr. Nee

22                     from Mr. Udemba and

23                     attachments marked exhibit

24                     number 18 for identification.)

Page 189

```
 1   A.   Yes.

 2   Q.   And that is a seal which every Licensed

 3        Site Professional is required to apply

 4        before he files with the DEP; correct?

 5   A.   Yes.

 6             MR. MOSS:  Okay.  Let's take a

 7        break.  Is five minutes okay?

 8             MS. LIPEDE:  That's fine.

 9             (Recess taken at 2:40 p.m.)

10             (Recess ended at 2:52 p.m.)

11        BY MR. MOSS:

12   Q.   Mr. Udemba, we have already had occasion

13        to refer to consultants, and the

14        consultants that we have referred to,

15        these are not employees of Cumberland

16        Farms, Inc.; is that right?

17   A.   The consultants are not?  Yes.

18   Q.   That is correct?

19   A.   Yes.

20   Q.   You are an employee of Cumberland Farms,

21        Inc.; right?

22   A.   Yes.

23   Q.   These consultants are outside businesses

24        that Cumberland Farms hires as outside
```

Page 190

```
 1        contractors to perform work on

 2        environmental projects?

 3   A.   Yes.

 4   Q.   Is that correct?

 5   A.   Yes.

 6   Q.   And so they have their own employees?

 7   A.   Yes.

 8   Q.   And so they are not employees of

 9        Cumberland Farms?

10   A.   No.

11   Q.   So when I use the word "consultants," do

12        you understand that I am referring to

13        those people?

14   A.   Yes.

15   Q.   Okay.  And you mentioned one of them, ECS?

16   A.   Yes.

17   Q.   And that stands for?

18   A.   Environmental Compliance Services, Inc.

19   Q.   Okay.  And can you name any others that

20        Cumberland Farms uses?

21   A.   ENSR Corporation, E-N-S-R.

22   Q.   E-N-S-R?

23   A.   Yes.  ENSR Corporation.

24   Q.   And are there any others?
```

Page 199

1    Q.   Let me ask you something.  The outside

2         consultants are actually doing the

3         physical work at the site?

4    A.   Yes.

5    Q.   Correct?

6    A.   Yes.

7    Q.   You don't do any of that?

8    A.   No.

9    Q.   So whether it is a question of taking

10        samples of the air, soil, and water or

11        testing the samples or excavating the site

12        to remove contaminated materials, that is

13        all done by outside consultants?

14   A.   Yes.

15   Q.   It is not done by you?

16   A.   No.

17   Q.   It is not done by any Cumberland Farms

18        employees?

19   A.   No.

20   Q.   Okay.  All right.  And has that been true

21        for as long as you have worked for

22        Cumberland Farms?

23   A.   Yes.

24   Q.   Okay.  So since you were hired in 1991,

Page 200

```
1           you have never done any of that work?
2           That has all been done by outside
3           consultants?
4     A.    Yes.
5     Q.    Correct?
6     A.    Yes.
7     Q.    Okay.  So there is this relationship, I
8           guess I would call it, between Cumberland
9           Farms and the outside consultants, or
10          between you, Oliver Udemba, and the
11          outside consultants, that they do their
12          thing, and you do your thing?
13                  MS. LIPEDE:  Objection --
14    A.    No.
15                  MS. LIPEDE:  -- as to form.
16    A.    No.
17    Q.    No?
18    A.    No.
19    Q.    All right.  Maybe I am misconstruing it.
20          You don't do what the consultants do, and
21          they don't do what you do?
22    A.    No.  They don't do their own thing.  You
23          said they do their own thing.  They do --
24          whatever they do is predicated upon what I
```

Page 202

1   Q.   Okay.  What has changed?

2   A.   Well, since that --

3              MS. LIPEDE:  Objection.  Because

4        I'm not sure what time frame you are

5        referring to.

6              MR. MOSS:  Well, I am talking

7        about since he started work for Cumberland

8        Farms in 1991.

9              MS. LIPEDE:  Well --

10  Q.   Let's go back five years.  Has it changed

11       in the last five years?

12  A.   No.

13  Q.   Did it change in the five years before

14       that?

15  A.   Well, it has changed -- no.

16  Q.   That brings us back five years.  And you

17       have worked for Cumberland Farms since

18       1991.  So did the division of labor

19       between you and the outside consultants

20       change in the first five years that you

21       worked for Cumberland Farms?

22  A.   No.

23  Q.   Okay.  So that's the point that I'm trying

24       to establish, that the division of labor

Page 203

1        between you and the outside consultants

2        hasn't changed since you started work for

3        Cumberland Farms; is that correct?

4   A.   Yes.

5   Q.   Thank you.  Tell me if you recognize these

6        names.  These are people that work for

7        CEA.  Steven Migridichian,

8        M-I-G-R-I-D-I-C-H-I-A-N?

9   A.   Yes.

10  Q.   Adam Last?

11  A.   Yes.

12  Q.   Scott Masse?

13  A.   Yes.

14  Q.   M-A-S-S-E?

15  A.   Yes.

16  Q.   For LBG, Dan Bezea, B-E-Z-E-A?

17  A.   Yes.

18  Q.   Rob Good?

19  A.   Yes.

20  Q.   John, Zbell, Z-B-E-L-L?

21  A.   Yes.

22  Q.   Lydia Key?

23  A.   Yes.

24  Q.   Matt Robbins?

Page 260

1   A.   Yes.

2   Q.   So it wasn't necessary for you to have an

3        LSP license in order to serve that

4        function, was it?

5   A.   No.

6   Q.   And if you testified previously that you

7        were on call because --

8            MR. MOSS:  Strike that.  Let me

9        start that over.

10  Q.   The firm of ECS that you identified, one

11       of the consultants, --

12  A.   Yes.

13  Q.   -- okay, do they employ any Licensed Site

14       Professionals?

15  A.   Yes.

16  Q.   And have they always employed Licensed

17       Site Professionals as long as they have

18       been doing work for Cumberland Farms?

19  A.   No.

20  Q.   When did they not have a Licensed Site

21       Professional?

22  A.   When it wasn't the law to have a Licensed

23       Site Professional.

24  Q.   And when did that law go into effect?

Page 261

1    A.    '93-'94.

2    Q.    And ever since then has ECS employed

3          Licensed Site Professionals?

4    A.    Yes.

5    Q.    Okay.  What about the other consultants

6          that you identified?  Do they also employ

7          Licensed Site Professionals?

8    A.    Yes.

9    Q.    Okay.  And so when Cumberland Farms

10         employs one of these outside consulting

11         firms to perform work of an environmental

12         nature, is it thereby utilizing the

13         Licensed Site Professional employed by

14         that consultant?

15   A.    Say that again?

16   Q.    When Cumberland Farms employs one of these

17         consulting firms, is it thereby employing

18         the Licensed Site Professional who works

19         for that consultant?

20   A.    Yes.

21   Q.    Can you take a look at exhibit 21 in your

22         pile, please?

23              (Witness complying.)

24   Q.    Do you remember --

Page 262

1   A.   Yes.

2   Q.   -- I asked you about the seal that appears

3        there?

4   A.   Yes.

5   Q.   Okay.  The outside consultants that we

6        have been talking about, such as ECS and

7        CEA and LBG, they all have Licensed Site

8        Professionals who have their own seal;

9        correct?

10  A.   Yes.

11  Q.   And all of the reports that require an

12       LSP's seal on projects for Cumberland

13       Farms have been filed by the LSPs employed

14       by these consultants; am I right?

15  A.   Employed by the LSPs of record of these

16       companies, yes.

17  Q.   So, in other words, Cumberland Farms has

18       relied upon the LSPs employed by its

19       outside consultants to file all reports

20       with the Massachusetts Department of

21       Environmental Protection that require an

22       LSP's seal; correct?

23  A.   Cumberland Farms has used outside LSPs as

24       the LSPs of record to file those reports.

Page 263

1    Q.   Okay.  And I would like you to tell me in

2         what way Cumberland Farms is required by

3         the Commonwealth of Massachusetts to

4         employ an LSP as one of its own employees.

5    A.   I didn't tell -- I didn't tell you that

6         the Commonwealth of Massachusetts required

7         Cumberland Farms to do so.

8    Q.   In fact, there is no requirement as a

9         matter of law in Massachusetts that

10        Cumberland Farms employ its own LSP, is

11        there?

12   A.   No.

13              MS. LIPEDE:  Objection.

14   Q.   I am sorry.  Your answer is no?

15   A.   Yes.

16   Q.   Okay.  Okay.  In fact Cumberland Farms is

17        reimbursed by the Commonwealth of

18        Massachusetts for the services performed

19        by the LSPs that are employees of the

20        outside consultants; correct?

21   A.   Cumberland Farms is reimbursed for --

22        Cumberland Farms participates in the

23        insurance program with the state, and they

24        get some degree of reimbursement for both

Page 275

1           an LSP, could you perform that function

2           for Cumberland Farms in their place?

3    A.    I am already performing the function of

4           the LSP.

5    Q.    Well, I mean you haven't filed any reports

6           with the state on behalf of Cumberland

7           Farms with the seal of an LSP, have you?

8    A.    No.  I have not become -- I am not the LSP

9           of record.

10   Q.    Okay.  So thank you for correcting me.  If

11          an outside consultant performing work for

12          Cumberland Farms did not have an LSP of

13          record on that site, could you perform

14          that function?

15   A.    Yes.

16   Q.    Okay.  But you have not done so?

17   A.    No.

18   Q.    Okay.

19               MR. MOSS:  Well, could you mark

20          that?

21   A.    But I have been the supervising LSP as

22          required.

23               MS. LIPEDE:  There is no

24          question before you.

Page 1

VOLUME: II

PAGES: 1 to 244

EXHIBITS: 34-36

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11161 RGS

OLIVER UDEMBA,                    )

            Plaintiff,            )

                                  )

v.                                )

                                  )

CUMBERLAND FARMS, INC., and       )

EMILE C. TAYEH,                   )

            Defendants.           )

                                  )

CONTINUED DEPOSITION OF OLIVER
UDEMBA, called as a witness on behalf of the
Defendants, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Jeanette N. Maracas,
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Offices of Seyfarth
Shaw, LLP, Two Seaport Lane, Boston,
Massachusetts, on Tuesday, March 7, 2006,
commencing at 9:16 a.m.

Page 24

| | | |
|---|---|---|
| 10:04:47 | 1 | renting a pizza shop, who is renting the |
| 10:04:51 | 2 | location where we have a public water supply |
| 10:04:55 | 3 | installation, received correspondence and |
| 10:04:58 | 4 | called the DEP.  Then the DEP called me to -- |
| 10:05:03 | 5 | Q.  My question was what instruction did you |
| 10:05:05 | 6 | receive from the DEP? |
| 10:05:06 | 7 | A.  To make sure that that facility that I |
| 10:05:12 | 8 | take care of, I get the information that |
| 10:05:16 | 9 | the lady have that should have been coming |
| 10:05:18 | 10 | to me, to make sure I retrieved the |
| 10:05:22 | 11 | information, and we discussed the -- |
| 10:05:23 | 12 | Q.  What instruction did you receive from the |
| 10:05:25 | 13 | DEP? |
| 10:05:25 | 14 | A.  To make sure that I take actions for the |
| 10:05:31 | 15 | water supply facility to be in compliance, |
| 10:05:33 | 16 | to take care of compliance. |
| 10:05:35 | 17 | Q.  What actions did you take in order to carry |
| 10:05:37 | 18 | out that instruction? |
| 10:05:40 | 19 | A.  I talked to the lady and asked her to forward |
| 10:05:45 | 20 | the information that the DEP forwarded to |
| 10:05:47 | 21 | her to me. |
| 10:05:48 | 22 | Q.  So which lady was that? |
| 10:05:51 | 23 | A.  It's the lady that is renting the pizza |
| 10:05:57 | 24 | shop in one of our supermarkets.  I don't |

Page 54

| | | | |
|---|---|---|---|
| 10:50:34 | 1 | Q. | Mr. Udemba, are you now saying that Mr. Tayeh |
| 10:50:37 | 2 | | said something in response to your analogy |
| 10:50:39 | 3 | | about Colin Powell? |
| 10:50:41 | 4 | A. | I'm saying I don't recollect all the |
| 10:50:45 | 5 | | conversations that went on. |
| 10:50:46 | 6 | Q. | Can you answer my question, sir, yes or no, |
| 10:50:49 | 7 | | are you now saying under oath that Mr. Tayeh |
| 10:50:53 | 8 | | said something in response to your analogy |
| 10:50:55 | 9 | | about Colin Powell? |
| 10:50:56 | 10 | A. | I'm saying that I don't remember everything |
| 10:50:59 | 11 | | that -- |
| 10:51:00 | 12 | Q. | Just answer my question.  Are you saying |
| 10:51:01 | 13 | | that he made a response to your analogy |
| 10:51:03 | 14 | | about Colin Powell?  Yes or no. |
| 10:51:05 | 15 | A. | I'm not saying that. |
| 10:51:07 | 16 | | MS. LIPEDE:  It's been asked and |
| 10:51:08 | 17 | | answered about three times. |
| 10:51:11 | 18 | A. | I'm not saying that. |
| 10:51:12 | 19 | | MS. LIPEDE:  He's saying he can't |
| 10:51:14 | 20 | | recall. |
| 10:51:14 | 21 | A. | I can't recall whether he said anything or |
| 10:51:15 | 22 | | not. |
| 10:51:16 | 23 | Q. | You can't recall whether he said anything |
| 10:51:18 | 24 | | or not? |

Page 55

| 10:51:19 | 1 | A. | Yes, I told you that. |
| 10:51:20 | 2 | Q. | So the best of your recollection is that he |
| 10:51:24 | 3 | | said nothing? |
| 10:51:25 | 4 | | MS. LIPEDE:  Objection. |
| 10:51:25 | 5 | A. | No, I don't recall whether he said anything |
| 10:51:27 | 6 | | or not. |
| 10:51:27 | 7 | Q. | Okay.  Now, the position that you were asking |
| 10:51:55 | 8 | | Mr. Tayeh about was the position that had |
| 10:52:01 | 9 | | previously been held by Andrew Beland; is |
| 10:52:03 | 10 | | that correct? |
| 10:52:03 | 11 | A. | Yes. |
| 10:52:08 | 12 | Q. | What was Mr. Beland's position? |
| 10:52:12 | 13 | A. | The position, he was supervising project |
| 10:52:18 | 14 | | manager. |
| 10:52:20 | 15 | Q. | Was he your supervisor? |
| 10:52:21 | 16 | A. | Yes. |
| 10:52:23 | 17 | Q. | And he left that position -- |
| 10:52:26 | 18 | A. | Yes. |
| 10:52:27 | 19 | Q. | -- in December of 1994? |
| 10:52:30 | 20 | A. | Yes, or thereabouts, yes. |
| 10:52:34 | 21 | Q. | That's the position that you say that you |
| 10:52:38 | 22 | | approached Mr. Tayeh about filling? |
| 10:52:40 | 23 | A. | Yes. |
| 10:52:42 | 24 | Q. | Was anybody else given that position when |

Page 56

| 10:52:46 | 1 | | Mr. Beland left? |
| 10:52:50 | 2 | A. | No. |
| 10:52:53 | 3 | Q. | Nobody?  It was never filled? |
| 10:52:56 | 4 | A. | Well -- |
| 10:52:58 | 5 | Q. | It's a yes or no question, Mr. Udemba. |
| 10:53:01 | 6 | | MS. LIPEDE:  Let him answer.  You |
| 10:53:04 | 7 | | don't know whether it's yes or whether it |
| 10:53:05 | 8 | | isn't. |
| 10:53:06 | 9 | Q. | Was it filled or wasn't it? |
| 10:53:09 | 10 | A. | I don't know if it was filled or not. |
| 10:53:09 | 11 | Q. | You don't know? |
| 10:53:10 | 12 | A. | No. |
| 10:53:11 | 13 | Q. | Well, who filled it? |
| 10:53:14 | 14 | A. | I don't know. |
| 10:53:25 | 15 | Q. | Now, you attribute to Mr. Tayeh the remark, |
| 10:53:30 | 16 | | quote, "the construction and other |
| 10:53:32 | 17 | | departments of the company would not accept |
| 10:53:34 | 18 | | you," close quote, and then you go on to |
| 10:53:36 | 19 | | say in Paragraph 23, "Mr. Tayeh made these |
| 10:53:39 | 20 | | comments because Mr. Udemba is a black |
| 10:53:43 | 21 | | African and the construction department |
| 10:53:45 | 22 | | and other departments at the time were |
| 10:53:47 | 23 | | predominantly white."  Mr. Tayeh did not say |
| 10:53:50 | 24 | | that, though, correct?  He didn't say it's |

Page 57

| | | | |
|---|---|---|---|
| 10:53:54 | 1 | | because you're a black African? |
| 10:53:58 | 2 | A. | He implied it. |
| 10:53:59 | 3 | Q. | He didn't say -- Mr. Udemba, please answer |
| 10:54:01 | 4 | | my question. |
| 10:54:04 | 5 | A. | No, he didn't say it.  He didn't use those |
| 10:54:07 | 6 | | words exactly, no. |
| 10:54:09 | 7 | Q. | He didn't say anything about you being a |
| 10:54:12 | 8 | | black African, did he? |
| 10:54:14 | 9 | | MS. LIPEDE:  Objection. |
| 10:54:18 | 10 | A. | No. |
| 10:54:20 | 11 | Q. | He didn't say anything about the construction |
| 10:54:22 | 12 | | and other departments being predominantly |
| 10:54:25 | 13 | | white, did he? |
| 10:54:26 | 14 | A. | No. |
| 10:54:27 | 15 | Q. | He didn't make any reference to race, white |
| 10:54:31 | 16 | | or black, in that conversation, did he? |
| 10:54:33 | 17 | A. | No. |
| 10:54:41 | 18 | Q. | Now, in Paragraphs 23 and 24, you say that |
| 10:55:00 | 19 | | Mr. Tayeh made that comment that the |
| 10:55:04 | 20 | | construction and other departments of the |
| 10:55:05 | 21 | | company would not accept you because you |
| 10:55:09 | 22 | | are a black African and the other departments |
| 10:55:11 | 23 | | were predominantly white.  Do you have some |
| 10:55:23 | 24 | | evidence to support that other than what's |

Page 58

| 10:55:27 | 1 | | in your complaint? |
| 10:55:32 | 2 | A. | Do I have some evidence to support the |
| 10:55:37 | 3 | | statement? |
| 10:55:38 | 4 | Q. | Yes, your conclusion.  You say Mr. Tayeh |
| 10:55:41 | 5 | | made these comments because Mr. Udemba is a |
| 10:55:44 | 6 | | black African and the construction and |
| 10:55:46 | 7 | | other departments at the time were |
| 10:55:49 | 8 | | predominantly white.  My question is, do |
| 10:55:51 | 9 | | you have any evidence to support that |
| 10:55:54 | 10 | | conclusion that it was race?  Let me break |
| 10:56:02 | 11 | | it down for you, Mr. Udemba. |
| 10:56:06 | 12 | | Did you ever receive something in |
| 10:56:08 | 13 | | writing from Mr. Tayeh saying that because |
| 10:56:16 | 14 | | Oliver Udemba is a black African, he's not |
| 10:56:20 | 15 | | going to get this job? |
| 10:56:22 | 16 | A. | No. |
| 10:56:23 | 17 | Q. | Did you ever receive anything from Mr. Tayeh |
| 10:56:28 | 18 | | in writing making reference to your race? |
| 10:56:37 | 19 | A. | No. |
| 10:56:37 | 20 | Q. | Did you ever see a document from anybody in |
| 10:56:44 | 21 | | the company that said Oliver Udemba is not |
| 10:56:50 | 22 | | going to get a job because he's a black |
| 10:56:53 | 23 | | African? |
| 10:56:54 | 24 | A. | No. |

Page 59

| | | | |
|---|---|---|---|
| 10:56:54 | 1 | Q. | Did you ever see a document from anybody in |
| 10:56:58 | 2 | | the company making reference to your race? |
| 10:57:13 | 3 | A. | There are documents in the company that |
| 10:57:17 | 4 | | make references to race. |
| 10:57:20 | 5 | Q. | Like what?  You mean their equal employment |
| 10:57:24 | 6 | | opportunity policy? |
| 10:57:26 | 7 | A. | No.  It's like -- |
| 10:57:29 | 8 | Q. | What document are you referring to? |
| 10:57:32 | 9 | A. | Well, in the policy and procedure of the |
| 10:57:40 | 10 | | company. |
| 10:57:40 | 11 | Q. | Go ahead.  Tell me more. |
| 10:57:43 | 12 | A. | They classify, you know. |
| 10:57:50 | 13 | | MR. MOSS:  Let's go off the record |
| 10:57:51 | 14 | | for a moment. |
| 10:58:30 | 15 | | (Discussion off the record) |
| 10:58:30 | 16 | | MR. MOSS:  Let's go back on the |
| 10:58:31 | 17 | | record. |
| 10:58:31 | 18 | Q. | Mr. Udemba, have you seen any documents at |
| 10:58:37 | 19 | | Cumberland Farms that characterize a person's |
| 10:58:41 | 20 | | race as a factor in their employment? |
| 10:58:44 | 21 | A. | No. |
| 10:58:46 | 22 | Q. | Have you seen any documents at Cumberland |
| 10:58:50 | 23 | | Farms that say or suggest that a person's |
| 10:58:56 | 24 | | race will affect their ability to receive |

Page 60

| | | | |
|---|---|---|---|
| 10:58:59 | 1 | | a promotion? |
| 10:59:00 | 2 | A. | No. |
| 10:59:01 | 3 | Q. | Or how they're compensated? |
| 10:59:03 | 4 | A. | No. |
| 10:59:04 | 5 | Q. | Or how they're treated? |
| 10:59:06 | 6 | A. | No. |
| 10:59:06 | 7 | Q. | Do you have any reason to believe that there |
| 10:59:09 | 8 | | is such a document in which Cumberland Farms |
| 10:59:15 | 9 | | has said that race would be a factor in how |
| 10:59:18 | 10 | | its employees are treated? |
| 10:59:20 | 11 | A. | I don't know. |
| 10:59:22 | 12 | Q. | Do you have any reason to believe that |
| 10:59:23 | 13 | | there is such a document? |
| 10:59:27 | 14 | A. | I don't know. |
| 10:59:28 | 15 | Q. | Do you know what I mean by "reason to |
| 10:59:34 | 16 | | believe"? |
| 10:59:34 | 17 | | MS. LIPEDE: Objection. |
| 10:59:42 | 18 | A. | My answer would be that I don't know. |
| 10:59:45 | 19 | Q. | Okay. Do you have any reason to believe |
| 10:59:50 | 20 | | that there has ever been in the time that |
| 10:59:53 | 21 | | you've been employed by Cumberland Farms a |
| 10:59:55 | 22 | | document that says or suggests that an |
| 10:59:59 | 23 | | employee's race would be a factor in how |
| 11:00:01 | 24 | | he or she is treated? |

Page 61

| | | | |
|---|---|---|---|
| 11:00:03 | 1 | A. | I don't know. |
| 11:00:04 | 2 | | MS. LIPEDE: Objection. |
| 11:00:09 | 3 | Q. | Has anybody at Cumberland Farms in the |
| 11:00:13 | 4 | | entire time that you've worked there ever |
| 11:00:15 | 5 | | said or suggested to you that your race |
| 11:00:19 | 6 | | would be a factor in how you were treated |
| 11:00:21 | 7 | | at Cumberland Farms? |
| 11:00:25 | 8 | A. | The statement that is in Paragraph 23, |
| 11:00:32 | 9 | | that's my understanding of that. |
| 11:00:35 | 10 | Q. | Is that the only statement made by anybody |
| 11:00:38 | 11 | | at Cumberland Farms that you would attribute |
| 11:00:42 | 12 | | to your race? |
| 11:00:43 | 13 | A. | Yes. |
| 11:00:48 | 14 | Q. | Is there anything else you can point to |
| 11:00:51 | 15 | | to support your conclusion that you were |
| 11:00:55 | 16 | | denied promotion to Mr. Beland's position |
| 11:00:58 | 17 | | because of your race other than what's in |
| 11:01:00 | 18 | | Paragraphs 23 and 24? |
| 11:01:07 | 19 | A. | Well, in terms of documents? |
| 11:01:12 | 20 | Q. | Any evidence at all. |
| 11:01:18 | 21 | A. | Well, the way I was treated in the |
| 11:01:22 | 22 | | department. |
| 11:01:23 | 23 | Q. | As set forth in the other paragraphs in your |
| 11:01:30 | 24 | | complaint? Is there anything other than |

Page 63

| 11:02:43 | 1 | | relying upon, would you have set it forth |
| 11:02:46 | 2 | | in your answers to the company's |
| 11:02:49 | 3 | | interrogatories? |
| 11:02:49 | 4 | A. | Yes. |
| 11:02:50 | 5 | Q. | Thank you.  Now, based upon the testimony |
| 11:02:58 | 6 | | that you have just given, Mr. Udemba, am I |
| 11:03:02 | 7 | | correct that you never heard Mr. Tayeh use a |
| 11:03:07 | 8 | | racial epithet? |
| 11:03:09 | 9 | A. | No. |
| 11:03:11 | 10 | Q. | Do you know what I mean by a racial epithet? |
| 11:03:14 | 11 | A. | Yes. |
| 11:03:15 | 12 | Q. | I don't want to offend anybody's |
| 11:03:19 | 13 | | sensibilities, but I'm going to be explicit |
| 11:03:20 | 14 | | here so there's no disagreement on the |
| 11:03:23 | 15 | | record.  Have you ever heard Mr. Tayeh use |
| 11:03:27 | 16 | | the expression "nigger"? |
| 11:03:41 | 17 | A. | No. |
| 11:03:41 | 18 | Q. | Have you ever heard him use any other |
| 11:03:44 | 19 | | expression to describe people who are African |
| 11:03:49 | 20 | | or African American? |
| 11:03:51 | 21 | A. | Excuse me? |
| 11:03:53 | 22 | Q. | Have you ever heard Mr. Tayeh use any other |
| 11:03:56 | 23 | | expression to describe people who are African |
| 11:03:58 | 24 | | or African American? |

Page 64

| 11:03:59 | 1  | A. | No. |
| 11:04:04 | 2  | Q. | To the best of your knowledge, has Mr. Tayeh |
| 11:04:09 | 3  |    | ever used either the expression "nigger" or |
| 11:04:14 | 4  |    | any other expression that would be |
| 11:04:18 | 5  |    | disparaging of people who are African or |
| 11:04:20 | 6  |    | African American? |
| 11:04:22 | 7  | A. | I don't know. |
| 11:04:23 | 8  | Q. | Have you ever heard anybody say they heard |
| 11:04:26 | 9  |    | Mr. Tayeh use such an expression? |
| 11:04:27 | 10 | A. | No. |
| 11:04:30 | 11 | Q. | Do you have any knowledge that he ever did |
| 11:04:32 | 12 |    | use such an expression? |
| 11:04:34 | 13 | A. | No. |
| 11:04:36 | 14 | Q. | Is there anybody else in the environmental |
| 11:04:40 | 15 |    | affairs department who has used such an |
| 11:04:42 | 16 |    | expression? |
| 11:04:42 | 17 | A. | No. |
| 11:04:44 | 18 | Q. | Is there anybody else that you know of at |
| 11:04:47 | 19 |    | Cumberland Farms who has used such an |
| 11:04:49 | 20 |    | expression? |
| 11:04:50 | 21 | A. | Not that I can tell. |
| 11:05:35 | 22 | Q. | Now, take a look in Paragraph 26 of your |
| 11:05:57 | 23 |    | complaint and read that over to yourself |
| 11:06:00 | 24 |    | silently, please. |

Page 65

| | | | |
|---|---|---|---|
| 11:06:00 | 1 | A. | (Witness examines document)  Yes. |
| 11:06:13 | 2 | Q. | In Paragraph 26 you allege Ms. Cessarini |
| 11:06:19 | 3 | | immediately arranged a meeting between |
| 11:06:20 | 4 | | Mr. Udemba and Mr. Tayeh.  Mr. Udemba |
| 11:06:24 | 5 | | reiterated Mr. Tayeh's racially-charged |
| 11:06:29 | 6 | | comments.  The expression, "racially-charged |
| 11:06:34 | 7 | | comments" in Paragraph 26, does that refer |
| 11:06:35 | 8 | | to the exchange that is reflected in |
| 11:06:40 | 9 | | Paragraphs 23 and 24 of the complaint? |
| 11:06:42 | 10 | A. | Yes. |
| 11:06:43 | 11 | Q. | So when you say "racially-charged comments," |
| 11:06:46 | 12 | | you mean the comments that are in quotes |
| 11:06:48 | 13 | | in Paragraphs 23 and 24? |
| 11:06:50 | 14 | A. | Yes. |
| 11:06:51 | 15 | Q. | And nothing else? |
| 11:06:53 | 16 | A. | No. |
| 11:06:57 | 17 | Q. | So the racially-charged comment that you're |
| 11:07:00 | 18 | | referring to in Paragraph 26 is the analogy |
| 11:07:04 | 19 | | to Colin Powell that you said to Mr. Tayeh, |
| 11:07:09 | 20 | | correct? |
| 11:07:10 | 21 | | MS. LIPEDE:  Objection. |
| 11:07:10 | 22 | A. | Yes -- no. |
| 11:07:15 | 23 | Q. | Yes or no? |
| 11:07:24 | 24 | A. | It wasn't the -- the totality of that |

Page 66

| 11:07:28 | 1 | | statement is referring to both statements |
| 11:07:32 | 2 | | what he said; and to make sure that I |
| 11:07:35 | 3 | | understand where he's coming from, I gave |
| 11:07:37 | 4 | | the analogy of Colin Powell and he did not |
| 11:07:40 | 5 | | refute it, meaning that he understood what |
| 11:07:42 | 6 | | he said in the totality of that statement. |
| 11:07:47 | 7 | Q. | In Paragraph 26 when you refer to |
| 11:07:49 | 8 | | racially-charged comments, you're referring |
| 11:07:50 | 9 | | to the two comments that are in quotation |
| 11:07:53 | 10 | | marks in Paragraphs 23 and 24; is that |
| 11:07:55 | 11 | | correct? |
| 11:07:55 | 12 | A. | Yes, yes. |
| 11:07:56 | 13 | Q. | And nothing else? |
| 11:07:57 | 14 | A. | No. |
| 11:07:58 | 15 | Q. | Thank you.  Now, why did you go to Colleen |
| 11:08:09 | 16 | | Cessarini with this? |
| 11:08:11 | 17 | A. | Because it was clearly I was discriminated |
| 11:08:17 | 18 | | against. |
| 11:08:17 | 19 | Q. | Why her? |
| 11:08:18 | 20 | A. | Because she was the manager of human |
| 11:08:22 | 21 | | resources at the time, and she also was one |
| 11:08:30 | 22 | | of the persons that interviewed me when I |
| 11:08:33 | 23 | | joined the company. |
| 11:08:34 | 24 | Q. | Is there a human resources department at |

Page 67

| 11:08:36 | 1 | | Cumberland Farms? |
| 11:08:37 | 2 | A. | Yes. |
| 11:08:38 | 3 | Q. | Has there been a human resources department |
| 11:08:40 | 4 | | at Cumberland Farms since the day that you |
| 11:08:43 | 5 | | first came to work there? |
| 11:08:44 | 6 | A. | Yes. |
| 11:08:44 | 7 | Q. | Was Colleen Cessarini the head of the human |
| 11:08:48 | 8 | | resources department at Cumberland Farms? |
| 11:08:49 | 9 | A. | No. |
| 11:08:50 | 10 | Q. | Did she report to somebody over her? |
| 11:08:52 | 11 | A. | Yes. |
| 11:08:52 | 12 | Q. | And who was that? |
| 11:08:55 | 13 | A. | Foster Macrides. |
| 11:08:58 | 14 | Q. | Spelled M A C R I D E S.  Mr. Macrides is |
| 11:09:05 | 15 | | now the vice president of human resources; |
| 11:09:07 | 16 | | is that right? |
| 11:09:08 | 17 | A. | Yes, yes. |
| 11:09:09 | 18 | Q. | And was he the top official in the department |
| 11:09:14 | 19 | | of human resources when you were hired at |
| 11:09:20 | 20 | | Cumberland Farms? |
| 11:09:20 | 21 | A. | I don't know.  At the time I was hired, I |
| 11:09:23 | 22 | | don't know. |
| 11:09:23 | 23 | Q. | In 1994 when you had this conversation with |
| 11:09:28 | 24 | | Mr. Tayeh, was Foster Macrides the head of |

Page 68

| 11:09:34 | 1 | | the human resources department? |
| 11:09:36 | 2 | A. | I believe so. |
| 11:09:36 | 3 | Q. | Have you ever spoken to Mr. Macrides about |
| 11:09:41 | 4 | | your treatment at the company? |
| 11:09:41 | 5 | A. | No. |
| 11:09:43 | 6 | Q. | Have you ever spoken to anybody else in |
| 11:09:45 | 7 | | the human resources department about your |
| 11:09:48 | 8 | | treatment at the company other than Colleen |
| 11:09:51 | 9 | | Cessarini? |
| 11:09:51 | 10 | A. | No. |
| 11:09:53 | 11 | Q. | And did you ever speak to Ms. Cessarini |
| 11:09:58 | 12 | | other than the occasion described in |
| 11:10:02 | 13 | | Paragraphs 25 and 26 of the complaint? |
| 11:10:05 | 14 | A. | No. |
| 11:10:05 | 15 | Q. | That's the only time? |
| 11:10:06 | 16 | A. | Yes. |
| 11:10:07 | 17 | Q. | So that's the only time you ever asked |
| 11:10:10 | 18 | | anybody in the human resources department |
| 11:10:12 | 19 | | to consider the way you were being treated |
| 11:10:14 | 20 | | by the company? |
| 11:10:16 | 21 | A. | Yes. |
| 11:10:19 | 22 | Q. | Were you satisfied with Ms. Cessarini's |
| 11:10:24 | 23 | | handling of the matter on the occasion |
| 11:10:25 | 24 | | described in Paragraphs 25 and 26? |

Page 69

| 11:10:27 | 1 | A. | No. |
| 11:10:30 | 2 | Q. | In what way were you unsatisfied with |
| 11:10:32 | 3 | | Ms. Cessarini's handling of the matter? |
| 11:10:35 | 4 | A. | I did not hear anything back from -- it was |
| 11:10:39 | 5 | | in limbo. I was expecting to hear something |
| 11:10:44 | 6 | | from somebody, but I didn't hear any, didn't |
| 11:10:47 | 7 | | get any feedback. |
| 11:10:50 | 8 | Q. | Well, but you didn't go back to her and say |
| 11:10:54 | 9 | | "what's happening with this"? |
| 11:10:57 | 10 | A. | No. |
| 11:10:57 | 11 | Q. | And you didn't go to anybody else in the |
| 11:10:59 | 12 | | human resources department? |
| 11:11:00 | 13 | A. | No. |
| 11:11:01 | 14 | Q. | Why not? |
| 11:11:03 | 15 | A. | I was busy. I was very busy. I have a lot |
| 11:11:06 | 16 | | of work to do. I was busy. |
| 11:11:08 | 17 | Q. | Do you have any reason to think that Ms. |
| 11:11:10 | 18 | | Cessarini would refuse to meet with you |
| 11:11:12 | 19 | | again? |
| 11:11:12 | 20 | A. | No. |
| 11:11:13 | 21 | Q. | Did you have any reason to think that |
| 11:11:14 | 22 | | Foster Macrides would refuse to meet with |
| 11:11:17 | 23 | | you? |
| 11:11:17 | 24 | A. | No. |

Page 70

| 11:11:17 | 1 | Q. | Did you have any reason to think that |
| 11:11:19 | 2 | | Ms. Cessarini was biased against Africans or |
| 11:11:23 | 3 | | African Americans? |
| 11:11:24 | 4 | A. | No. |
| 11:11:24 | 5 | Q. | Or that Foster Macrides was biased against |
| 11:11:29 | 6 | | Africans or African Americans? |
| 11:11:31 | 7 | A. | I have no reason to believe so. |
| 11:11:32 | 8 | Q. | At any time? |
| 11:11:33 | 9 | A. | No. |
| 11:11:35 | 10 | Q. | Did you understand that if you were unhappy |
| 11:11:38 | 11 | | with Ms. Cessarini's handling of your |
| 11:11:41 | 12 | | concern, that you could have gone to Foster |
| 11:11:44 | 13 | | Macrides since he was her superior? |
| 11:11:47 | 14 | A. | Yes. |
| 11:11:49 | 15 | Q. | But you didn't do that? |
| 11:11:49 | 16 | A. | No. |
| 11:11:51 | 17 | Q. | So when you did not hear back from Ms. |
| 11:11:56 | 18 | | Cessarini and you were not satisfied with |
| 11:11:58 | 19 | | the outcome of that, you were convinced at |
| 11:12:04 | 20 | | that time that you did not get the position |
| 11:12:06 | 21 | | because of your race? |
| 11:12:07 | 22 | A. | Yes. |
| 11:12:10 | 23 | Q. | And did you file a complaint with the |
| | 24 | | Massachusetts Commission Against |

Page 71

| 11:12:17 | 1 | | Discrimination or with the Equal Employment |
| 11:12:23 | 2 | | Opportunity Commission in 1994 or 1995? |
| 11:12:26 | 3 | A. | No. |
| 11:12:27 | 4 | Q. | Why not? |
| 11:12:28 | 5 | A. | Because I thought the matter was still |
| 11:12:33 | 6 | | ongoing.  The matter was still open.  I |
| 11:12:36 | 7 | | haven't received any instruction from human |
| 11:12:41 | 8 | | resources to do anything otherwise. |
| 11:12:45 | 9 | Q. | So you didn't hear anything from human |
| 11:12:47 | 10 | | resources at Cumberland Farms and you were |
| 11:12:50 | 11 | | not satisfied with the outcome and you |
| 11:12:52 | 12 | | thought that you had been denied a promotion |
| 11:12:56 | 13 | | to Andy Beland's position because of your |
| 11:12:59 | 14 | | race? |
| 11:12:59 | 15 | A. | Yes. |
| 11:13:00 | 16 | Q. | But you did not file a complaint with the |
| | 17 | | Massachusetts Commission Against |
| 11:13:05 | 18 | | Discrimination or the EEOC -- |
| 11:13:06 | 19 | A. | Yes. |
| 11:13:08 | 20 | Q. | -- in 1994? |
| 11:13:10 | 21 | A. | Yes. |
| 11:13:10 | 22 | Q. | And 1995? |
| 11:13:12 | 23 | A. | Yes. |
| 11:13:13 | 24 | Q. | Or in 1996? |

Page 72

| | | |
|---|---|---|
| 11:13:13 | 1 | A. Yes. |
| 11:13:14 | 2 | Q. Or in 1997? |
| 11:13:15 | 3 | A. Yes. |
| 11:13:16 | 4 | Q. Or in 1998? |
| 11:13:17 | 5 | A. Yes. |
| 11:13:18 | 6 | Q. Or in 1999?  During that entire period of |
| 11:13:25 | 7 | time, did you remain convinced that you had |
| 11:13:27 | 8 | been denied the promotion to Andy Beland's |
| 11:13:30 | 9 | position because of your race? |
| 11:13:31 | 10 | A. Yes. |
| 11:13:31 | 11 | Q. And during that entire period of time, you |
| 11:13:34 | 12 | were unsatisfied with the outcome from your |
| 11:13:39 | 13 | conversation with Colleen Cessarini? |
| 11:13:40 | 14 | A. Yes. |
| 11:13:41 | 15 | Q. During that entire time period of time, you |
| 11:13:43 | 16 | took no action to express your continuing |
| 11:13:48 | 17 | concern to the human resources department? |
| 11:13:50 | 18 | A. I tried to -- at one point I tried to talk |
| 11:13:53 | 19 | to Harry Brenner. |
| | 20 | Q. Harry Brenner? |
| | 21 | A. Yeah. |
| 11:13:56 | 22 | Q. When was that? |
| 11:13:57 | 23 | A. I don't remember exactly when.  There was a |
| 11:14:00 | 24 | time I called him. |

Page 89

| | | |
|---|---|---|
| 11:31:24 | 1 | MS. LIPEDE:  My objection to your |
| 11:31:26 | 2 | question is that it was so convoluted. |
| 11:31:30 | 3 | That's my objection to the question. |
| 11:31:32 | 4 | MR. MOSS:  All right.  I'll have |
| 11:31:33 | 5 | another go at it. |
| 11:31:36 | 6 | Q. Wait till you hear the question, Mr. Udemba. |
| 11:31:58 | 7 | I asked you is there any other position at |
| 11:32:06 | 8 | Cumberland Farms that you claim you should |
| 11:32:08 | 9 | have been promoted to other than the position |
| 11:32:09 | 10 | that you describe in Paragraph 23, and you |
| 11:32:12 | 11 | said yes, and I said what is that, and you |
| 11:32:15 | 12 | said I should have been promoted to chief |
| 11:32:17 | 13 | of environmental affairs.  And I asked you |
| 11:32:20 | 14 | who held that position, and ultimately you |
| 11:32:25 | 15 | said it wasn't created because Emile was |
| 11:32:26 | 16 | the vice president of environmental affairs. |
| 11:32:30 | 17 | So what I gather from your testimony, sir, |
| 11:32:33 | 18 | is that you're saying that when the company |
| 11:32:36 | 19 | made Emile Tayeh the vice president of |
| 11:32:39 | 20 | construction, it should have promoted you |
| 11:32:41 | 21 | to the position that he held as the vice |
| 11:32:44 | 22 | president of environmental affairs.  Is that |
| 11:32:46 | 23 | your claim? |
| 11:32:46 | 24 | A. Yes. |

Page 90

| | | |
|---|---|---|
| 11:32:46 | 1 | Q. Okay.  And I asked you who made that decision |
| 11:32:52 | 2 | to keep him in that position instead of |
| 11:32:55 | 3 | giving it to you, and you said you didn't |
| 11:32:56 | 4 | know? |
| 11:32:57 | 5 | A. The company did. |
| 11:32:58 | 6 | Q. Who in the company? |
| 11:32:59 | 7 | A. I don't know. |
| 11:32:59 | 8 | Q. You don't know? |
| 11:33:00 | 9 | A. No. |
| 11:33:00 | 10 | Q. So what makes you say that they did that |
| 11:33:04 | 11 | because of your race? |
| 11:33:07 | 12 | A. Because they have not promoted me. |
| 11:33:10 | 13 | Q. Well, do you have any basis for concluding |
| 11:33:16 | 14 | that they didn't give you that position |
| 11:33:17 | 15 | because of your race? |
| 11:33:18 | 16 | A. Yes. |
| 11:33:19 | 17 | Q. What is the basis? |
| 11:33:20 | 18 | A. Because they treating other people |
| 11:33:23 | 19 | differently.  They promoting other people |
| 11:33:27 | 20 | who are white.  They have promotions and |
| 11:33:34 | 21 | Emile is considered white, he's white so |
| 11:33:36 | 22 | he gets promotions and I don't get any |
| 11:33:39 | 23 | promotion whatsoever.  So that is an |
| 11:33:42 | 24 | indication of racial discrimination, given |

Page 95

| | | | |
|---|---|---|---|
| 11:38:44 | 1 | A. | I don't know if he is or not. |
| 11:38:51 | 2 | Q. | And you did not file a complaint with the |
| 11:38:56 | 3 | | EEOC or the MCAD about this issue, this |
| 11:39:00 | 4 | | promotion to vice president, the fact that |
| 11:39:03 | 5 | | you were not promoted to vice president of |
| 11:39:06 | 6 | | environmental affairs in 1999, 2000, 2001 |
| 11:39:09 | 7 | | and 2002, did you? |
| 11:39:10 | 8 | A. | No. |
| 11:40:33 | 9 | Q. | Now, in your complaint you say that you were |
| 11:40:36 | 10 | | hired by Colleen Cessarini and Emile Tayeh; |
| 11:40:42 | 11 | | is that right? |
| 11:40:42 | 12 | A. | Yes.  I was interviewed by them, yes. |
| 11:40:44 | 13 | Q. | Were you interviewed by anybody else? |
| 11:40:50 | 14 | A. | No. |
| 11:40:51 | 15 | Q. | And this was in 1991? |
| 11:40:53 | 16 | A. | Yes. |
| 11:40:58 | 17 | Q. | Do you recall what each of them said when |
| 11:41:00 | 18 | | they interviewed you? |
| 11:41:05 | 19 | A. | I first interviewed with Colleen Cessarini |
| 11:41:07 | 20 | | and she told me that my qualifications were |
| 11:41:13 | 21 | | impressive, and she also mentioned that I |
| 11:41:17 | 22 | | coming into the department, she also |
| 11:41:25 | 23 | | mentioned that I had more experience than, |
| 11:41:29 | 24 | | you know, even Emile himself and that since |

Page 121

| | | |
|---|---|---|
| 12:13:19 | 1 | Q. Mr. Udemba, let me ask you another question. |
| 12:13:22 | 2 | Can you take a look at Paragraph 15 of your |
| 12:13:37 | 3 | complaint.  In Paragraph 15, sir, you said, |
| 12:13:41 | 4 | "upon his appointment as vice president of |
| 12:13:44 | 5 | environmental affairs, Mr. Tayeh promoted |
| 12:13:48 | 6 | Andrew Beland, who is white, to the position |
| 12:13:50 | 7 | of supervising project manager." |
| 12:13:53 | 8 | Mr. Udemba, is it your contention |
| 12:13:56 | 9 | that the promotion of Andrew Beland was based |
| 12:14:00 | 10 | upon his race? |
| 12:14:01 | 11 | A. I don't know. |
| 12:14:03 | 12 | Q. Is it your contention that it's based upon |
| 12:14:04 | 13 | his race or not? |
| 12:14:06 | 14 | A. I don't know.  I don't know.  I'm not saying |
| 12:14:10 | 15 | that. |
| 12:14:10 | 16 | Q. Okay.  Are you saying that you should have |
| 12:14:12 | 17 | been appointed to that position instead of |
| 12:14:14 | 18 | Andrew Beland? |
| 12:14:15 | 19 | A. I'm not saying that. |
| 12:14:16 | 20 | Q. Okay.  Thank you.  The other members of |
| 12:14:21 | 21 | the environmental affairs department that |
| 12:14:25 | 22 | we have talked about, we talked about maybe |
| 12:14:32 | 23 | a dozen times, how would you characterize |
| 12:14:32 | 24 | your relationship with them? |

Page 131

| | | | |
|---|---|---|---|
| 01:08:02 | 1 | | memo? |
| 01:08:02 | 2 | A. | No, no. |
| 01:08:06 | 3 | Q. | Now, the memo dated October 1st, 1992, as |
| 01:08:12 | 4 | | described in Paragraph 20 of the complaint, |
| 01:08:14 | 5 | | was signed by Foster Macrides, the vice |
| 01:08:19 | 6 | | president of human resources; is that right? |
| 01:08:21 | 7 | A. | Yes. |
| 01:08:23 | 8 | Q. | And I think you produced a copy of that memo. |
| 01:08:55 | 9 | | MS. LIPEDE:  It's No. 17. |
| 01:09:01 | 10 | | MR. MOSS:  Thank you. |
| 01:09:08 | 11 | Q. | This would be in Exhibit 4, document Bates |
| 01:09:13 | 12 | | stamped document No. 17.  Do you have that |
| 01:09:15 | 13 | | in front of you? |
| 01:09:23 | 14 | A. | Yes. |
| 01:09:26 | 15 | Q. | That's the memo that you're referring to in |
| 01:09:29 | 16 | | Paragraph 20 of your complaint? |
| 01:09:30 | 17 | A. | Yes. |
| 01:09:33 | 18 | Q. | Is there anything in this document, |
| 01:09:38 | 19 | | Exhibit 4, Bates stamped No. 17, that refers |
| 01:09:41 | 20 | | to the increase that you received in May |
| 01:09:43 | 21 | | of 1993? |
| 01:09:52 | 22 | A. | Specifically, no. |
| 01:09:53 | 23 | Q. | How do you know that this memo dated |
| 01:10:00 | 24 | | October 1st, 1992 has anything to do with |

Page 132

| 01:10:01 | 1 | | the increase you received in May of 1993? |
| 01:10:07 | 2 | A. | Because they happened at the same time that |
| 01:10:23 | 3 | | this, that this memo was implemented. |
| 01:10:27 | 4 | Q. | Mr. Udemba, I don't understand.  This |
| 01:10:29 | 5 | | document dated October 1st, 1992 is eight |
| 01:10:39 | 6 | | months before the wage increase you referred |
| 01:10:42 | 7 | | to in Paragraph 17 of your complaint. |
| 01:10:46 | 8 | | What's the connection between this memo of |
| 01:10:52 | 9 | | October 1st, 1992 and the pay increase that |
| 01:10:53 | 10 | | you say you received in May of 1993? |
| 01:10:58 | 11 | A. | Actually, that it happened, this wage, |
| 01:11:06 | 12 | | this announcement, already the pay increase |
| 01:11:14 | 13 | | followed this announcement.  That's my |
| 01:11:16 | 14 | | connection. |
| 01:11:16 | 15 | Q. | By eight months? |
| 01:11:17 | 16 | A. | Okay.  Yes. |
| 01:11:20 | 17 | Q. | Did anybody ever say to you this memo of |
| 01:11:26 | 18 | | October 1st, 1992 has some connection to the |
| 01:11:27 | 19 | | pay increase you received in May of 1993? |
| 01:11:31 | 20 | A. | No. |
| 01:11:33 | 21 | Q. | Do you have any other basis for assuming |
| 01:11:35 | 22 | | that this memo of October 1st, 1992 is |
| 01:11:40 | 23 | | somehow connected to the pay increase you |
| 01:11:42 | 24 | | received in May of 1993? |

Page 133

| 01:11:44 | 1 | A. | No. |
| 01:11:53 | 2 | Q. | Mr. Udemba, my records show that you received |
| 01:11:58 | 3 | | a pay increase on October 1st, 1992.  Do you |
| 01:12:03 | 4 | | recall that? |
| 01:12:05 | 5 | A. | No. |
| 01:12:06 | 6 | Q. | Do you have any reason to doubt that? |
| 01:12:13 | 7 | A. | I don't have any recollection of that. |
| 01:12:14 | 8 | Q. | Do you have any reason to doubt that? |
| 01:12:18 | 9 | A. | I don't know. |
| 01:12:20 | 10 | Q. | My records also show you received another |
| 01:12:24 | 11 | | pay increase on December 13, 1992.  Do you |
| 01:12:27 | 12 | | disagree with that? |
| 01:12:29 | 13 | A. | I don't know. |
| 01:12:32 | 14 | Q. | Either you do or don't disagree with it. |
| 01:12:37 | 15 | A. | I can't disagree with what I don't have |
| 01:12:39 | 16 | | any recollection of, what I don't know.  I |
| 01:12:45 | 17 | | can't disagree with what I don't know. |
| 01:12:46 | 18 | Q. | My records also show you received a pay |
| 01:12:48 | 19 | | increase on June 13, 2003.  Do you disagree |
| 01:12:52 | 20 | | with that, sir? |
| 01:12:53 | 21 | A. | Pay increase in 2003? |
| 01:12:55 | 22 | Q. | June 13, 2003. |
| 01:13:04 | 23 | A. | I don't know because I wouldn't know why I |
| 01:13:08 | 24 | | would receive pay increase in June.  I don't |

Page 139

| | | |
|---|---|---|
| 01:20:53 | 1 | A.  Yes. |
| 01:20:54 | 2 | Q.  What is that? |
| 01:20:55 | 3 | A.  Well, what prompted this is Muriel Tyler |
| 01:21:11 | 4 | demeaned me at the meeting and said to me in |
| 01:21:15 | 5 | front of other staff that nobody told her |
| 01:21:19 | 6 | that I'm anything other than -- that I'm |
| 01:21:22 | 7 | not -- nobody told her that I'm the senior |
| 01:21:26 | 8 | project manager.  She said, "you're just like |
| 01:21:29 | 9 | everybody else.  Nobody told me you're a |
| 01:21:31 | 10 | senior project manager." |
| 01:21:32 | 11 | Now, Muriel has access to personnel |
| 01:21:36 | 12 | file, okay?  She has access to personnel |
| 01:21:38 | 13 | file, and she said that in a very demeaning |
| 01:21:43 | 14 | manner in the presence of other staff members |
| 01:21:48 | 15 | during the meeting, and this is in 2003, |
| 01:21:53 | 16 | ten years after the fact.  And so I've been |
| 01:21:59 | 17 | using this all along, and so somebody who |
| 01:22:02 | 18 | has access to personnel file of the employee |
| 01:22:08 | 19 | who just didn't tell me but threw it open |
| 01:22:12 | 20 | out there in the presence of other staff in |
| 01:22:13 | 21 | a demeaning manner that you're not senior |
| 01:22:16 | 22 | project manager, nobody told me you're |
| 01:22:17 | 23 | senior project manager, so that kind of |
| 01:22:22 | 24 | cast some doubt as to who, what is actually |

Page 140

| | | |
|---|---|---|
| 01:22:26 | 1 | happening here. |
| 01:22:28 | 2 | Q.  Mr. Udemba, does Muriel Tyler work in the |
| 01:22:31 | 3 | human resources department? |
| 01:22:32 | 4 | A.  No. |
| 01:22:33 | 5 | Q.  Does Tracy Watts work in the human resources |
| 01:22:36 | 6 | department? |
| 01:22:36 | 7 | A.  Yes. |
| 01:22:38 | 8 | Q.  So this is an e-mail, this document Bates |
| 01:22:41 | 9 | stamped No. 3 in Exhibit 4, this is an |
| 01:22:43 | 10 | e-mail from someone in the human resources |
| 01:22:47 | 11 | department that says, and I quote, "it is |
| 01:22:52 | 12 | recognized that Oliver is a senior project |
| 01:22:55 | 13 | manager and this is reflected within the |
| 01:22:57 | 14 | company's organizational charts," close |
| 01:23:00 | 15 | quote.  Do you have any reason to think |
| 01:23:01 | 16 | that's untrue? |
| 01:23:04 | 17 | A.  I just told you what my feelings are. |
| 01:23:07 | 18 | Q.  Please answer my question, sir.  That |
| 01:23:10 | 19 | statement in Tracy Watts' e-mail to Emile |
| 01:23:13 | 20 | Tayeh, do you have any reason to think that |
| 01:23:15 | 21 | that statement is untrue? |
| 01:23:16 | 22 | A.  I don't have any -- based on what Muriel |
| 01:23:27 | 23 | said to me and how she treated me, who has |
| 01:23:30 | 24 | also access to my personnel file, I don't |

Page 141

| | | |
|---|---|---|
| 01:23:32 | 1 | know what to believe anymore. |
| 01:23:35 | 2 | Q. Are you saying that Tracy Watts' statement |
| 01:23:37 | 3 | to Emile Tayeh in this e-mail that I just |
| 01:23:40 | 4 | quoted to you is untrue? |
| 01:23:43 | 5 | A. I don't know what it is. That's what I'm |
| 01:23:45 | 6 | saying. |
| 01:23:45 | 7 | Q. You don't know if it is untrue? |
| 01:23:47 | 8 | A. Yes, I don't know what it is. I don't know |
| 01:23:50 | 9 | what to make of it. |
| 01:23:53 | 10 | Q. She goes on to say, quote, "in regards to |
| 01:23:55 | 11 | the employee profile record in which he is |
| 01:24:00 | 12 | referring 'job code 621 engineer,' we assign |
| 01:24:04 | 13 | job codes to every employee," close quote. |
| 01:24:08 | 14 | Do you have any reason to think that that's |
| 01:24:10 | 15 | untrue? |
| 01:24:10 | 16 | A. No. |
| 01:24:11 | 17 | Q. She goes on to say, quote: We do not have |
| 01:24:13 | 18 | a different code for every existing job |
| 01:24:17 | 19 | title," close quote. Do you have any |
| 01:24:19 | 20 | reason to believe that that is not true? |
| 01:24:20 | 21 | A. No. |
| 01:24:21 | 22 | Q. She goes on to say, quote, "other persons |
| 01:24:24 | 23 | with his same job title as senior project |
| 01:24:26 | 24 | manager are also documented on the employee |

Page 142

| 01:24:28 | 1 | | profile as engineer," close quote. Do you |
|---|---|---|---|
| 01:24:31 | 2 | | have any reason to think that that statement |
| 01:24:33 | 3 | | is untrue? |
| 01:24:39 | 4 | A. | I don't know what to make of that statement. |
| 01:24:41 | 5 | Q. | Do you have any reason to think that it was |
| 01:24:43 | 6 | | untrue? |
| 01:24:43 | 7 | A. | No. |
| 01:24:44 | 8 | Q. | She goes on to say, quote, "in regards to |
| 01:24:48 | 9 | | 061/4019, this coding simply reflects the |
| 01:24:53 | 10 | | corporation and department or location where |
| 01:24:54 | 11 | | the employee is assigned," close quote. Do |
| 01:24:57 | 12 | | you have any reason to think that that was |
| 01:25:00 | 13 | | untrue? |
| 01:25:01 | 14 | A. | No. |
| 01:25:01 | 15 | Q. | She goes on to say, quote, "further, the |
| 01:25:03 | 16 | | date of 05/25/91 is simply the week ending |
| 01:25:08 | 17 | | date he started working for the company." |
| 01:25:11 | 18 | | Do you have any reason to think that that's |
| 01:25:13 | 19 | | untrue? |
| 01:25:13 | 20 | A. | No. |
| 01:25:23 | 21 | Q. | Let's continue with Exhibit 4. No, excuse |
| 01:25:30 | 22 | | me. Let's go back to Bates stamp No. 2. |
| 01:25:47 | 23 | | In the last paragraph of this memo from you |
| 01:25:50 | 24 | | to Emile, you said, quote, "I am at a loss |

Page 145

| | | | |
|---|---|---|---|
| 01:28:20 | 1 | A. | I just did.  I don't know what to tell you. |
| 01:28:24 | 2 | Q. | So you can't explain how the employee profile |
| 01:28:27 | 3 | | was not consistent with your duties and |
| | 4 | | functions? |
| 01:28:30 | 5 | A. | I just told you I have nothing more to add |
| 01:28:34 | 6 | | to that statement. |
| 01:28:40 | 7 | Q. | Okay.  Turn, please, to Bates stamp No. 5. |
| 01:29:00 | 8 | | Am I correct that the handwriting on this |
| 01:29:03 | 9 | | page is all yours? |
| 01:29:04 | 10 | A. | Yes. |
| 01:29:05 | 11 | Q. | So this is a note that presumably you sent |
| 01:29:08 | 12 | | to Emile Tayeh -- |
| 01:29:10 | 13 | A. | Yes. |
| 01:29:10 | 14 | Q. | -- on the date shown, October 4, 1995? |
| 01:29:12 | 15 | A. | Yes. |
| 01:29:15 | 16 | Q. | Turn to Page 6, Bates stamp No. 6. |
| 01:29:20 | 17 | A. | Yes. |
| 01:29:20 | 18 | Q. | And am I right that this is a memo which |
| 01:29:27 | 19 | | Emile sent on October 4th, 1995? |
| 01:29:29 | 20 | A. | Yes. |
| 01:29:30 | 21 | Q. | And you received a copy of that? |
| 01:29:41 | 22 | A. | Well, I was not CC'd on it, but I saw how I |
| 01:29:44 | 23 | | got a copy of it. |
| 01:29:45 | 24 | Q. | So looking at this memo that Emile penned, |

Page 146

| | | | |
|---|---|---|---|
| 01:29:50 | 1 | | that he wrote on October 4, 1995, it looks |
| 01:29:54 | 2 | | as if he corrected the situation which you |
| 01:29:59 | 3 | | described on the previous page, right?  On |
| 01:30:09 | 4 | | October 4th you wrote Emile a note saying, |
| 01:30:11 | 5 | | "the information in the company directory |
| 01:30:14 | 6 | | describing me is incorrect." |
| 01:30:18 | 7 | A. | Okay. |
| 01:30:18 | 8 | Q. | Am I right? |
| 01:30:19 | 9 | A. | Can I read it? |
| 01:30:20 | 10 | Q. | Sure. |
| 01:30:24 | 11 | A. | "The above is information that's |
| 01:30:25 | 12 | | contained" -- |
| 01:30:26 | 13 | Q. | Do you want to read it out loud?  You don't |
| 01:30:28 | 14 | | have to. |
| 01:30:28 | 15 | A. | All right.  Yeah, okay, so I agree with what |
| 01:30:31 | 16 | | you just said. |
| 01:30:32 | 17 | Q. | So you wrote Emile a note on October 4th |
| 01:30:36 | 18 | | saying the information in the company |
| 01:30:44 | 19 | | directory is incorrect and on the same day |
| 01:30:50 | 20 | | Emile took steps to correct it. |
| 01:30:54 | 21 | A. | I didn't say it was incorrect.  No, I didn't |
| 01:30:58 | 22 | | say that because I don't know whether it's |
| 01:31:07 | 23 | | correct or not. |
| 01:31:08 | 24 | Q. | What is it that you wanted Emile to do? |

Page 147

| | | | |
|---|---|---|---|
| 01:31:10 | 1 | A. | Well, to -- I was informing him of -- first |
| 01:31:21 | 2 | | of all, when this happened, when I saw this |
| 01:31:26 | 3 | | or somebody actually brought it to my |
| 01:31:28 | 4 | | attention, then I went to Lorraine Higgins |
| 01:31:33 | 5 | | and showed it to her, and I said to her a |
| 01:31:36 | 6 | | mistake has been made, and she said it was |
| 01:31:38 | 7 | | not a mistake, that Emile approved the way |
| 01:31:40 | 8 | | it was written. |
| 01:31:42 | 9 | Q. | Mr. Udemba, please listen to the question. |
| 01:31:51 | 10 | | In this memo that you sent to Emile, Bates |
| 01:31:54 | 11 | | stamped No. 5, you did not ask him to do |
| 01:31:59 | 12 | | anything, did you? |
| 01:32:03 | 13 | A. | I brought his attention to it. |
| 01:32:06 | 14 | Q. | Is there anything in this memo that you |
| 01:32:07 | 15 | | sent to Emile that says, "here's what I want |
| 01:32:10 | 16 | | you to do"? |
| 01:32:11 | 17 | A. | That's exactly what I said.  No, I didn't |
| 01:32:14 | 18 | | tell him, no.  I just brought his attention |
| 01:32:17 | 19 | | to it. |
| 01:32:17 | 20 | Q. | So you never said to him in writing or in |
| 01:32:21 | 21 | | e-mail or in person or over the phone |
| 01:32:24 | 22 | | "here's what I want you to do about this"? |
| 01:32:26 | 23 | A. | No. |
| 01:32:27 | 24 | Q. | So you sent him this memo, and the same day |

Page 148

| | | | |
|---|---|---|---|
| 01:32:31 | 1 | | he took steps to correct the information in |
| 01:32:33 | 2 | | the directory, am I right? |
| 01:32:40 | 3 | A. | Yeah, he did. |
| 01:32:42 | 4 | Q. | Yes or no? |
| 01:32:42 | 5 | A. | He took steps, yes, yes. |
| 01:32:46 | 6 | Q. | What else did you want him to do? |
| 01:32:52 | 7 | A. | Well, the problem is how did he -- |
| 01:32:56 | 8 | Q. | Please just answer my question.  What else |
| 01:32:59 | 9 | | did you want him to do? |
| 01:32:59 | 10 | A. | Well, what I want him to do, what else would |
| 01:33:06 | 11 | | be helpful is Lorraine Higgins -- |
| 01:33:13 | 12 | Q. | But you never told him Lorraine Higgins. |
| 01:33:16 | 13 | | You just told him the information in there |
| 01:33:17 | 14 | | is incorrect. |
| 01:33:18 | 15 | A. | Lorraine Higgins said that the way this |
| 01:33:23 | 16 | | thing was written was given to him, he |
| 01:33:26 | 17 | | looked at it, he approved it.  So the |
| 01:33:30 | 18 | | question is what is, you know, apart from |
| 01:33:34 | 19 | | what this memo, what it actually is, what |
| 01:33:36 | 20 | | is going on, communicate what you wrote, |
| 01:33:40 | 21 | | communicate, you know, instead of people |
| 01:33:42 | 22 | | not communicate that to staff members so |
| 01:33:46 | 23 | | they don't demean me, communicate what the |
| 01:33:50 | 24 | | situation is. |

Page 151

| | | |
|---|---|---|
| | 1 | A. But the publication says that he's the senior |
| | 2 | project manager. |
| 01:36:29 | 3 | Q. I'll repeat the question.  Emile Tayeh never |
| 01:36:32 | 4 | told you that Kevin McCabe was your boss, |
| 01:36:34 | 5 | did he? |
| 01:36:35 | 6 | A. No, he didn't. |
| 01:36:37 | 7 | Q. So who told you that Kevin McCabe was your |
| 01:36:40 | 8 | boss? |
| 01:36:41 | 9 | A. Kevin McCabe was giving me orders.  Lorraine |
| 01:36:46 | 10 | Higgins published something in the company |
| 01:36:51 | 11 | directory that shows Kevin McCabe as having |
| 01:36:56 | 12 | superior position over me, and I went to |
| 01:36:57 | 13 | her and she said Emile approved it.  And |
| 01:37:03 | 14 | Kevin McCabe was acting as my boss, giving |
| 01:37:06 | 15 | me assignments and people were talking about |
| 01:37:09 | 16 | it and coming to me and somebody brought it |
| 01:37:11 | 17 | to me and showed it to me. |
| 01:37:12 | 18 | Q. Did Kevin McCabe say to you, "Oliver, I'm |
| 01:37:15 | 19 | your boss"? |
| 01:37:15 | 20 | A. He gave me assignments like he's my boss. |
| 01:37:18 | 21 | Q. Please, just listen to the question.  Are |
| 01:37:25 | 22 | you testifying that Kevin McCabe told you |
| 01:37:27 | 23 | "I'm your boss"? |
| 01:37:28 | 24 | A. No. |

Page 152

| | | | |
|---|---|---|---|
| 01:37:30 | 1 | Q. | So who told you that Kevin McCabe was your |
| 01:37:34 | 2 | | boss? |
| 01:37:36 | 3 | A. | Nobody told me that. |
| 01:37:39 | 4 | Q. | Now, your boss at this time was Emile Tayeh, |
| 01:37:44 | 5 | | correct? |
| 01:37:44 | 6 | A. | Yes. |
| 01:37:48 | 7 | Q. | You didn't go to Emile and say, "people |
| 01:37:51 | 8 | | are telling me that Kevin is my boss," did |
| 01:37:58 | 9 | | you? |
| 01:37:58 | 10 | A. | Actually, I have at one point told him that |
| 01:38:02 | 11 | | Kevin is acting like my boss. |
| 01:38:05 | 12 | Q. | Please, listen to my question. |
| 01:38:07 | 13 | A. | Yes, I went to him, yes. |
| 01:38:08 | 14 | Q. | You told Emile Tayeh that somebody told |
| 01:38:10 | 15 | | you that Kevin McCabe was your boss? |
| 01:38:12 | 16 | A. | No.  I told Emile Tayeh that Kevin is |
| 01:38:16 | 17 | | giving me orders and acting like my boss, |
| 01:38:20 | 18 | | acting. |
| 01:38:20 | 19 | Q. | When did you say that to Emile Tayeh? |
| 01:38:23 | 20 | A. | One time, one of the times that did happen. |
| 01:38:39 | 21 | | There was one occasion that he acted, |
| 01:38:47 | 22 | | brought some assignments to me and told me |
| 01:38:49 | 23 | | to do it and report back to him and so -- |
| 01:38:55 | 24 | | and he just threw it into my in basket. |

Page 153

| 01:38:59 | 1 | | And so I called it to the attention of Emile |
| 01:39:04 | 2 | | and told Emile what happened and I remember |
| 01:39:09 | 3 | | one time that that happened. |
| 01:39:10 | 4 | Q. | When was that? |
| 01:39:11 | 5 | A. | I don't remember exactly when. |
| 01:39:13 | 6 | Q. | Was it more than ten years ago? |
| 01:39:19 | 7 | A. | I don't remember. It was the time that |
| 01:39:21 | 8 | | Kevin was there. I don't remember exactly |
| 01:39:23 | 9 | | when, but it did happen. |
| 01:39:24 | 10 | Q. | What was the assignment that Kevin McCabe |
| 01:39:27 | 11 | | tried to give you? |
| 01:39:28 | 12 | A. | Kevin McCabe tried to give me an assignment, |
| 01:39:31 | 13 | | came to my office and threw a report into |
| 01:39:34 | 14 | | my desk and said "review it and report back |
| 01:39:37 | 15 | | to me." |
| 01:39:38 | 16 | Q. | What was the report about? |
| 01:39:40 | 17 | A. | It was about an environmental report. |
| 01:39:46 | 18 | Q. | Is that his exact words to you, "review this |
| 01:39:48 | 19 | | and get back to me"? |
| 01:39:49 | 20 | A. | Yes. |
| 01:39:51 | 21 | Q. | You remember those were his exact words? |
| 01:39:53 | 22 | A. | It's not exact words. It's my paraphrasing |
| 01:39:57 | 23 | | what he did. |
| 01:40:01 | 24 | Q. | Can you remember his exact words? |

Page 154

| | | | |
|---|---|---|---|
| 01:40:03 | 1 | A. | No, I can't remember his exact words, no. |
| 01:40:08 | 2 | Q. | So Kevin McCabe came into your office, threw |
| 01:40:13 | 3 | | a report in your in basket and said, "review |
| 01:40:16 | 4 | | this and get back to me"? |
| 01:40:17 | 5 | A. | Yes. |
| 01:40:18 | 6 | Q. | Did he say anything else? |
| 01:40:19 | 7 | A. | No, that I can recall. |
| 01:40:21 | 8 | Q. | Is that the only time that Kevin McCabe gave |
| 01:40:24 | 9 | | you an order? |
| 01:40:25 | 10 | A. | No, it's not the only time. |
| 01:40:26 | 11 | Q. | Give me another example. |
| 01:40:28 | 12 | A. | That's the one that I can recall right now. |
| 01:40:37 | 13 | Q. | Can you recall any other thing that Kevin |
| 01:40:42 | 14 | | McCabe said to you that you contend was |
| 01:40:44 | 15 | | an order? |
| 01:40:45 | 16 | A. | No. |
| 01:40:54 | 17 | Q. | Do you remember what the report was about? |
| 01:40:56 | 18 | A. | It was an environmental report. |
| 01:41:02 | 19 | Q. | Did you review it? |
| 01:41:06 | 20 | A. | I probably did. |
| 01:41:07 | 21 | Q. | Did you get back to him? |
| 01:41:08 | 22 | A. | I don't remember if I got back to him or |
| 01:41:15 | 23 | | not because he's a company -- I don't |
| 01:41:17 | 24 | | remember if I got back to him or not. |

Page 161

| | | |
|---|---|---|
| 01:48:12 | 1 | MR. MOSS:  This is a document which |
| 01:48:13 | 2 | by the fax code Mr. Udemba received or his |
| 01:48:18 | 3 | attorney received from the EEOC? |
| 01:48:21 | 4 | MS. LIPEDE:  Well, I couldn't vouch |
| 01:48:23 | 5 | for it because I didn't receive it. |
| 01:48:26 | 6 | MR. MOSS:  I'm pretty sure I |
| 01:48:27 | 7 | understand where the Exhibit 12 notation |
| 01:48:29 | 8 | comes from.  It's a document that was |
| 01:48:32 | 9 | submitted to the EEOC during their |
| 01:48:34 | 10 | investigation into his charge. |
| 01:48:35 | 11 | MS. LIPEDE:  Yes, I'll agree with |
| 01:48:37 | 12 | that. |
| 01:48:39 | 13 | Q. Mr. Udemba, take a look at this page, Bates |
| 01:48:42 | 14 | stamp No. 12.  This is a memo from Edward |
| 01:48:49 | 15 | Potkay, spelled P O T K A Y, to Patricia |
| 01:48:53 | 16 | Firing, who is sitting next to me, dated |
| 01:48:57 | 17 | March 28, 2004, regarding company |
| 01:48:59 | 18 | automobiles, correct? |
| 01:49:00 | 19 | A. Yes. |
| 01:49:02 | 20 | Q. Do you have any reason to doubt the |
| 01:49:05 | 21 | information that Ed Potkay provided in |
| 01:49:08 | 22 | this memo? |
| 01:49:09 | 23 | A. I can't comment on it one way or the other. |
| 01:49:13 | 24 | Q. Well, this memo purports to set forth a |

Page 163

| 01:50:34 | 1 | A. | I believe.  Yeah, approximately, yes, because |
| 01:50:39 | 2 | | he stayed about nine months. |
| 01:50:42 | 3 | Q. | So in 1992 your testimony is Emile Tayeh |
| 01:50:46 | 4 | | told you that you were going to get a company |
| 01:50:49 | 5 | | car? |
| 01:50:49 | 6 | A. | 1992 or thereabout, yes, because Andrew |
| 01:50:56 | 7 | | Beland already had a company car. |
| 01:50:59 | 8 | Q. | Andy Beland in 1992 -- |
| 01:51:01 | 9 | A. | Yes. |
| 01:51:02 | 10 | Q. | -- was what?  What was his position? |
| 01:51:06 | 11 | A. | He was one of the project managers, was a |
| 01:51:09 | 12 | | project manager. |
| 01:51:12 | 13 | Q. | But you never got a company car? |
| 01:51:16 | 14 | A. | I never got a company car. |
| 01:51:17 | 15 | Q. | Did you go back to Mr. Tayeh and say how |
| 01:51:20 | 16 | | come? |
| 01:51:20 | 17 | A. | Every year. |
| 01:51:22 | 18 | Q. | Every year? |
| 01:51:23 | 19 | A. | Every year. |
| 01:51:27 | 20 | Q. | And are you claiming that the failure to |
| 01:51:31 | 21 | | give you a company car was because you were |
| 01:51:36 | 22 | | black or African or African American? |
| 01:51:45 | 23 | A. | I'm claiming that the failure to give me |
| 01:51:51 | 24 | | what was promised or what I need for my job |

Page 164

| 01:51:55 | 1 | | is discriminatory, right. |
|---|---|---|---|
| 01:51:59 | 2 | Q. | My question to you is are you claiming that |
| 01:52:01 | 3 | | this was because of your race? |
| 01:52:02 | 4 | A. | Yes. |
| 01:52:05 | 5 | Q. | Who else besides Andrew Beland had a company |
| 01:52:08 | 6 | | car? |
| 01:52:08 | 7 | A. | Nobody.  I stayed there long enough to really |
| 01:52:15 | 8 | | come to that.  Most people who came, they |
| 01:52:18 | 9 | | left. |
| 01:52:18 | 10 | Q. | My question is real simple.  Who else besides |
| 01:52:22 | 11 | | Andrew Beland had a company car? |
| 01:52:23 | 12 | A. | Emile has a company car. |
| 01:52:25 | 13 | Q. | Okay.  Anybody else? |
| 01:52:27 | 14 | A. | No. |
| 01:52:31 | 15 | Q. | Did Andrew Beland keep his company car until |
| 01:52:35 | 16 | | he resigned from the company? |
| 01:52:37 | 17 | A. | Yes. |
| 01:52:38 | 18 | Q. | You're sure about that? |
| 01:52:41 | 19 | A. | Yes, to my knowledge, yes. |
| 01:52:43 | 20 | Q. | Do you know how many miles a year Andrew |
| 01:52:46 | 21 | | Beland drove on company business? |
| 01:52:48 | 22 | A. | Andrew Beland did not go to the field a lot. |
| 01:52:52 | 23 | Q. | No? |
| 01:52:53 | 24 | A. | He didn't go to the field a lot. |

Page 165

| | | | |
|---|---|---|---|
| 01:52:55 | 1 | Q. | How do you know? |
| 01:52:56 | 2 | A. | Because I was in the department.  I was there |
| 01:52:58 | 3 | | with him. |
| 01:52:59 | 4 | Q. | So you saw him every day? |
| 01:53:01 | 5 | A. | Yes, I saw him every day.  I'm familiar |
| 01:53:03 | 6 | | with what he does, and we saw each other |
| 01:53:08 | 7 | | every day.  He rarely goes to the field. |
| 01:53:13 | 8 | | Not, I mean, once in a blue moon. |
| 01:53:17 | 9 | Q. | So when did Andrew Beland quit?  When did |
| 01:53:20 | 10 | | he leave? |
| 01:53:23 | 11 | A. | I believe in '94. |
| 01:53:25 | 12 | Q. | '94? |
| 01:53:27 | 13 | A. | Yeah.  It's already stated in the complaint. |
| 01:53:29 | 14 | Q. | After he left the company, nobody else in |
| 01:53:32 | 15 | | the environmental affairs department had |
| 01:53:34 | 16 | | a company car other than the vice president, |
| 01:53:38 | 17 | | Emile Tayeh? |
| 01:53:39 | 18 | A. | Nobody has stayed long enough to really -- |
| 01:53:42 | 19 | | MS. LIPEDE:  No. |
| 01:53:42 | 20 | A. | Nobody has, yes, yes. |
| 01:53:44 | 21 | Q. | You said nobody has stayed long enough.  Is |
| 01:53:47 | 22 | | there some company policy -- |
| 01:53:49 | 23 | A. | Nobody except me. |
| 01:53:51 | 24 | Q. | Is there a company policy that says you get |

Page 166

| | | | |
|---|---|---|---|
| 01:53:52 | 1 | | a company car after you've been there for so |
| 01:53:55 | 2 | | many years? |
| 01:53:57 | 3 | A. | I don't know. |
| 01:53:59 | 4 | Q. | So where are you getting this thing that |
| 01:54:03 | 5 | | you're saying to me about nobody stayed |
| 01:54:06 | 6 | | there long enough?  Where are you getting |
| 01:54:06 | 7 | | that? |
| 01:54:09 | 8 | A. | What I'm saying to you, nobody stayed long |
| 01:54:12 | 9 | | enough is a fact.  I don't know what it has |
| 01:54:12 | 10 | | to do with a car. |
| 01:54:13 | 11 | Q. | You have no basis for asserting that you |
| 01:54:16 | 12 | | get a company car after you've been employed |
| 01:54:19 | 13 | | for a certain number of years, do you? |
| 01:54:22 | 14 | A. | No.  The basis I'm talking that he told me |
| 01:54:26 | 15 | | I'd get a company car, and no. |
| 01:54:29 | 16 | Q. | So when you didn't get a company car in |
| 01:54:31 | 17 | | 1994, were you convinced that that was |
| 01:54:34 | 18 | | because of your race? |
| 01:54:39 | 19 | A. | Yes. |
| 01:54:40 | 20 | Q. | In 1994? |
| 01:54:43 | 21 | A. | If I didn't get a promotion, yes.  If I |
| 01:54:45 | 22 | | didn't get a car, yes. |
| 01:54:46 | 23 | Q. | So in 1994 you believed the failure to give |
| 01:54:49 | 24 | | you a company car was due to your race? |

Page 167

| | | | |
|---|---|---|---|
| 01:54:50 | 1 | A. | Yes. |
| 01:54:51 | 2 | Q. | But you didn't complain about that to the |
| 01:54:54 | 3 | | human resources department at Cumberland |
| 01:54:55 | 4 | | Farms, did you? |
| 01:54:56 | 5 | A. | No. |
| 01:54:57 | 6 | Q. | And you didn't file a charge about that |
| 01:54:59 | 7 | | with the EEOC or the MCAD, did you? |
| 01:55:02 | 8 | A. | No, no. |
| 01:55:05 | 9 | Q. | Why not? |
| 01:55:08 | 10 | A. | I didn't. |
| 01:55:10 | 11 | Q. | Why didn't you if you thought it was due to |
| 01:55:13 | 12 | | your race? |
| 01:55:16 | 13 | A. | When he told me just the same reason I did |
| 01:55:20 | 14 | | not file for the comments he made about my |
| 01:55:25 | 15 | | race, when he denied me the promotion to |
| 01:55:27 | 16 | | replace Andrew Beland. |
| 01:55:28 | 17 | Q. | And that reason was? |
| 01:55:30 | 18 | A. | I didn't. |
| 01:55:31 | 19 | Q. | Because why didn't you file a complaint? |
| 01:55:33 | 20 | A. | I just did not. |
| 01:55:35 | 21 | Q. | That's the only answer? |
| 01:55:35 | 22 | A. | Yes.  I did not. |
| 01:55:37 | 23 | Q. | Then why didn't you complain to the human |
| 01:55:39 | 24 | | resources department in 1994 that Emile |

Page 168

| | | | |
|---|---|---|---|
| 01:55:42 | 1 | | Tayeh promised me a company car and now |
| 01:55:44 | 2 | | he's not delivering it? |
| 01:55:47 | 3 | A. | Because I didn't do that every year.  I |
| 01:55:56 | 4 | | still remind him about it. |
| 01:55:58 | 5 | Q. | But why didn't you complain to the human |
| 01:55:59 | 6 | | resource department? |
| 01:56:00 | 7 | A. | Because I have work to do.  I have work to |
| 01:56:03 | 8 | | do. |
| 01:56:03 | 9 | Q. | That's the only reason that you didn't |
| 01:56:05 | 10 | | complain about it? |
| 01:56:08 | 11 | A. | That's the major reason. |
| 01:56:12 | 12 | Q. | You said that's the major reason and my |
| 01:56:15 | 13 | | question is, is that the only reason why |
| 01:56:17 | 14 | | you did not complain about that to the |
| 01:56:19 | 15 | | human resources department? |
| 01:56:21 | 16 | A. | No. |
| 01:56:21 | 17 | Q. | What other reason was there for your failure |
| 01:56:23 | 18 | | to complain about that? |
| 01:56:24 | 19 | A. | I already complained about the denial of |
| 01:56:28 | 20 | | promotion so, you know, I can't be |
| 01:56:31 | 21 | | complaining about everything. |
| 01:56:35 | 22 | Q. | Is there any other reason why you didn't |
| 01:56:36 | 23 | | complain about this to the human resources |
| 01:56:39 | 24 | | department? |

Page 169

| | | | |
|---|---|---|---|
| 01:56:39 | 1 | A. | Not that I can think of. |
| 01:56:57 | 2 | Q. | Please turn to Page 13 in Exhibit 4, Bates |
| 01:57:01 | 3 | | stamped 13.  What is this? |
| 01:57:14 | 4 | A. | This is a notice of -- this is a publication |
| 01:57:17 | 5 | | in the newspaper as required by the MCP. |
| 01:57:22 | 6 | Q. | Does this have some relevance to this case? |
| 01:57:38 | 7 | A. | It might have. |
| 01:57:41 | 8 | Q. | Would you tell me what that is, please. |
| 01:57:54 | 9 | A. | You know, I don't know what relevance it |
| 01:57:56 | 10 | | has at this point.  I don't know what |
| 01:58:00 | 11 | | specific relevance it might have at this |
| 01:58:01 | 12 | | point. |
| 01:58:01 | 13 | Q. | Does this document support any of your |
| 01:58:03 | 14 | | claims in this case? |
| 01:58:06 | 15 | A. | I don't know.  Like I said, I don't have |
| 01:58:08 | 16 | | any specific -- |
| 01:58:10 | 17 | | MS. LIPEDE:  Did you read it? |
| 01:58:16 | 18 | | MR. MOSS:  I think Mr. Udemba's |
| 01:58:18 | 19 | | attorney just asked him if he had read it. |
| 01:58:24 | 20 | Q. | Have you read it? |
| 01:58:27 | 21 | A. | I know what the document is. |
| 01:58:29 | 22 | | MS. LIPEDE:  Review it. |
| 01:58:31 | 23 | A. | Okay.  (Witness examines document)  Yeah. |
| 01:59:05 | 24 | Q. | So does that document support any of your |

Page 177

| | | |
|---|---|---|
| 02:10:16 | 1 | I'm a little slow. Well, I mean, the |
| 02:10:24 | 2 | objection is just -- |
| 02:10:26 | 3 | MR. MOSS: I'm not asking. |
| 02:10:34 | 4 | A. But I've already told you -- |
| 02:10:34 | 5 | MS. LIPEDE: No, I've objected. |
| 02:11:12 | 6 | MR. MOSS: Take a five-minute break. |
| | 7 | (Break taken) |
| 02:21:19 | 8 | BY MR. MOSS: |
| 02:21:24 | 9 | Q. Mr. Udemba, again with Exhibit 5, turn to |
| 02:21:31 | 10 | Bates stamp page 39, please. |
| 02:21:41 | 11 | A. Yes. |
| 02:21:42 | 12 | Q. Now, I remember a reference in your complaint |
| 02:21:47 | 13 | to this particular evaluation, and just |
| 02:21:50 | 14 | going from memory, I think that your |
| 02:21:53 | 15 | complaint says that Lorraine Higgins, the |
| 02:21:57 | 16 | office manager, wrote an evaluation when |
| 02:22:00 | 17 | she wasn't your supervisor. Is that a fair |
| 02:22:04 | 18 | paraphrase of your complaint? |
| 02:22:05 | 19 | A. Yes. |
| 02:22:06 | 20 | Q. And this document that I'm looking at, |
| 02:22:10 | 21 | Bates stamped Nos. 39, 40, 41, is that right, |
| 02:22:22 | 22 | that's the evaluation in question? |
| 02:22:26 | 23 | A. It appears to be. |
| 02:22:27 | 24 | Q. It's a document you produced? |

Page 178

| 02:22:31 | 1 | A. | Yes. |
| 02:22:33 | 2 | Q. | Was that the document in question, then? |
| 02:22:35 | 3 | | That's the evaluation you're referring to? |
| 02:22:36 | 4 | A. | Yes. |
| 02:22:37 | 5 | Q. | And on the page that's Bates stamped 41, at |
| 02:22:44 | 6 | | the bottom I see some handwriting. Is that |
| 02:22:46 | 7 | | your handwriting? |
| 02:22:47 | 8 | A. | Yes. |
| 02:22:48 | 9 | Q. | Where it says "I report to the vice |
| 02:23:00 | 10 | | president, Emile Tayeh. It is a major |
| 02:23:03 | 11 | | discrepancy to indicate Lorraine Higgins, |
| 02:23:06 | 12 | | office supervisor, as my supervisor." |
| 02:23:12 | 13 | A. | Yes. |
| 02:23:13 | 14 | Q. | Have I quoted that correctly? |
| 02:23:14 | 15 | A. | Yes. |
| 02:23:14 | 16 | Q. | And you wrote that in the space on the |
| 02:23:17 | 17 | | evaluation form for employee comments? |
| 02:23:19 | 18 | A. | Yes. |
| 02:23:20 | 19 | Q. | So that was your comment? |
| 02:23:21 | 20 | A. | Yes. |
| 02:23:22 | 21 | Q. | That was the only comment you made? |
| 02:23:23 | 22 | A. | Yes. |
| 02:23:25 | 23 | Q. | And did you say anything to Emile Tayeh |
| 02:23:29 | 24 | | other than what you wrote in the space for |

Page 179

| | | | |
|---|---|---|---|
| 02:23:32 | 1 | | employee comments? |
| 02:23:34 | 2 | A. | I don't remember. |
| 02:23:42 | 3 | Q. | Please turn to the documents Bates stamped |
| 02:23:47 | 4 | | 43, 44 and 45. |
| 02:23:55 | 5 | A. | Yes. |
| 02:23:56 | 6 | Q. | Now, am I right that those three pages are |
| 02:23:59 | 7 | | an exact duplicate of Pages 39, 40 and 41, |
| 02:24:06 | 8 | | except that Lorraine Higgins' name has been |
| 02:24:12 | 9 | | whited out and Emile Tayeh typed in its |
| 02:24:16 | 10 | | place? |
| 02:24:16 | 11 | A. | Yes. |
| 02:24:17 | 12 | Q. | So am I correct that after receiving your |
| 02:24:25 | 13 | | comment on the evaluation about reporting |
| 02:24:29 | 14 | | to Emile instead of Lorraine, that Emile |
| 02:24:37 | 15 | | changed Lorraine's name, took her name off |
| 02:24:39 | 16 | | and put his name on? |
| 02:24:40 | 17 | A. | Yes. |
| 02:24:45 | 18 | Q. | Did you ask him to do that? |
| 02:24:48 | 19 | A. | No. |
| 02:24:49 | 20 | Q. | I don't see on here that you asked him to |
| 02:24:51 | 21 | | do anything. |
| 02:24:56 | 22 | A. | I said no. |
| 02:24:57 | 23 | Q. | So you didn't ask him to do anything in |
| 02:25:00 | 24 | | response to your comment on the evaluation? |

Page 183

| | | |
|---|---|---|
| 02:27:47 | 1 | Q. So my question again is, do you know whether |
| 02:27:55 | 2 | Emile scored the evaluation or Lorraine |
| 02:27:58 | 3 | Higgins scored it?  Do you know? |
| 02:28:06 | 4 | A. I don't know. |
| 02:28:06 | 5 | Q. You don't? |
| 02:28:08 | 6 | A. No. |
| 02:28:17 | 7 | Q. Now, is it your testimony, Mr. Udemba, that |
| 02:28:24 | 8 | because Lorraine Higgins' name appears in |
| 02:28:27 | 9 | the space for supervisor on Bates stamp 39, |
| 02:28:30 | 10 | that this was an act of racial |
| 02:28:33 | 11 | discrimination? |
| 02:28:33 | 12 | A. I don't know what it is.  No, it's not my |
| 02:28:36 | 13 | testimony. |
| 02:28:37 | 14 | Q. I'm sorry? |
| 02:28:37 | 15 | A. It's not my testimony. |
| 02:28:39 | 16 | Q. It's not.  So you're not claiming that this |
| 02:28:41 | 17 | was an act of racial discrimination? |
| 02:28:43 | 18 | A. No.  I don't know what it is. |
| 02:28:47 | 19 | Q. Are you contending that this is evidence of |
| 02:28:51 | 20 | racial discrimination against you? |
| 02:28:54 | 21 | A. I don't know. |
| 02:28:54 | 22 | Q. You don't know? |
| 02:28:56 | 23 | A. No. |
| 02:29:31 | 24 | Q. Is there anything else -- there are a number |

Page 189

| | | | |
|---|---|---|---|
| 02:34:44 | 1 | A. | Yes. |
| 02:34:45 | 2 | Q. | All right.  Good.  Now, Mr. Udemba, as I |
| 02:34:52 | 3 | | understand it, it is your contention that |
| 02:34:55 | 4 | | this chart supports your claim of racial |
| 02:34:59 | 5 | | discrimination? |
| 02:34:59 | 6 | A. | Yes. |
| 02:35:00 | 7 | Q. | Please explain how. |
| 02:35:04 | 8 | A. | That's what I was trying to explain to you. |
| 02:35:06 | 9 | | MS. LIPEDE:  Explain it. |
| 02:35:13 | 10 | A. | The list under environmental section, you |
| 02:35:16 | 11 | | see every other section has a section |
| 02:35:20 | 12 | | head.  The only section that doesn't have |
| 02:35:28 | 13 | | a section head is the environmental section |
| 02:35:31 | 14 | | as depicted by this chart.  And at the top |
| 02:35:33 | 15 | | of that, section head is designated as |
| 02:35:37 | 16 | | environmental engineers. |
| 02:35:38 | 17 | Q. | I'm sorry. |
| 02:35:40 | 18 | A. | At the top, the section head of that |
| 02:35:43 | 19 | | environmental section is designated |
| 02:35:47 | 20 | | environmental engineers, which is vacant. |
| 02:35:49 | 21 | Q. | Engineers? |
| 02:35:50 | 22 | A. | Well, that's what it says.  Maybe it's a |
| | 23 | | typo. |
| 02:35:56 | 24 | Q. | What does it say? |

Page 190

| | | | |
|---|---|---|---|
| 02:35:57 | 1 | A. | It says environmental engineers. |
| 02:36:00 | 2 | Q. | Plural? |
| 02:36:01 | 3 | A. | Plural, yeah. |
| 02:36:06 | 4 | Q. | Go ahead.  Continue with your answer. |
| 02:36:08 | 5 | A. | Okay.  So every other section has a section |
| 02:36:13 | 6 | | head.  The only section that doesn't have |
| 02:36:14 | 7 | | a section head is my section, and at the |
| 02:36:18 | 8 | | top of it, it says environmental engineers. |
| 02:36:24 | 9 | | You know, at the very least, I should have |
| 02:36:28 | 10 | | been -- I'm certainly qualified, more than |
| 02:36:32 | 11 | | qualified to take the environmental section |
| 02:36:35 | 12 | | as the environmental engineer, to be the |
| 02:36:37 | 13 | | head of the environmental section, to |
| 02:36:47 | 14 | | occupy that, to be the head, to occupy that |
| 02:36:52 | 15 | | position marked by environmental engineer. |
| 02:36:56 | 16 | | I'm certainly qualified in the least to be |
| 02:37:01 | 17 | | promoted to that position.  And being the |
| 02:37:06 | 18 | | only in-house LSP and having spent all |
| 02:37:10 | 19 | | these years with the company and also that |
| 02:37:18 | 20 | | is how my business card comes to play, |
| 02:37:21 | 21 | | this title, environmental engineer, so |
| 02:37:26 | 22 | | engineer, as the case may be, there's also |
| 02:37:29 | 23 | | some title that I've held in 1991, '93, |
| 02:37:33 | 24 | | ten years before.  So I am, according to |

Page 192

| | | | |
|---|---|---|---|
| 02:39:00 | 1 | Q. | That's your contention? |
| 02:39:01 | 2 | A. | Yes. |
| 02:39:02 | 3 | Q. | And you say you should have been that person? |
| 02:39:04 | 4 | A. | I said I'm qualified -- |
| 02:39:07 | 5 | Q. | Yes or no. |
| 02:39:07 | 6 | A. | Yes. |
| 02:39:10 | 7 | Q. | It's your contention that -- oh, and the |
| 02:39:13 | 8 | | company never did put somebody in that |
| 02:39:15 | 9 | | position, did they? |
| 02:39:19 | 10 | A. | I don't know. |
| 02:39:20 | 11 | Q. | You don't know? |
| 02:39:21 | 12 | A. | No. |
| 02:39:22 | 13 | Q. | Can you identify anybody? |
| 02:39:23 | 14 | A. | No, I can't. |
| 02:39:24 | 15 | Q. | So is it your contention that the company |
| 02:39:29 | 16 | | deliberately left, deliberately refrained |
| 02:39:33 | 17 | | from filling that position because of your |
| 02:39:35 | 18 | | race? |
| 02:39:35 | 19 | A. | Yes. |
| 02:39:36 | 20 | Q. | Based upon what? |
| 02:39:39 | 21 | A. | Based upon the historical trends, based |
| 02:39:43 | 22 | | upon the fact that in 1991, '93, I was |
| 02:39:48 | 23 | | environmental engineer and I couldn't even |
| 02:39:49 | 24 | | fill a position which is the same thing I |

Page 193

| | | |
|---|---|---|
| 02:39:53 | 1 | held in 1991, '93, when somebody else who |
| 02:39:57 | 2 | is white was supervising me. Okay? A |
| 02:40:01 | 3 | position that I held when a white person |
| 02:40:03 | 4 | was supervising me I could not fill in 2003 |
| 02:40:09 | 5 | when that person had left and I was not |
| 02:40:11 | 6 | allowed to -- I was not promoted to that |
| 02:40:14 | 7 | position when certainly I'm, you know, well |
| 02:40:17 | 8 | qualified to fill it. |
| 02:40:18 | 9 | Q. So you're saying that somebody within |
| 02:40:23 | 10 | Cumberland Farms intentionally decided not |
| 02:40:27 | 11 | to put anybody in this position because if |
| 02:40:34 | 12 | they had filled that position, they would |
| 02:40:36 | 13 | have had no choice but to fill it with you? |
| 02:40:39 | 14 | A. Yes. |
| 02:40:39 | 15 | MS. LIPEDE: Objection. |
| 02:40:40 | 16 | Q. Is that your argument? |
| 02:40:41 | 17 | MS. LIPEDE: Objection. |
| 02:40:42 | 18 | Q. Yes or no? |
| 02:40:44 | 19 | MS. LIPEDE: Yes or no. |
| 02:40:45 | 20 | A. Yes. |
| 02:40:48 | 21 | Q. Now, looking again at this chart, in the |
| 02:40:51 | 22 | box we're talking about, it says |
| 02:40:54 | 23 | environmental engineers, and is that the |
| 02:40:58 | 24 | label that's given to the people listed |

Page 207

| | | |
|---|---|---|
| 02:57:57 | 1 | Q. And there was remediation work at this site |
| 02:58:01 | 2 | also, wasn't there? |
| 02:58:01 | 3 | A. Yes. |
| 02:58:01 | 4 | Q. You did not design any part of the |
| 02:58:07 | 5 | remediation plan, did you? |
| 02:58:09 | 6 | A. Design of remediation is a collaborative |
| 02:58:13 | 7 | effort. It's not something that is done -- |
| 02:58:17 | 8 | it has a lot of inputs. Now, the actual |
| 02:58:23 | 9 | design is done -- I did not do, but when |
| 02:58:26 | 10 | the design is done, finished, it comes back |
| 02:58:29 | 11 | to me for review. |
| 02:58:30 | 12 | Q. So ECS designed the remediation plan, you |
| 02:58:34 | 13 | reviewed it? |
| 02:58:35 | 14 | A. Yes. |
| 02:58:36 | 15 | Q. And, in fact, that is the way the work is |
| 02:58:41 | 16 | divided up between yourself and the various |
| 02:58:44 | 17 | consultants that Cumberland Farms uses; am |
| 02:58:46 | 18 | I right? They design the remediation plans, |
| 02:58:49 | 19 | you review them? |
| 02:58:50 | 20 | A. Yes. |
| 02:58:50 | 21 | Q. You do not design the remediation plans |
| 02:58:52 | 22 | yourself? |
| 02:58:52 | 23 | A. No. |
| 02:58:54 | 24 | Q. And that's the way it's always been, isn't |

Page 208

| 02:58:56 | 1 | it? |
| 02:58:56 | 2 | A.  Yes. |
| 02:59:24 | 3 | MR. MOSS:  Can we take a five-minute |
| 02:59:26 | 4 | break? |
| 02:59:27 | 5 | MS. LIPEDE:  Yes. |
| | 6 | (Break taken) |
| 03:06:00 | 7 | BY MR. MOSS: |
| 03:09:17 | 8 | Q.  Please turn to Exhibit 6, and I want to |
| 03:09:33 | 9 | direct your attention to Bates stamp |
| 03:09:38 | 10 | documents 99 all the way through 150, and |
| 03:09:50 | 11 | I'll ask my question and give you a moment |
| 03:09:51 | 12 | to consider the documents, okay?  My question |
| 03:09:55 | 13 | is as to all of those pages, is there |
| 03:10:02 | 14 | anything in any of those pages that you |
| 03:10:05 | 15 | contend support your claims in this case? |
| 03:10:08 | 16 | A.  (Witness examines documents) Yes. |
| 03:10:16 | 17 | Q.  And what is that? |
| 03:10:21 | 18 | A.  This is an effort to show my value to the |
| 03:10:27 | 19 | company. |
| 03:10:28 | 20 | Q.  And is there anything more than that in |
| 03:10:31 | 21 | these documents that support your claims in |
| 03:10:33 | 22 | this case? |
| 03:10:36 | 23 | A.  It also shows the level of my expertise at |
| 03:10:43 | 24 | the time I joined the company in terms of |

Page 214

| | | |
|---|---|---|
| 03:18:17 | 1 | documents that Mr. Udemba -- |
| 03:18:19 | 2 | MS. LIPEDE:  All documents within |
| 03:18:20 | 3 | my possession have been turned over.  Now, |
| 03:18:24 | 4 | what Mr. Hrones turned over, I don't know, |
| 03:18:27 | 5 | but it's my understanding that he turned |
| 03:18:29 | 6 | over the whole file to me so I believe |
| 03:18:34 | 7 | everything was turned over to you. |
| 03:19:09 | 8 | Q.  Mr. Udemba, in Paragraph 27 of your complaint |
| 03:19:13 | 9 | which is Exhibit 1 in this case -- do you |
| 03:19:18 | 10 | want a moment to get that in front of you? |
| 03:19:19 | 11 | A.  Yes. |
| 03:19:20 | 12 | Q.  Go ahead. |
| 03:19:21 | 13 | MS. LIPEDE:  What paragraph? |
| 03:19:23 | 14 | MR. MOSS:  27. |
| 03:19:28 | 15 | (Pause) |
| 03:19:28 | 16 | A.  Yeah, I have it. |
| 03:19:30 | 17 | Q.  Paragraph 27. |
| 03:19:32 | 18 | A.  27.  Okay.  Yes. |
| 03:19:41 | 19 | Q.  In Paragraph 27 you assert that Lorraine |
| 03:19:43 | 20 | Higgins began issuing directives to you? |
| 03:19:46 | 21 | A.  Yes. |
| 03:19:47 | 22 | Q.  Such as what? |
| 03:19:57 | 23 | A.  Such as evaluating my -- |
| 03:20:03 | 24 | Q.  No, no, Mr. Udemba.  You make that a |

Page 215

| 03:20:06 | 1 | | separate allegation.  In Paragraph 27 you |
| 03:20:12 | 2 | | said, quote, "as time progressed, Ms. Higgins |
| 03:20:15 | 3 | | began issuing directives to Mr. Udemba and |
| 03:20:18 | 4 | | even completed a performance evaluation of |
| 03:20:20 | 5 | | Mr. Udemba."  I'm not asking you about the |
| 03:20:22 | 6 | | performance evaluation.  My question is |
| 03:20:24 | 7 | | what directives did Lorraine Higgins issue |
| 03:20:27 | 8 | | to you? |
| 03:20:28 | 9 | A. | I can't remember any one specific at this |
| 03:20:33 | 10 | | point. |
| 03:20:33 | 11 | Q. | You can't remember a single one? |
| 03:20:34 | 12 | A. | No. |
| 03:20:41 | 13 | Q. | Is it your contention that the directives |
| 03:20:45 | 14 | | that she issued to you are evidence of |
| 03:20:47 | 15 | | racial discrimination? |
| 03:20:52 | 16 | A. | I don't know. |
| 03:20:53 | 17 | Q. | You don't know? |
| 03:20:54 | 18 | A. | No. |
| 03:20:55 | 19 | Q. | Why did you put it in your complaint? |
| 03:21:04 | 20 | A. | It is to show how I'm being demeaned in the |
| 03:21:08 | 21 | | department. |
| 03:21:08 | 22 | Q. | How is it demeaning for Lorraine Higgins to |
| 03:21:12 | 23 | | issue directives to you? |
| 03:21:13 | 24 | A. | It is demeaning for her to do my evaluation |

Page 216

| | | |
|---|---|---|
| 03:21:16 | 1 | because she's not -- |
| 03:21:18 | 2 | Q.  I'm not asking about your evaluation. |
| 03:21:21 | 3 | You're making two allegations in Paragraph |
| 03:21:23 | 4 | 27, am I right? |
| 03:21:24 | 5 | A.  Yes. |
| 03:21:25 | 6 | Q.  One concerns your evaluation and one concerns |
| 03:21:27 | 7 | the directives that you say Lorraine Higgins |
| 03:21:31 | 8 | issued. |
| 03:21:32 | 9 | A.  If she issues directives as my boss, as my |
| 03:21:35 | 10 | supervisor when she's not, that's demeaning. |
| 03:21:38 | 11 | Q.  Well, where does it say that she issued |
| 03:21:41 | 12 | directives to you as your boss? |
| 03:21:44 | 13 | A.  Well, that's what is amplified indicating |
| 03:21:50 | 14 | that she signed my evaluation form. |
| 03:21:52 | 15 | Q.  I'm not asking you about your evaluation. |
| 03:21:57 | 16 | A.  That no way shows that, no. |
| 03:21:58 | 17 | Q.  So the fact that she issued directives to |
| 03:22:00 | 18 | you is not evidence of racial discrimination? |
| 03:22:03 | 19 | A.  I don't know. |
| 03:22:04 | 20 | Q.  Well, are you saying it is or are you saying |
| 03:22:07 | 21 | it's not? |
| 03:22:08 | 22 | A.  I'm saying I don't know. |
| 03:22:10 | 23 | Q.  You don't know if it is evidence of |
| 03:22:13 | 24 | discrimination against you? |

Page 217

| | | | |
|---|---|---|---|
| 03:22:15 | 1 | A. | Yes. |
| 03:22:43 | 2 | Q. | In Paragraph 29 of your complaint, you said |
| 03:22:50 | 3 | | that other white individuals were trained |
| 03:22:54 | 4 | | by you and then promoted to supervisory |
| 03:22:58 | 5 | | positions over you.  Who are you referring |
| 03:23:02 | 6 | | to? |
| 03:23:03 | 7 | A. | I'm referring to Kevin McCabe. |
| 03:23:13 | 8 | Q. | And you had already given testimony about |
| 03:23:17 | 9 | | Mr. McCabe and the question of whether he |
| 03:23:21 | 10 | | was your boss.  Do you have anything to |
| 03:23:22 | 11 | | add to that? |
| 03:23:23 | 12 | A. | No. |
| 03:23:25 | 13 | Q. | Who else besides Mr. McCabe? |
| 03:23:28 | 14 | A. | I will mention Angela Pimental. |
| 03:23:32 | 15 | Q. | Anybody else? |
| 03:23:35 | 16 | A. | I can't think of anyone. |
| 03:23:42 | 17 | Q. | When was Angela Pimental promoted to a |
| 03:23:47 | 18 | | supervisory position over you? |
| 03:23:49 | 19 | A. | I don't know that. |
| 03:23:54 | 20 | Q. | I'm sorry? |
| 03:23:54 | 21 | A. | I don't know.  I don't know that. |
| 03:23:56 | 22 | Q. | Was she promoted to a supervisory position |
| 03:23:59 | 23 | | over you? |
| 03:24:00 | 24 | A. | I don't know. |

Page 220

| 03:26:34 | 1 | has been with the company, one time Angela |
| 03:26:37 | 2 | brought that to my office and instructed |
| 03:26:40 | 3 | me to sit down with Jason and talk with |
| 03:26:44 | 4 | Jason. |
| 03:26:45 | 5 | Q. What exactly did she say on that occasion? |
| 03:26:48 | 6 | A. What I just said now is a paraphrase of |
| 03:26:50 | 7 | what she said. |
| 03:26:51 | 8 | Q. Can you remember exactly what she said? |
| 03:26:53 | 9 | A. I cannot. |
| 03:26:56 | 10 | Q. You said she instructed you. What words |
| 03:26:59 | 11 | did she use? |
| 03:27:00 | 12 | A. I'm just paraphrase what she said. She |
| 03:27:03 | 13 | came into my office and instructed me to |
| 03:27:06 | 14 | sit down and talk with Jason. |
| 03:27:09 | 15 | Q. Did she order you to sit down and work with |
| 03:27:18 | 16 | Jason? |
| 03:27:18 | 17 | A. She instructed me, was the word that I used. |
| 03:27:18 | 18 | Q. Did she say "I'm your boss"? |
| 03:27:27 | 19 | A. No. |
| 03:27:27 | 20 | Q. Did she ever say "I'm your boss"? |
| 03:27:27 | 21 | A. No. |
| 03:27:27 | 22 | Q. Did she ever say "I've been promoted over |
| 03:27:27 | 23 | you"? |
| 03:27:27 | 24 | A. No. |

Page 221

| | | |
|---|---|---|
| 03:27:27 | 1 | Q. Did anybody ever say to you that Angela has |
| 03:27:29 | 2 | been promoted over you? |
| 03:27:30 | 3 | A. No. |
| 03:27:31 | 4 | Q. Did anybody ever say to you that Angela is |
| 03:27:33 | 5 | your boss? |
| 03:27:34 | 6 | A. No. |
| 03:27:38 | 7 | Q. Is there anything else that you're relying |
| 03:27:40 | 8 | on for your claim in this case that Angela |
| 03:27:45 | 9 | Pimental was promoted to a supervisory |
| 03:27:47 | 10 | position over you other than that one |
| 03:27:49 | 11 | incident that you just described? |
| 03:27:50 | 12 | A. This is the only one I can recall at this |
| 03:27:53 | 13 | point. |
| 03:27:57 | 14 | Q. Is there anybody besides Angela Pimental |
| 03:27:59 | 15 | and Kevin McCabe that you are referring to |
| 03:28:02 | 16 | in Paragraph 29 of the complaint? |
| 03:28:05 | 17 | A. Those are the only two individuals I can |
| 03:28:07 | 18 | recall right now. |
| 03:28:21 | 19 | Q. In Paragraph 31 of your complaint, you said |
| 03:28:29 | 20 | that Mr. McCabe became your superior issuing |
| 03:28:34 | 21 | directives.  Directives to you? |
| 03:28:35 | 22 | A. Yes. |
| 03:28:36 | 23 | Q. What directive did he issue to you? |
| 03:28:40 | 24 | A. Like I told you before, she would come into |

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

## ORIGINAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OLIVER UDEMBA,

              Plaintiff

        vs.           No. 05-11161-RGS

CUMBERLAND FARMS, INC.

and EMILE C. TAYEH,

              Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME: III

PAGES: 3-1 - 3-155

CONTINUED DEPOSITION of OLIVER UDEMBA, a witness called on behalf of the Defendants, pursuant to the Federal Rules of Civil Procedure, before Judith McGovern Williams, Certified Shorthand Reporter No. 130993, Registered Professional Reporter, Certified Realtime Reporter, Certified LiveNote Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Seyfarth, Shaw, Two Seaport Lane, Boston, Massachusetts 02110, on Friday, March 17, 2006, commencing at 9:16 a.m.

Page 28

1        McCabe earned more money than you did.

2   A.   I am saying that.

3   Q.   Was it 1991, 1992, 1993?  Give me a date.

4   A.   No.  I just want -- I just want to

5        explain.  When I came into Cumberland

6        Farms, I was paid $23,000.  Okay?

7             When McCabe came in, he was not

8        paid $23,000.  That's what I'm saying.

9             In addition, he also received a

10       higher rate of pay increases as time goes

11       on.  That's exactly what I'm saying.

12  Q.   Okay.

13  A.   I am not saying --

14  Q.   Was there ever a time when you and Kevin

15       McCabe were both working in the

16       environmental affairs department at

17       Cumberland Farms that you claim he was

18       paid more money than you?

19  A.   No.  He is paid --

20  Q.   Yes or no.

21  A.   No.

22  Q.   Okay.  So at no time -- as far as you

23       know, at no time was Kevin McCabe paid

24       more money than you; correct?

Page 29

1    A.    That's not what I am saying.

2    Q.    You are not making that claim?

3    A.    No.

4    Q.    Okay.  As I understand it from the

5          testimony you have just given, you are

6          making two claims with regard to Kevin

7          McCabe's pay, and the first of those is

8          that his starting salary when he was hired

9          at Cumberland Farms was higher than the

10         salary that you were hired at?  Is that

11         your claim?

12   A.    I am saying --

13                    MS. LIPEDE:  Is that?

14   Q.    Yes or no.

15   A.    Yes.

16   Q.    That's your claim?

17   A.    Yes.

18   Q.    And the second claim you're making is that

19         one or more of the salary increases he

20         received at Cumberland Farms was higher

21         than one or more of the salary increases

22         you received at Cumberland Farms; is that

23         correct?

24   A.    Yes.

Page 30

1    Q.    Okay.  Are you making any other claims

2          with regard to Kevin McCabe's

3          compensation?

4    A.    Well --

5    Q.    Yes or no.

6    A.    Yes.

7    Q.    What other claims are you making with

8          regard to Kevin McCabe's compensation?

9    A.    That he is treated more fairly than me.

10   Q.    That has nothing to do with compensation,

11         sir.

12   A.    Okay.

13   Q.    I am asking you about pay.

14   A.    None -- not that I know of, no.

15   Q.    Okay.  Now what evidence do you have that

16         Cumberland Farms paid Kevin McCabe a

17         higher starting salary than it paid you

18         when you were hired because of his race or

19         your race?

20               MS. LIPEDE:  I am sorry.  What

21         was the question?

22   Q.    You are claiming that Kevin McCabe was

23         paid a higher starting salary when he

24         started work at Cumberland Farms than you

Page 33

1    furnished with any other equipment or

2    benefit that you were not furnished with?

3  A.  Kevin McCabe doesn't -- doesn't need a

4      company car.

5  Q.  Just yes or no.

6  A.  No, no.

7  Q.  So when you say that Kevin McCabe was

8      treated more favorably than you, is there

9      anything else that you are relying upon

10     other than what you have just said, that

11     he was not demeaned and you were demeaned?

12  A.  No.

13  Q.  Okay.  Thank you.

14          Now you say in paragraph 31 of

15     your Complaint that Kevin McCabe performed

16     less than 10 percent of the duties that

17     you performed.  What do you base that on?

18  A.  I base that on the volume of work that I

19     do and what he does.

20  Q.  How do you know what he does --

21  A.  I don't --

22  Q.  -- or what he did?

23  A.  Well, I have an idea.

24  Q.  Based upon what?

Page 34

1   A.   Based upon observation of what, you know,
2        what he does.
3   Q.   You were not his supervisor?
4   A.   No.
5   Q.   You did not assign him work?
6   A.   No.
7   Q.   And your supervisor was Emile Tayeh?
8   A.   Yes.
9   Q.   Mr. Tayeh was also Kevin McCabe's
10       supervisor?
11  A.   Yes.
12  Q.   Did Emile Tayeh routinely show you what
13       assignments he was giving everybody else
14       in the department?
15  A.   No.
16  Q.   So when you say that you base this claim
17       that McCabe performed less than 10 percent
18       of the duties you performed, you based it
19       upon your observation.  How often did you
20       observe him?
21  A.   As often as I was -- as often as possible.
22  Q.   Did he work in the same physical space
23       that you did?
24  A.   Yes -- well, not in the same, but he

Page 35

1          worked, you know, adjacent to my, you

2          know, to my space.

3    Q.    Did you have a separate office?

4    A.    Yes.

5    Q.    Did your office have walls?

6    A.    Yes.

7    Q.    Floor to ceiling walls?

8    A.    Yes.

9    Q.    It is not a cubicle?  It is a regular

10          enclosed office?

11    A.    Yes.  His office, you know, his space is

12          adjacent to mine.

13    Q.    His office was next to yours?

14    A.    Yes.

15    Q.    Did his office have a door?

16    A.    Yes.

17    Q.    Did your office have a door?

18    A.    Yes.

19    Q.    Does your office have a telephone?

20    A.    Yes.

21    Q.    Did his office have a telephone?

22    A.    Yes.

23    Q.    Did you share his office?

24    A.    No.

Page 36

1    Q.    Did he share your office?

2    A.    No.

3    Q.    Did you share his telephone?

4    A.    No.

5    Q.    Did he share your telephone?

6    A.    No.

7    Q.    Did anybody share your telephone?

8    A.    I don't know.

9    Q.    Not as far as you know?

10   A.    Not as far as I know.

11   Q.    Now when you say you observed Kevin

12         McCabe, observed him where?

13   A.    I observed him in the office.

14   Q.    In which office?

15   A.    In -- in the office environment.  In the

16         environment of the office.

17   Q.    Which part of the office environment?

18   A.    In the office environment in the -- in the

19         environment of the department.

20   Q.    The common area?

21   A.    The common area, yes.

22   Q.    Okay.  What percentage of your day did you

23         spend in the common area of the office as

24         opposed to in your office or outside of

Page 37

1           the office?

2    A.    Not much.

3    Q.    Not much.  An hour?

4    A.    Not much.

5    Q.    Less than an hour?

6    A.    Not much, I said.

7    Q.    You can't quantify it?

8    A.    No.

9    Q.    Okay.  So every time that you were in the

10          common area of the office was McCabe also

11          in the common area?

12   A.    Not necessarily.

13   Q.    So if you were -- if you didn't spend much

14          time in the common area, is it fair to say

15          that the amount of time that both of you,

16          you and McCabe, spent in the common area

17          was even less?

18   A.    Could you repeat the question again?

19   Q.    Yes.  You said that the amount of time

20          that you spent in the common area of the

21          office was not much; correct?

22   A.    Yes.

23   Q.    And you also said that McCabe was not in

24          the common area every time that you were;

Page 38

1      correct?

2  A.  That's possible.  It is fair to say that.

3      Yes.

4  Q.  I believe the testimony you gave a minute

5      ago ran like this:  "So every time that

6      you were in the common area of the office

7      was McCabe also in the common area?"

8              And your answer was:  "Not

9      necessarily."

10 A.  Yes.

11 Q.  Okay.  So when you were in the common

12     area, were you preparing reports out

13     there?

14 A.  Not necessarily.

15 Q.  Yes or no.

16 A.  No.  I could be signing something.  I

17     could have a document and, you know, I

18     could be signing something or I could be,

19     you know, reviewing something.

20 Q.  And what was McCabe doing in the common

21     area?

22 A.  I can't tell you what he was doing.  I

23     don't know.

24 Q.  You can't tell me what he was doing at any

Page 39

```
1          part of his day, can you?

2                    MS. LIPEDE:  Objection.

3     A.   Yes.  I could tell you that.  I could tell

4          you what -- what he is doing in some parts

5          of his day.

6     Q.   Okay.  Go ahead.  Tell me what he did.

7     A.   He was complying -- part of what he did

8          was compile an inventory -- equipment --

9          inventory -- equipment inventory.

10    Q.   Is that it?

11    A.   That is part of what he did.

12    Q.   That's all he did?

13    A.   No.  That is part of what he did.

14    Q.   How do you --

15    A.   That is the major thing he did.

16    Q.   That is the major thing he did was compile

17         an equipment inventory?

18    A.   Right.

19    Q.   How many years did he work there?

20    A.   I think it is in the record.  I don't

21         remember.  I can't, you know, I don't know

22         how many -- I can't tell you with

23         specificity how many years he worked

24         there.  It is in the record.
```

Page 40

1   Q.   What else did McCabe do when he worked at

2        Cumberland Farms besides compile an

3        equipment inventory?

4   A.   That is the major thing he did.

5   Q.   What else did he do?  You said it is the

6        major thing.  Is that the only thing he

7        did?

8   A.   No, I didn't say that is the only thing.

9        That is the major thing.  That is the

10       major thing that he did.

11  Q.   What else did he do?

12  A.   I just told you the major thing he did.

13  Q.   Can you tell me anything else that he did?

14       Yes or no.

15  A.   I just told you the major part of his

16       work.

17  Q.   Mr. Udemba, please answer my question.

18       Can you tell me anything else that McCabe

19       did when he worked at Cumberland Farms?

20       Either you can or you can't.  It is a yes

21       or no question.

22  A.   No.

23  Q.   How much time did McCabe spend compiling

24       an equipment inventory?  10 percent of his

Page 41

1      time?  50 percent of his time?

2  A.  That was the major part of his work.

3  Q.  Please answer my question, Mr. Udemba.

4  A.  I don't know whether it is 10 percent

5      or -- you know, that's --

6  Q.  Well, you don't know how much time he

7      spent doing any of his duties, do you?

8  A.  I answered the question that that was the

9      major part of.

10                  MS. LIPEDE:  Oliver, --

11  A.  No, I don't know.

12  Q.  Mr. Udemba, I would like you to turn to

13      paragraph 37 of your Complaint, which is

14      exhibit one.

15  A.  Exhibit one?

16                  (Witness complying.)

17  Q.  Do you have that in front of you, sir?

18  A.  Yes.

19  Q.  In paragraph 37, you say, "When Mr. McCabe

20      left CFI in 1997, Mr. Udemba expected that

21      he would be promoted to supervising

22      project manager."

23                  Do you see where that appears --

24  A.  Yes.

Page 50

1       better than you in terms of compensation?

2   A.  Well, according to the -- the employee

3       profile sheet, Angela Pimental got --

4       within a short period of time got promoted

5       into three positions, and at one time had

6       a 50 percent rate increase.

7   Q.  So are you claiming that she was paid more

8       money than you?

9   A.  That's not what I'm saying.  I said she

10      got promoted more rapidly, meaning have

11      not -- have not -- have not been promoted,

12      even with little or -- you know, with no

13      -- with less qualification and got a

14      higher rate, you know, a higher rate of

15      pay increase.

16  Q.  So I want to understand your claim in this

17      lawsuit, Mr. Udemba.  It sounds like

18      you're saying that the company promoted

19      Angela Pimental and increased her pay in

20      order to demean you.

21  A.  No.

22              MS. LIPEDE:  Objection.

23  Q.  Is that your claim?

24  A.  I am saying --

Page 53

1      was because of your race or her race?

2   A. It is obvious. Because -- because if --

3      if you were to reverse the role, I come

4      into Cumberland Farms with a high school

5      education, and then a white person with an

6      engineering degree have spent, with that

7      level of experience, and is an LSP, has

8      attained the highest level of -- the

9      highest level of professional status, if I

10     was -- if I was a black person with a high

11     school education with this white person, I

12     don't see how I -- I don't see how all of

13     a sudden within a few years or within a

14     year I would attain the same status as

15     that person. It just -- it just -- it is

16     just common sense. It just -- it just --

17     it just wouldn't happen.

18  Q. Is there anything else that you can offer

19     in support of your claim with respect to

20     Angela Pimental other than what you have

21     just told me?

22  A. Well, I don't have any -- any other thing

23     more compelling than this.

24  Q. Well, I am not asking you to rank it.

1    she, you know, I was -- she called me --

2    she told me that she needed me in the

3    conference room.

4          So, you know, I went in there,

5    and as they were talking, then I -- I

6    asked a question. I asked a question. I

7    was trying to say -- I said -- I said, "I

8    don't understand. What is going on? I

9    mean is there any" -- what, you know, I

10   was trying to understand what the problem

11   was.

12         And, you know, she shouted me

13   down. She told me to, you know, to stop.

14   That Angela was talking. That Angela

15   should talk first. And she shouted me

16   down.

17         MR. MOSS:  Off the record for a

18   minute.

19         (Discussion off the record.)

20         MR. MOSS:  Back on the record.

21   BY MR. MOSS:

22   Q.  So you have identified two incidents in

23   which you said that Muriel Tyler rudely

24   ordered you around. Was there a third

Page 68

1       incident?

2   A.  There might have been, but these are the

3       ones that I recall right now.

4   Q.  You can't remember any other occasion that

5       she rudely ordered you around?

6   A.  I don't recall any right now, any other.

7   Q.  Is it your contention that on each of

8       these two occasions that you have

9       described that Muriel acted that way

10      because you're black?

11  A.  I don't know why she acted that way.

12  Q.  Now in paragraph 43 of your Complaint, you

13      say, "When Mr. Udemba related these events

14      to Mr. Tayeh, he stated, quote, if you do

15      not like the way you were treated, you

16      should quit, close quote."

17  A.  Yes.

18  Q.  Do you mean -- by those quotes, do you

19      mean to say that those were his exact

20      words?

21  A.  That's what I recall that he said -- that

22      he said, yes.

23  Q.  So you don't know if those were his exact

24      words?

Page 81

```
 1    Q.   Do you have any knowledge that Kevin

 2         McCabe was assisting Emile Tayeh with the

 3         operation of the department?

 4    A.   I don't have -- I don't have any specific

 5         knowledge.

 6    Q.   In paragraph 58 of your Complaint, sir,

 7         you say, "Mr. Udemba has requested the use

 8         of a company car, a cellular phone."

 9                   Is it your contention that the

10         refusal to give you a cellular phone is

11         evidence of discrimination on account of

12         race?

13    A.   I believe that --

14    Q.   Yes or no.

15    A.   I believe that the refusal to provide me

16         with necessary tools for my work is

17         discriminatory and has something to do

18         with my race.

19    Q.   Well, Mr. Udemba, I am going to ask the

20         question again.  Are you claiming that the

21         refusal to give you a cell phone is

22         evidence of race discrimination?  Yes or

23         no.

24    A.   Not necessarily really, but I am saying
```

Page 82

```
 1        put it in the context of every other
 2        thing.  It has -- it -- you know, it's
 3        racial discrimination.  The cell phone
 4        per se, not necessarily.
 5   Q.   Are you claiming that other people were
 6        given cell phones and you weren't?
 7   A.   I'm saying --
 8   Q.   Yes or no, Mr. Udemba.
 9   A.   I don't know.  I don't know what other
10        people were given.
11   Q.   Isn't there a cell phone that anybody in
12        the environmental affairs department can
13        take with them when they leave the office?
14   A.   Not that I know of.
15   Q.   Okay.  Okay.  Now you say that you were
16        denied Internet access at the office?
17   A.   Yes.
18   Q.   Do you have Internet access now?
19   A.   Yes.
20   Q.   And how long have you had Internet access
21        at the office?
22   A.   It was provided to me since I filed this
23        Complaint.
24   Q.   Only after you filed the Complaint?
```

Page 83

```
 1   A.   Yes.

 2   Q.   Okay.  And who else had Internet access at

 3        the office prior to your filing the

 4        Complaint?

 5   A.   Emile had one.

 6   Q.   Yes.

 7   A.   Lorraine had one.

 8   Q.   Anybody else?

 9   A.   And a few other people.

10   Q.   Who?

11   A.   Those are the only names that I can

12        remember now.

13   Q.   How do you know that they had Internet

14        access?  I don't mean Emile or Lorraine.

15        I mean other people.  How do you know that

16        they had Internet access at the office?

17   A.   Because they had access to the Internet.

18   Q.   How do you know?

19   A.   I could hear that they have.  I could hear

20        from.  I could hear things.

21   Q.   Okay.  And is it your contention that

22        other people were given Internet access at

23        the office because they were white and you

24        weren't because of your race?
```

Page 84

1   A.   I believe that has something to do with

2        it.

3   Q.   Based upon what?

4   A.   Based upon the way I have been treated

5        generally; based on the fact that I have

6        not been promoted, for instance.

7   Q.   Oh, okay.  We talked about your mileage.

8        Is it -- do I understand your prior

9        testimony to be that you did not always

10       report your business mileage on company

11       reimbursement forms?

12  A.   Yes.

13  Q.   Well, would you say that the amount of

14       driving you did on company business that

15       was unreported was greater or less than

16       the mileage you did report?

17  A.   I don't know.

18  Q.   You don't know?

19  A.   No.

20  Q.   Okay.  Okay.  In paragraph 60 of your

21       Complaint, you say, "On numerous occasions

22       Mr. Udemba approached Mr. Tayeh about

23       CFI's discriminatory practices and its

24       failure to adequately compensate him for

Page 92

1            don't know if he did or not.

2    Q.    So you don't know if he did it or not?

3    A.    No.

4    Q.    Okay.  In paragraph 63 of your Complaint,

5          you say that you requested a contract.

6          This was in what year?

7    A.    2003.

8    Q.    Well, tell me exactly what was said in

9          that conversation.

10   A.    What is that he threw this idea of -- he

11         has done it before.

12   Q.    Can you tell me what you said and he said

13         in that conversation?

14   A.    That I would become -- that I would make

15         more money if I would become an

16         independent consultant LSP for the

17         company.

18   Q.    Did he say anything else?

19   A.    No.  That was the main focus.

20   Q.    Did you say anything?

21   A.    Yes.  I said, "That sounds like a good

22         idea."

23   Q.    Did either one of you say anything else,

24         or was that the sum total of the

Page 93

```
 1        conversation?

 2   A.   No, no.  I said, "It is a good idea, but

 3        I, you know, I will need a contract for

 4        that, to do that."

 5   Q.   So what were you talking about?  Quitting

 6        your job and becoming an outside

 7        consultant to Cumberland Farms?

 8   A.   He suggested that I could become -- you

 9        know, he suggested as an alternative to

10        this, to, you know, to the company

11        regularizing my pay for additional

12        responsibilities, he suggested to me that

13        I could also become -- yes -- I could also

14        leave the company and become an

15        independent consultant LSP and then work

16        for the company as an independent

17        consultant LSP.

18   Q.   Are you claiming that Emile's failure to

19        give you a contract as an outside

20        consultant to Cumberland Farms was due to

21        your race?

22   A.   I believe so.

23   Q.   Based upon what?

24   A.   Because he has not promoted me, and then
```

Page 99

```
 1          been carrying on since 1997, and he didn't
 2          do -- it wasn't done, and then in 2003
 3          instead of that he figured out a way to
 4          constructively get me out of the company
 5          by telling me that, you know, you could
 6          become an independent LSP working for the
 7          company, making $275,000 and --
 8     Q.   And is there anything else that happened
 9          in 2003 that you contend was an act of
10          discrimination?
11     A.   And when I asked for a contract, he
12          wouldn't give it to me, whereas other
13          white -- other white LSPs engaged -- other
14          -- other white LSPs engaged by the company
15          are given contracts.
16     Q.   Wait a minute, Mr. Udemba.  Was there
17          anybody else who was working for
18          Cumberland Farms that was given a contract
19          to work for the company as an LSP?
20     A.   All the -- all the --
21     Q.   No, no.  Anybody -- any other employee.
22          I'm not talking about outside consultants.
23          Was there another employee like you?
24     A.   We don't have any other employee LSP in
```

Page 100

1    Cumberland Farms.  I am the only in-house

2    LSP.

3    Q.   Well, was there any other employee of the

4         environmental affairs department who was

5         given a contract to work for the company

6         by Emile Tayeh?

7    A.   I don't know.

8    Q.   So when you say other people who were

9         white were given contracts, you are

10        talking about people who never were

11        employees of Cumberland Farms?  They

12        were --

13   A.   I don't know.

14   Q.   You don't know?

15   A.   I said I don't know.  You asked me.  I

16        said I don't know.

17   Q.   Okay.  Is there anything else that

18        happened to you in 2003 that you claim was

19        an act of discrimination by the company?

20   A.   I continued not to be promoted.

21   Q.   Yes.  You have already covered that.

22   A.   Okay.

23   Q.   Anything else?

24   A.   I didn't get the company car that I needed

Page 109

1          supervise another Licensed Site

2          Professional.  Do you remember that

3          testimony?

4    A.    With respect to Licensed Site Professional

5          work.

6    Q.    Right.  So prior to 1997, it is your

7          testimony that you had oversight over

8          outside consultants who were Licensed Site

9          Professionals.  Are you now telling me

10         that you had oversight over everything

11         they did except their work as Licensed

12         Site Professionals?

13   A.    No.

14   Q.    That is a yes or no question.

15   A.    No.  It -- no.  I -- I just want to make

16         sure that I understand your question.  Let

17         me explain what I am saying so that I make

18         sure we are on the same wavelength.  A

19         Licensed Site Professional can also

20         perform other duties other than Licensed

21         Site Professional.

22   Q.    Stop right there, Mr. Udemba.

23                   Prior to 1997, did the LSPs who

24         worked for the consultants that you

Page 110

```
 1          managed perform services for Cumberland

 2          Farms as LSPs?

 3    A.    Yes.

 4    Q.    Did you supervise them in the performance

 5          of those duties?

 6    A.    Yes.

 7    Q.    Even though you yourself were not a

 8          Licensed Site Professional at the time?

 9    A.    No.  I supervised their other duties.

10    Q.    Then you didn't understand my question.

11    A.    Exactly.  That is why I wanted to explain

12          it, so that --

13    Q.    Well, listen carefully, and I will do it

14          again.

15    A.    Okay.

16    Q.    Prior to 1997, did the LSPs employed by

17          the outside consultants that you managed

18          perform services for Cumberland Farms as

19          LSPs?

20    A.    Yes.

21    Q.    Did you supervise them in the performance

22          of those services?  Yes or no.

23    A.    Mr. Moss --

24    Q.    Yes or no.
```

1    A.    That's --

2    Q.    Yes or no.

3    A.    Yes.

4    Q.    Even though you were not an LSP?

5    A.    There is something called supervisory LSP.

6          Okay?  If they're -- when they were --

7          when I was supervising them, when I'm not

8          an LSP, if they -- if there is a

9          violation, LSP-related violation, I would

10         not be liable for that.

11                   Now that I'm an LSP and

12         supervising their project management

13         functions as well as their LSP duties, any

14         aspect of it that is an LSP duty that I

15         supervise, I am also liable.  The law

16         provides that I am liable.  If there is

17         any violation arising out of that that

18         they perform, the law provides that as a

19         supervising LSP I am also liable to that.

20         That is what is the law.  It is inherent

21         in the LSP law.

22   Q.    Mr. Udemba, that is all very interesting,

23         but it is not --

24   A.    That is a fact.